# Exhibit 1

1  IRELL & MANELLA LLP
2  Iian D. Jablon (Bar No. 205458)
   ijablon@irell.com
3  Harry A. Mittleman (Bar No. 172343)
   hmittleman@irell.com
4  Jonathan B. Waxman (Bar No. 294851)
5  jwaxman@irell.com
6  1800 Avenue of the Stars, Suite 900
   Los Angeles, California 90067-4276
7  Telephone:   (310) 277-1010
8  Facsimile:   (310) 203-7199

9  Attorneys for Plaintiff
   Faraday&Future, Inc.
10

11            JUDICIAL ARBITRATION AND MEDIATION SERVICES

12

| | |
|---|---|
| 13  FARADAY&FUTURE, INC. | ) JAMS Reference No. 1210035060 |
| 14        Claimant, | )<br>)    FIRST AMENDED DEMAND FOR |
| 15     vs. | )    ARBITRATION AND STATEMENT<br>)    OF CLAIM FOR: |
| 16  STEFAN KRAUSE, ULRICH | )<br>) 1. BREACH OF CONTRACT; |
| 17  KRANZ, RICHARD KIM, SOHEL | ) 2. BREACH OF THE IMPLIED |
| 18  MERCHANT, IRVING (BILL) | )    COVENANT OF GOOD FAITH<br>)    AND FAIR DEALING; |
| 19  STRICKLAND, CHRISTOPH<br>KUTTNER, and DOES 5-10; | ) 3. BREACH OF FIDUCIARY DUTY; |
| 20 | ) 4. CIVIL CONSPIRACY TO COMMIT<br>)    BREACH OF FIDUCIARY DUTY; |
| 21        Respondents. | ) 5. MISAPPROPRIATION OF TRADE |
| 22 | )    SECRETS IN VIOLATION OF<br>)    DEFEND TRADE SECRETS ACT; |
| 23 | ) 6. CIVIL CONSPIRACY TO COMMIT |
| 24 | )    MISAPPROPRIATION OF TRADE<br>)    SECRETS IN VIOLATION OF |
| 25 | )    DEFEND TRADE SECRETS ACT; |
| 26 | ) 7. UNFAIR BUSINESS PRACTICES<br>)    (Cal. Bus. & Prof. Code § 17200, *et* |
| 27 | )    *seq.*). |

28

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

FIRST AMENDED DEMAND FOR ARBITRATION AND STATEMENT OF CLAIM

1  Plaintiff Faraday&Future, Inc. ("FF") by and through its attorneys, hereby

2  alleges as follows:

## I.   **INTRODUCTION**

4  1.      This arbitration arises out of Respondents' brazen disregard for their

5  contractual and legal obligations to FF.  Founded in May 2014, FF has invested tens

6  of thousands of work hours and over $1 billion dollars in developing the next

7  generation of AI electric vehicles, also known as smart mobility ecosystems.  These

8  cutting-edge vehicles will target many different segments of the consumer vehicle

9  market.  Ultimately, FF's mission is to create forward-thinking vehicles that

10  integrate clean energy, artificial intelligence, and the internet.  To that end, FF has

11  built from scratch an impressive enterprise staffed with well over 800 employees

12  from the most respected companies in the internet, technology, automotive,

13  aerospace, and energy industries, and FF is presently on track to release its first

14  production vehicle – the high-tech "FF-91" – by the beginning of 2019.

15  2.      Since 2014, FF has focused its efforts and resources on creating a truly

16  unique AI electric vehicle experience that could be compared to spending time in a

17  very high-tech residence.  In this regard, the primary similarity between FF's AI

18  electric vehicles and those offered by current consumer vehicle manufacturers is that

19  both are capable of getting a driver and passengers from point A to point B.  Beyond

20  that, however, FF is creating a user experience that has never before been offered in

21  a commercially-available vehicle – one in which a very fast, quiet, and

22  environmentally-clean vehicle will drive and park itself, creating an electronic

23  chauffeur-driven experience that frees the "driver" and passengers to focus on things

24  besides the act of driving, and to enjoy in-car amenities that have no close

25  counterpart in current consumer vehicles.

26  3.      Simply put, FF is not just a car manufacturer, but also a cutting-edge

27  technology company that is developing new products that are different than

28

anything the world has ever seen.  The host of trade secrets that FF has developed since 2014 would be highly valuable to any competitor in the electric vehicle space, especially since the market for AI electric vehicles is brand new and evolving quickly.  Obtaining some or all of FF's technologies would allow a competitor to unfairly capitalize on FF's tremendous amount of capital investment, allowing the competitor to bypass the expenditure of literally years of development time and over $1 billion dollars in research and development costs that FF has put into its venture.  Just by way of example, FF has developed valuable trade secrets in proprietary variable platform architecture ("VPA"), battery technology, power-train, safety features, autonomous driving, internet of vehicles technology, and proprietary software and source code.  FF also has valuable trade secrets in its financial and business information including, but not limited to, confidential information regarding FF's costs, materials, vendors, and business plans.  All of this information has taken FF substantial time and money to develop, and has been the subject of FF's reasonable and diligent efforts to maintain secrecy.  Obtaining all or any of this information would be extremely valuable to competitors.

4.     FF's business has already achieved substantial milestones.  In January 2017 at the Consumer Electronics Show in Las Vegas, FF debuted a prototype of its initial vehicle, the FF-91, which is designed to compete with the top electric cars on the market today, boasting 1050 horsepower and a zero to 60 mile per hour time of 2.39 seconds.  These stats would make the FF-91 the fastest commercially available sports utility vehicle in the world.  Since that debut in January 2017, FF has made significant progress on the FF-91, and the updated FF-91 is now on track to be commercially available to the public by the end of the year.  In fact, a January 9, 2018 report on the FF-91 by Roadshow relays that the FF-91 will be "one of the coolest looking cars out on the road," and after a test-drive, Roadshow remarked, "acceleration is absolutely remarkable, especially in a car of this size."

1      5.    Moreover, while the FF-91 is FF's current high-end "flagship" vehicle,

2 the proprietary technology and know-how that FF has developed to design, build

3 and market the FF-91 will also be applied to other forthcoming FF vehicles,

4 including future models that are primarily intended for mass-market users.  FF has

5 expended substantial resources in developing those other vehicles as well, most of

6 which are still two or more years away from being available to consumers.

7      6.    In or about March, 2017, FF hired Respondent Stefan Krause

8 ("Krause") to serve as FF's Chief Financial Officer ("CFO").  Krause, who is a

9 citizen of Germany, had previously served as CFO at BMW Group and as the CFO

10 of Deutsche Bank, and was primarily retained by FF to assist the company with

11 fundraising efforts.  As one of FF's most senior executives, FF reposed immense

12 trust and confidence in Krause, providing him with broad exposure to the

13 company's most sensitive intellectual property, strategic planning, and other

14 proprietary and confidential information.  In exchange, Krause agreed in a written

15 contract that during and after his employment with FF, he would protect FF's

16 confidential information and trade secrets, and that for a period of one-year after his

17 employment ended he would not solicit any FF employees to join him at any

18 subsequent venture.

19      7.    Soon after hiring Krause, and upon Krause's recommendation, in or

20 about late June, 2017, FF hired Ulrich Kranz ("Kranz") to serve as its Chief

21 Technology Officer ("CTO").  Mr. Kranz is also a German national who had

22 previously served as an executive at BMW, and who was a long-term acquaintance

23 of Krause.  Just as with Krause, as one of FF's most senior executives, FF reposed

24 immense trust and confidence in Kranz, providing him with broad exposure to the

25 company's most sensitive intellectual property, strategic planning, and other

26 proprietary and confidential information.  And, like Krause and all of the other

27 Respondents, Kranz agreed that during and after his employment with FF, he would

28

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

FIRST AMENDED DEMAND FOR ARBITRATION AND STATEMENT OF CLAIM

1   protect FF's confidential information and trade secrets, and not solicit FF employees

2   for at least a year after his departure.

3          8.     In the fall of 2017, CFO Krause and CTO Kranz demanded that FF's

4   acting CEO Jia Yueting ("YT") step down and hand over operational control of the

5   company to them.  To this end, Krause and Kranz told numerous FF personnel that

6   the company would soon run out of money and that no additional financing would

7   be possible unless YT agreed to step aside.  These statements proved to be untrue, as

8   FF did secure additional financing in the fall without YT stepping down.  However,

9   even while they continued to negotiate with FF management, Krause and Kranz,

10  along with the other Respondents, began covertly soliciting a large number of FF

11  employees, including several key executives and technical personnel, to leave with

12  them and work at non-party Evelozcity, Inc. ("Evelozcity"), a new competing

13  venture that Respondents founded, control, and operate.  Evelozcity was

14  incorporated in early November 2017 and is located only a few miles from FF.

15         9.     Beginning around early November 2017, Respondents and their agents

16  have surreptitiously solicited at least 20 or more FF employees (many of whom

17  were relatively senior) to leave FF and join Evelozcity.  In addition, on information

18  and belief, several of the Respondents, and also several of the FF employees whom

19  Respondents and their accomplices have improperly solicited, copied and took

20  highly valuable and proprietary FF trade secrets shortly before their respective

21  departures.  Some of those departing FF employees also falsely denied to FF

22  personnel that they intended to join Evelozcity.

23         10.    In particular, FF is informed and believes that several of the

24  Respondents, and also several other departing FF employees who were improperly

25  solicited by Respondents, have copied and taken FF's trade secret information, and

26  disclosed and used that information for the benefit of Respondents and their new

27  venture.  Indeed, it appears that Respondents' agreed upon and intended business

28

1  plan for Evelozcity is to hire as many senior FF personnel as possible, have them
2  copy and take FF's proprietary information that has been developed at great trouble
3  and expense on their way out the door, and then use those trade secrets to unfairly
4  compete with FF.

5      11.    In light of Respondents' ongoing breaches of their employment
6  agreements and legal duties owed to FF, FF brings this arbitration demand to
7  prevent any further improper solicitation of FF employees, to prevent the
8  misappropriation of FF's trade secrets, to obtain the return of all FF confidential
9  information taken by Respondents and those working with them, and to obtain
10  compensation for FF's damages and for Respondents' unjust enrichment resulting
11  from their unlawful and improper conduct.  FF notes that it has also filed a separate
12  federal lawsuit against Evelozcity under the Defend Trade Secrets Act to address
13  Evelozcity's misappropriation of FF's trade secrets.

14                    **II.    PARTIES**

15      12.    Claimant Faraday&Future, Inc. is a California company with its
16  principal place of business located in Gardena, California.  FF is a global mobility
17  company that develops smart, connected, electric vehicles, and other related
18  technology components.

19      13.    Respondent Stefan Krause is an individual who, upon information and
20  belief, is a citizen of Germany but presently resides in West Hollywood, California.

21      14.    Respondent Ulrich Kranz is an individual who, upon information and
22  belief, is a citizen of Germany but presently resides in Manhattan Beach, California.

23      15.    Respondent Richard Kim ("Kim") is an individual who resides in Los
24  Angeles, California.  In or about March 2015, FF hired Kim to serve as FF's Head
25  of Design.

26
27
28

**IRELL & MANELLA LLP**
A Registered Limited Liability
Law Partnership Including
Professional Corporations

FIRST AMENDED DEMAND FOR ARBITRATION AND STATEMENT OF CLAIM

16.     Respondent Sohel Merchant ("Merchant") is an individual who resides in Rolling Hills Estates, California.  In or about March 2015, FF hired Merchant to serve as FF's Senior Director of Vehicle Packaging and Seating.

17.     Respondent Irving  ("Bill") Strickland ("Strickland") is an individual who resides in Rancho Palos Verdes, California.  In or about September 2016, FF hired Strickland to serve as a Vehicle Line Engineer.

18.     Respondent Christoph Kuttner ("Kuttner") is an individual who resides in Irvine, California.  In or about June 2015, FF hired Kuttner to serve as FF's Director for Interior and Exterior Trim.

19.     All of the Respondents named above were highly-paid senior executives who signed substantially similar employment agreements with FF that, among other things, required each of them: (1) to protect and not to misuse FF's confidential information and trade secrets, (2) not to solicit any of FF's employees for a period of one-year after their employment with FF ended, and (3) to resolve any disputes relating to their employment with FF in binding arbitration before JAMS.  Copies of FF's written employment agreements with Respondents (the "Agreements") are attached hereto as Exhibits A through F.  In reliance on Respondents' legal and contractual obligations and because each of the Respondents served in senior roles at FF, FF reposed immense trust and confidence in each of them, providing them with broad exposure to the company's most sensitive intellectual property, strategic planning, and other proprietary and confidential information.

20.     On information and belief, Does 5-10 are former FF employees who have acted in concert with Respondents in committing the misconduct alleged in this arbitration demand.  FF is not presently aware of the true names and capacities of the Respondents named herein as Does 5-10, and therefore sues these Respondents by such fictitious names.  FF will amend this demand to allege the true names and

1  capacities of such Respondents when they have been ascertained.  In the meantime,
2  FF is informed and believes, and on that basis alleges, that Does 5-10 are in some
3  way responsible for the damages that FF has alleged herein, and/or that they may be
4  in possession of the FF trade secrets at issue in this arbitration.

### III.   FACTUAL ALLEGATIONS

**A.   FF Hires Respondents in 2015-2017 as Highly Paid Senior Executives**

8   21.   FF was founded in 2014.  In 2015, FF hired Respondents Kim,
9  Merchant, Strickland, and Kuttner into highly paid senior executive positions
10  pursuant to written Agreements described above.  Each of these four Respondents
11  received salaries over $200,000, signing bonuses of approximately $50,000, and
12  generous grants of stock options in FF and other incentives.

13   22.   In early 2017, FF interviewed Krause as a potential new CFO for the
14  company.  Krause had previously served as the CFO at BMW Group and as the
15  CFO of Deutsche Bank.  Although FF knew that Krause had been the target of a tax-
16  evasion investigation in the early 2010s while at Deutsche Bank, Krause convinced
17  FF executives that he had the experience and contacts necessary to take FF to the
18  next level of corporate fundraising.  Accordingly, FF hired Krause as its CFO in or
19  about March 2017.

20   23.   Krause was very highly compensated at FF, receiving a $1,000,000
21  annual salary, a $300,000 signing bonus, and a generous grant of stock options that
22  were to vest over time.  Krause also received many other benefits and incentives as
23  part of his employment with FF.  As with the other Respondents, Krause signed an
24  Agreement that, among other things, prohibited him from taking or misusing FF's
25  confidential information, and that prohibited him from soliciting FF personnel for a
26  year following Krause's departure from the company.

27
28

24.     Soon after hiring Krause as CFO, in or about late June 2017, FF hired Kranz as its CTO.  Like Krause, Kranz was very highly compensated at FF, receiving a $1,000,000 annual salary, a $300,000 signing bonus, a generous award of stock options, and other benefits and incentives.  Like the other Respondents, Kranz signed an Agreement that prohibited him from soliciting FF's personnel for a year after his departure, and that prohibited him from taking or misusing FF's confidential information.

25.     As officers and/or senior executives of FF throughout their tenures at the company, Respondents owed a duty to act in FF's best interests at all times.  Among other things, this meant that they could not compete with FF while they were still employed by FF.  Likewise, they could not take FF's corporate opportunities for their own benefit, nor take or use FF's confidential information without FF's authorization.

26.     In addition to owing fiduciary duties to FF, Respondents also owed contractual duties as well.  FF's Agreements with Respondents contain several provisions that are directly relevant to this dispute, and that Respondents have brazenly flouted.

27.     For example, the Agreements require each of the Respondents to protect FF's trade secrets and other confidential information.  To that end, Section 2 of the Agreements requires Respondents to "hold in the strictest confidence, and take all reasonable precautions to prevent any unauthorized disclosure" of FF "Confidential Information," a term that is broadly defined to include any non-public information concerning FF's business.  The Agreements further prohibit Respondents from "(i) us[ing] the Company Confidential Information for any purpose whatsoever other than for the benefit of the Company in the course of [Respondents'] employment, or (ii) disclos[ing] the Company Confidential Information to any third party without the prior written authorization of the

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

1  President, CEO, or the Board of Directors of the Company." Agreements, Section
2  2.B.

3      28.    In addition, the Agreements also expressly prohibit Respondents from
4  soliciting, either directly or indirectly, FF's employees for a period of twelve months
5  following termination of Respondents' employment at FF:

6      **To the fullest extent permitted under applicable law, I agree that**
7  **during my employment and for a period of twelve (12) months**
    **immediately following termination of my relationship with the**
8  **Company for any reason, whether voluntary or involuntary, with or**
    **without cause, I will not directly or indirectly solicit any of the**
9  **Company's employees to leave their employment at the Company.**

10
11  Agreements, Section 8 (emphasis added).

12      29.    As outlined herein, Respondents have breached and continue to breach
13  the Agreements, including at least their confidentiality and non-solicitation
14  undertakings.

15      **B.**    **Respondents Unsuccessfully Attempt to Seize Control of FF, Then**
16      **Improperly Solicit FF Personnel to Join Evelozcity**

17      30.    In his role as FF's new CFO, Respondent Krause held a series of
18  meetings with potential FF investors. But nearly from the outset, Krause made it
19  clear that he was unhappy with merely serving as CFO, arguing to FF executives
20  that he should instead be promoted to CEO. In the fall of 2017, Respondents Krause
21  and Kranz then hosted a series of internal meetings that were attended by several of
22  the Respondents and other senior FF employees. In those meetings, Krause and
23  Kranz reported that their financing discussions had purportedly hit a dead end, and
24  that no investors would be willing to invest in FF unless FF's acting CEO YT would
25  agree to step down. Respondents urged many senior FF employees to join them in
26  demanding that YT step down and allow Respondents Krause and Kranz to lead a
27  substantial reorganization of the company and its management.

28

31.     Respondents Krause's and Kranz's statements that FF could not obtain funding unless YT gave up control of the company proved to be false.  To the contrary, FF did obtain additional financing in November 2017, despite the fact that YT had not stepped down.  Though they continued to negotiate with FF's management, Krause and Kranz, along with other Respondents, began covertly soliciting multiple FF employees to leave with them and work at Evelozcity, a new competing venture that Respondents founded, control, and operate.  Evelozcity was incorporated on or about November 7, 2017, and which is located just a few miles from FF's offices.

32.     On or about November 6, 2017, Evelozcity registered the domain name www.evelozcity.com.  That same day, Krause requested that FF's then Senior Director of Human Resources backdate his resignation from FF by approximately two weeks.  On information and belief, Krause made this request in an attempt to cover up the fact that he had been secretly working on behalf of Evelozcity while still employed by FF.

33.     On or about November 7, 2017, Evelozcity was officially incorporated with the Delaware Secretary of State by FF's former Senior Corporate Counsel, Andrew Wolstan, who later joined Evelozcity.  At the time FF filed its original Arbitration Demand in this matter, Evelozcity's publicly-stated mission was to: "Design, develop and deliver the most competitive, capable, connected and clean mobility device for the next generation."  In other words, Evelozcity's stated business mission is to compete directly with FF.  Moreover, according to a December 20, 2017 news report, "Sources say that [Krause] was able to raise funds [for Evelozcity] using the groundwork that he had done on the previous deals [at FF]."  In short, it appears that Krause and Kranz are funding Evelozcity by soliciting investments from the same investors that they met with in the fall of 2017 when working for FF, and that they are "pitching" those investors and others on

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

- 10 -

1 | technology that Krause and Kranz learned about at FF, and that Respondents and
2 | Evelozcity have stolen from FF.

3 |     34.    Beginning around the time of Evelozcity's incorporation in early
4 | November 2017, Respondents and their agents have surreptitiously solicited at least
5 | 20 or more FF employees (some of whom were relatively senior executives) to leave
6 | FF and join Evelozcity. For example, on information and belief, Respondent Kim
7 | improperly solicited, either directly or indirectly, nearly the entire design team that
8 | reported to him when he worked at FF. Moreover, based on preliminary forensic
9 | analysis, on information and belief, several of the Respondents, and also several
10 | additional FF employees whom Respondents or their accomplices have improperly
11 | solicited, copied and stole highly valuable and proprietary FF trade secrets shortly
12 | before their respective departures. Some of those departing FF employees also
13 | falsely denied to FF personnel that they intended to join Evelozcity.

14 |     35.    In particular, based on a preliminary forensic analysis, FF is informed
15 | and believes that both (a) several of the Respondents, and (b) several of the
16 | improperly-solicited FF employees have, at Respondents' and Evelozcity's
17 | encouragement and direction, copied and taken large amounts of FF's trade secret
18 | information, and then have disclosed and used that information for the benefit of
19 | Respondents and their new venture, and to the detriment of FF.

20 |     36.    Simply by way of example, Respondent Strickland's employment
21 | relationship with FF terminated on or about November 17, 2017, and he is now
22 | apparently employed by Evelozcity. Shortly before leaving FF for Evelozcity, it
23 | appears that Strickland copied and took potentially *thousands* of FF's most sensitive
24 | electronic documents from his FF computer and FF's servers. Forensic analysis has
25 | shown that Strickland accessed and apparently copied onto a portable USB drive
26 | and/or a personal Google drive substantial amounts of FF trade secret information
27 | that included at least: plans for parts in vehicles, material specs, cost lists, financial
28 |

1  spreadsheets, information about FF's proprietary VPA system, confidential power

2  train information, vendor information, and many other categories of confidential and

3  proprietary trade secret information.  FF is informed and believes that Strickland

4  took FF's trade secrets for the benefit of himself and the other Respondents, and that

5  Respondents and Evelozcity have wrongfully possessed, disclosed and used FF's

6  trade secrets.

7       37.    In addition, on or about December 15, 2016, in the course of his duties

8  for FF, Strickland had prepared a "proprietary and confidential" document with a

9  "Program Status Review" of the FF-91.  That presentation contained highly

10  confidential and trade secret information regarding, among other things, FF's

11  expected costs and release dates.  However, shortly after Strickland's departure from

12  FF, confidential portions of this presentation were leaked on the internet.  In short, it

13  appears that Strickland illicitly copied and took this document around the time of his

14  departure from FF, and that Respondents and their new venture leaked that secret

15  information to aid them and/or to damage FF.

16       38.    Respondent Kuttner's employment relationship with FF terminated on

17  December 1, 2017.  On information and belief, Kuttner left FF for the purpose of

18  joining Evelozcity, and is currently employed by Evelozcity.  Soon before leaving

19  FF for Evelozcity, Kuttner plugged multiple external storage devices into his FF

20  computer and, while they were inserted, accessed (and apparently copied and took)

21  several files and folders containing trade secret and confidential FF information,

22  including engineering files for several future vehicles in FF's anticipated product

23  line.  There was no legitimate reason for Kuttner to take these files with him and, on

24  information and belief, Kuttner took the materials to benefit himself and the other

25  Respondents, and Respondents and Evelozcity are now using them to unfairly

26  compete with FF.

27

28

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

- 12 -

39.     Respondent Merchant's employment relationship with FF terminated on December 1, 2017, and on information and belief he is now employed by Evelozcity. A preliminary forensic analysis has shown that soon before leaving FF for Evelozcity, Merchant researched on the internet how he could "wipe" particular files from his FF computers. Merchant then downloaded a program called "Eraser" to perform targeted wipes of both his FF laptop and desktop computers. After carrying out the "wipes," and after Evelozcity's incorporation, Merchant then deleted the Eraser software that he had previously downloaded. In addition to "wiping" information from those computers, it appears that Merchant likely also copied and took large amounts of confidential and proprietary technical information and FF materials on external drives shortly before his departure to Evelozcity. FF is informed and believes that these actions were undertaken to benefit Respondents and their new venture and/or to harm FF.

40.     In short, it appears that Respondents and Evelozcity are attempting to hire as many senior FF personnel as possible, have them copy and take FF's proprietary information that has been developed at great trouble and expense by FF, and then use those trade secrets to unfairly compete with FF. In this regard, Respondents and their new venture apparently not only encouraged departing FF employees to take trade secret information with them, but have also coached the departed employees to falsely deny to FF personnel (when asked, such as during exit interviews) that they intend to join Respondents at Evelozcity.

**C.     FF Has Been, And Will Be, Severely Harmed By Respondents' Misappropriation Of FF's Confidential And Proprietary Trade Secret Information**

41.     FF developed its trade secrets at great expense, and through years of painstaking research, experimentation, and trial and error. FF's trade secret information confers an economic benefit on FF from not being known or readily

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

1  discoverable by others.  Respondents have misappropriated FF's trade secret
2  information by wrongfully taking it from FF; by encouraging other FF employees to
3  take FF's trade secrets from FF and bring them to Evelozcity (knowing that this is
4  improper and in breach of duties owed to FF); by disclosing FF's trade secrets
5  without authorization; and by using FF's trade secrets without authorization to
6  benefit Evelozcity, as well as Respondents personally.  This has unjustly enriched
7  Respondents and their new venture, and has caused injury to FF.  If Respondents are
8  not enjoined from continuing these ongoing acts of misappropriation, then they will
9  continue to be unjustly enriched and will cause further severe and irreparable harm
10 to FF.  In addition, unless restrained, Respondents will continue to capitalize
11 unfairly on FF's proprietary information to get a significant and improper head start
12 in their competing venture, and to personally enrich themselves at FF's expense.
13 There is also the threat that if Respondents are not enjoined, then they will cause
14 further wrongful and damaging disclosures of FF's trade secret information.

## FIRST CAUSE OF ACTION

### Breach of Contract

### (Against All Respondents)

18  42.    FF incorporates all of the above paragraphs as though fully set forth
19 herein.

20  43.    The Agreements constitute valid and binding contracts between FF, on
21 the one hand, and Respondents, on the other hand, supported by adequate and
22 valuable consideration.  The confidentiality and non-solicitation provisions
23 contained in the contracts are reasonably necessary to protect FF's legitimate
24 protectable interests in FF's trade secrets, confidential information, customer
25 relationships, work force, and goodwill.

26  44.    FF fully performed its obligations under the Agreements except for
27 those obligations that were excused by the acts of Respondents.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

1    45.    Respondents have breached and continue to breach the Agreements by,

2  directly or through intermediaries, soliciting FF employees to work for their new

3  venture, Evelozcity.

4    46.    Respondents have also breached and continue to breach the

5  Agreements by taking and using FF's confidential information, and by encouraging

6  others to do so.

7    47.    As a direct and proximate result of Respondents' breaches of their

8  Agreements, FF has suffered damages in an amount to be determined in accordance

9  with proof at arbitration in this matter.

10    **SECOND CAUSE OF ACTION**

11    **Breach of the Implied Covenant of Good Faith and Fair Dealing**

12    **(Against All Respondents)**

13    48.    FF incorporates all of the above paragraphs as though fully set forth

14  herein.

15    49.    The Agreements specify the contractual terms governing the

16  relationship between FF, on the one hand, and Respondents, on the other hand.  In

17  addition, under California law, in every contract there is an implied covenant of

18  good faith and fair dealing.

19    50.    As described above, Respondents breached and continue to breach the

20  express non-solicitation and confidentiality provisions of the Agreements.  In the

21  alternative, however, at a minimum, Respondents have breached the implied

22  covenant of good faith and fair dealing by depriving FF of the fruits of the

23  Agreements through bad faith such acts as encouraging other FF employees to take

24  FF's confidential information for use at Evelozcity, and by scheming to improperly

25  solicit FF employees, including by using a headhunter to directly solicit FF

26  employees in an apparent (and unavailing) attempt to circumvent the clear anti-

27  solicitation provisions of the Agreements.

28

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

FIRST AMENDED DEMAND FOR ARBITRATION AND STATEMENT OF CLAIM

51.     Respondents' breaches of the implied covenant intentionally and unfairly frustrated FF's ability to receive key benefits of the Agreements, including the protection of FF's confidential information, and FF's rights under the one-year non-solicitation provision agreed to by each of the Respondents.

52.     As a direct and proximate result of Respondents' breaches of the implied covenant of good faith and fair dealing, FF has suffered damages in an amount to be determined in accordance with proof at arbitration in this matter.

## THIRD CAUSE OF ACTION

### Breach of Fiduciary Duty

### (Against All Respondents)

53.     FF incorporates all of the above paragraphs as though fully set forth herein.

54.     As officers of FF, Respondents owed FF fiduciary duties including, but not limited to, the duties of loyalty, care, diligence, and skill, including duties to act for FF's benefit, protect FF's interests, and subordinate their own personal interests to those of FF.

55.     Respondents breached their fiduciary duties to FF by the acts alleged herein, including, but not limited to: (a) by improperly soliciting key FF employees to join Evelozcity both during and after the time Respondents were employed as senior FF executives, (b) by improperly competing with FF while still employed by the company, and while continuing to accept generous compensation and other benefits from FF, (c) by taking and/or encouraging others to take and misuse FF's property for Respondents' benefit, and (d) by making false representations to FF personnel (and likely to outsiders as well) in a wrongful attempt to put their own personal interests ahead of FF's.

56.     As a direct and proximate result of Respondents' breach of their fiduciary duties owed to FF, FF has suffered damages in an amount to be

1   determined in accordance with proof at arbitration in this matter.  In addition,

2   Respondents have been unjustly enriched and must be ordered to disgorge all

3   compensation and benefits wrongfully obtained from FF.

4          57.    Respondents' actions were willful, wanton, malicious, oppressive, and

5   fraudulent, and justify the award of exemplary and punitive damages.

6                            **FOURTH CAUSE OF ACTION**

7             **Civil Conspiracy to Commit Breach of Fiduciary Duty**

8                           **(Against All Respondents)**

9          58.    FF incorporates all of the above paragraphs as though fully set forth

10  herein.

11         59.    As officers and/or senior executives of FF, Respondents owed FF

12  fiduciary duties including, but not limited to, the duties of loyalty, care, diligence,

13  and skill, including duties to act for FF's benefit, protect FF's interests, and

14  subordinate their own personal interests to those of FF.

15         60.    On information and belief, each Respondent was aware that the other

16  Respondents planned to breach fiduciary duties owed to FF, as detailed above.

17         61.    On information and belief, each Respondent agreed with the other

18  Respondents that they would each breach duties owed to FF, and intended that

19  braches of duty would be committed.

20         62.    One or more of the Respondents then in fact breached fiduciary duties

21  owed to FF in furtherance of Respondents' improper conspiracy, including, but not

22  limited to: (a) by improperly soliciting key FF employees to join Evelozcity both

23  during and after the time Respondents were employed as senior FF executives, (b)

24  by improperly competing with FF while still employed by the company, and while

25  continuing to accept generous compensation and other benefits from FF, (c) taking

26  and/or encouraging others to take and misuse FF's property for Respondents'

27  benefit, and (d) by making false representations to FF personnel (and likely to

28

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

1  outsiders as well) in a wrongful attempt to put their own personal interests ahead of

2  FF's.

3      63.     As a direct and proximate result of the acts committed pursuant to the

4  conspiracy between all of the Respondents, FF has suffered and will suffer damages

5  in an amount to be determined in accordance with proof at arbitration in this matter.

6  In addition, Respondents have been unjustly enriched and must be ordered to

7  disgorge all compensation and benefits wrongfully obtained from FF.

8      64.     Respondents' actions were willful, wanton, malicious, oppressive, and

9  fraudulent, and justify the award of exemplary and punitive damages.

10                          **FIFTH CAUSE OF ACTION**

11  **Misappropriation of Trade Secrets in Violation of Defend Trade Secrets Act**

12                          **(Against All Respondents)**

13      65.     FF incorporates all of the above paragraphs as though fully set forth

14  herein.

15      66.     FF owns and possesses certain trade secrets, as alleged above.  Simply

16  by way of example, FF has trade secrets in its proprietary VPA, the variable

17  platform architecture that serves as the base of FF's AI electric vehicle.  The second

18  iteration of this VPA at FF (i.e., VPA2) is scalable and can serve as the base for a

19  multitude of electric vehicles of different dimensions and sizes.  VPA2 will greatly

20  reduce both production costs and production time for electric vehicles.  FF also has

21  highly valuable trade secrets in its battery technology, autonomous driving, internet

22  of vehicles technology, power-train, safety features, and proprietary software and

23  source code related to, among other things, the interaction of electronics within the

24  vehicles.  FF similarly has valuable trade secrets in its related financial and business

25  information including, but not limited to, its costs, margins, components, and vendor

26  lists.

27

28

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

- 18 -

67. FF's trade secrets relate to products and services used, sold, shipped and/or ordered in, or intended to be used, sold, shipped and/or ordered in, interstate or foreign commerce.

68. As detailed above, FF takes great care in guarding its proprietary, confidential, and trade secret information and technologies. For example, all FF employees are required to sign robust confidentiality agreements as conditions of their employment at FF. Likewise, access to FF's offices is strictly controlled and monitored. Visitors must have pre-authorization even to enter the company's parking lot, which is secured by fences and security guards, and must then sign confidentiality agreements and submit to being photographed in order to enter FF's offices. Employees likewise must pass through security to access FF's offices, and must have a company-issued keycard in order to move around within the facility. Some particularly sensitive areas at FF's offices are further limited so that only select FF employees may access them. Likewise, FF's computer systems are themselves password and firewall protected, so that only authorized users can access the company's systems. Moreover, sensitive technological information on FF's computer systems is often stored such that it is only available to a handful of FF employees with specific need to access the information. FF also requires all contractors, consultants, vendors, investors, and manufacturers to sign confidentiality agreements before any confidential or proprietary trade secret information is disclosed to them.

69. FF's trade secrets derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who could obtain economic value from the disclosure or use of the information.

70. In violation of FF's rights, Respondents have misappropriated FF's trade secrets in the improper and unlawful manner alleged herein. Respondents'

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

FIRST AMENDED DEMAND FOR ARBITRATION AND STATEMENT OF CLAIM

1  misappropriation of FF's trade secrets was intentional, knowing, willful, malicious,
2  fraudulent, and oppressive.  Respondents have attempted and continue to attempt to
3  conceal their misappropriation.

4        71.    As the direct and proximate result of Respondents' conduct, FF has
5  suffered and, if Respondents' conduct is not stopped, will continue to suffer, severe
6  competitive harm, irreparable injury, and significant damages, in an amount to be
7  proven at the arbitration in this matter.  In addition to damages, FF seeks temporary,
8  preliminary, and permanent injunctive relief to recover and protect its trade secrets
9  and confidential information, and to protect other legitimate business interests.  FF's
10 business operates in a competitive market and will continue suffering irreparable
11 harm absent injunctive relief.  On information and belief, if Respondents are not
12 enjoined, Respondents will continue to misappropriate and use FF's trade secrets for
13 their own benefit and to FF's detriment.

14       72.    FF has been damaged by all of the foregoing and is entitled to an award
15 of exemplary damages and attorney's fees.

16                      **SIXTH CAUSE OF ACTION**
17       **Civil Conspiracy to Commit Misappropriation of Trade Secrets**
18                          **(Against All Respondents)**

19       73.    FF incorporates all of the above paragraphs as though fully set forth
20 herein.

21       74.    FF owns and possesses certain valuable trade secrets, as alleged above.
22 FF's trade secrets relate to products and services used, sold, shipped and/or ordered
23 in, or intended to be used, sold, shipped and/or ordered in, interstate or foreign
24 commerce.  FF takes great care in guarding its proprietary, confidential, and trade
25 secret information and technologies, and FF's trade secrets derive independent
26 economic value from not being generally known to, and not being readily

27
28

1   ascertainable through proper means by, another person who could obtain economic

2   value from the disclosure or use of the information.

3       75.   On information and belief, each Respondent was aware that other

4   Respondents planned to misappropriate FF's trade secrets, and agreed that other

5   Respondents would misappropriate trade secrets.  Each Respondent intended that

6   Respondents would misappropriate FF's trade secrets for their collective benefit.

7       76.   In violation of FF's rights, one or more of the Respondents then in fact

8   carried out their conspiracy and misappropriated FF's trade secrets in the improper

9   and unlawful manner alleged herein, both directly and through other departing FF

10   employees whom Respondents improperly solicited.  Respondents'

11   misappropriation of FF's trade secrets was intentional, knowing, willful, malicious,

12   fraudulent, and oppressive.  Respondents have attempted and continue to attempt to

13   conceal their misappropriation.

14       77.   As the direct and proximate result of Respondents' conspiracy to

15   misappropriate FF's trade secrets, FF has suffered and, if Respondents' conduct is

16   not stopped, will continue to suffer, severe competitive harm, irreparable injury, and

17   significant damages, in an amount to be proven at the arbitration in this matter.  In

18   addition to damages, FF seeks temporary, preliminary, and permanent injunctive

19   relief to recover and protect its trade secrets and confidential information, and to

20   protect other legitimate business interests.

21       78.   FF has been damaged by all of the foregoing and is entitled to an award

22   of exemplary damages and attorney's fees.

23   **SEVENTH CAUSE OF ACTION**

24   **Unfair Competition (Cal. Bus. & Prof. Code §17200 *et seq.*)**

25   **(Against All Respondents)**

26       79.   FF incorporates all of the above paragraphs, aside from those related to

27   FF's Trade Secret Information, as though fully set forth herein.

28

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

80.    California Business and Professions Code section 17200 *et seq.* prohibits unfair competition in the form of any unlawful, unfair, or fraudulent business practice.

81.    Respondents violated Section 17200 of the California Business and Professions Code by engaging in unlawful and unfair acts including, but not limited to, breaching fiduciary duties by soliciting FF employees while they were still employed by FF, diverting their loyalty from FF by establishing a direct competitor of FF using FF time and resources while still employed by FF, taking and/or encouraging others to take and misuse FF's property for Respondents' benefit, and making false or misleading representations to FF personnel (and likely to outsiders as well).

82.    Respondents' conduct is unlawful and unfair, as it consists of breaches of fiduciary duty and other misconduct.  Accordingly, Respondents have committed unlawful and unfair acts as defined in California Business and Professions Code Section 17200.

83.    Respondents are fully aware of the harm (both financial and otherwise) that their conduct has caused, and continues to cause, FF.  Respondents' conduct is intentional, and they are fully aware that it is unlawful.

84.    As a result of the foregoing, FF will suffer immediate and irreparable harm, and has suffered, and will continue to suffer, harm including harm that cannot be adequately compensated by money damages.  FF is entitled to (a) recover restitution, including without limitation, all benefits that Respondents received as a result of their unlawful, unfair, and fraudulent business acts and practices and (b) an injunction restraining Respondents from engaging in further acts of unfair competition.

## **PRAYER FOR RELIEF**

85.    WHEREFORE, FF respectfully requests the following relief:

1    a.    Resolution in FF's favor and against Respondents on all causes

2          of action alleged herein;

3    b.    For damages in an amount to be further proven at arbitration;

4    c.    For preliminary and permanent injunctive relief;

5    d.    For judgment that this is an exceptional case;

6    e.    For punitive damages;

7    f.    For restitution and disgorgement;

8    g.    For prejudgment interest;

9    h.    For attorneys' fees and costs; and

10   i.    For such other and further relief as the Arbitrator may deem to be

11         just and proper.

12

13   Dated: February 9, 2018                    IRELL & MANELLA LLP

14

15                                    By:_____/s/ Iian Jablon_____

16                                        Iian Jablon
                                          Attorneys for Plaintiff
17                                        Faraday&Future, Inc.

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A



# At-Will Employment Confidential Information Invention Assignment Arbitration Agreement

As a condition of my employment with Faraday & Future its subsidiaries, affiliates, successors or assigns (together, the "company"), and in consideration of my employment with the company and my receipt of the compensation now and hereafter paid to me by company, I agree to the following provisions of this Faraday & Future. At-will employment, confidential information, invention assignment, and arbitration agreement (this "agreement"):

## 1. At-will, employment

I understand and acknowledge that my employment with the company is for no specified term and constitutes "at-will" employment, I also understand that any representation to the contrary is unauthorized and not valid unless in writing and signed by the president or CEO of Faraday & Future. Accordingly, I acknowledge that my employment relationship may be terminated at any time, with or without good cause or for any or no cause, at my option or at the option of the company, with or without notice. I further acknowledge that the company may modify job titles, salaries, and benefits from time to time as it deems necessary.

## 2. Confidentiality

**A. Definition of Confidential Information.** I understand that "Company Confidential Information" means information that the Company has or will develop, acquire, create, compile, discover or own, that has value in or to the Company's business which is not generally known and which the Company wishes to maintain as confidential. Company Confidential Information includes both information disclosed by the Company to me, and information developed or learned by me during the course of my employment with Company. Confidential Information also includes all information of which the unauthorized disclosure could be detrimental to the interests of Company, whether or not such information is identified as Company Confidential Information. By example, and without limitation, Company Confidential Information includes any and all non-public information that relates to the actual or anticipated business and/or products, research or development of the Company, or to the Company's technical data, trade secrets, or know-how, including, but not limited to, research, product plans, or other information regarding the Company's products or services and markets therefor, customer lists and customers (including, but not limited to, customers of the Company on which I called or with which I may become acquainted during the term of my employment), software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances, and other business information disclosed by the Company either directly or indirectly in writing, orally or by drawings or inspection of premises, parts, equipment, or other Company property.

Notwithstanding the foregoing, Company Confidential Information shall not include any such information which I can establish (i) was publicly known or made generally available prior to the time of disclosure by Company to me; (ii) becomes publicly known or made generally available after disclosure by Company to me through no wrongful action or omission by me; or (iii) is in my rightful possession, without confidentiality obligations, at the time of disclosure by Company as shown by my then-contemporaneous written records. I understand that nothing in this Agreement is intended to limit employees' rights to discuss the terms, wages, and working conditions of their employment, as protected by applicable law.

**B. Nonuse and Nondisclosure.** I agree that during and after my employment with the Company, I will hold in the strictest confidence, and take all reasonable precautions to prevent any unauthorized use or disclosure of Company Confidential Information, and I will not (i) use the Company Confidential Information for any purpose whatsoever other than for the benefit of the Company in the course of my employment, or (ii) disclose the Company Confidential Information to any third party without the prior written authorization of the President, CEO, or the Board of Directors of the Company. Prior to disclosure when compelled by applicable law; I shall provide prior written notice to the President, CEO, and General Counsel of Faraday & Future, (as applicable). I agree that I obtain no title

1

to any Company Confidential Information, and that as between Company and myself, Faraday & Future, retains all Confidential Information as the sole property of Faraday & Future. I understand that my unauthorized use or disclosure of Company Confidential Information during my employment may lead to disciplinary action, up to and including immediate termination and legal action by the Company. I understand that my obligations under this **Section 2.B** shall continue after termination of my employment.

**C. Former Employer Confidential Information.** I agree that during my employment with the Company, I will not improperly use, disclose, or induce the Company to use any proprietary information or trade secrets of any former employer or other person or entity with which I have an obligation to keep in confidence. I further agree that I will not bring onto the Company's premises or transfer onto the Company's technology systems any unpublished document, proprietary information, or trade secrets belonging to any such third party unless disclosure to, and use by, the Company has been consented to in writing by such third party.

**D. Third Party Information.** I recognize that the Company has received and in the future will receive from third parties associated with the Company, e.g., the Company's customers, suppliers, licensors, licensees, partners, or collaborators ("**Associated Third Parties**"), their confidential or proprietary information ("**Associated Third Party Confidential Information**") subject to a duty on the Company's part to maintain the confidentiality of such Associated Third Party Confidential Information and to use it only for certain limited purposes. By way of example, Associated Third Party Confidential Information may include the habits or practices of Associated Third Parties, the technology of Associated Third Parties, requirements of Associated Third Parties, and information related to the business conducted between the Company and such Associated Third Parties. I agree at all times during my employment with the Company and thereafter, that I owe the Company and its Associated Third Parties a duty to hold all such Associated Third Party Confidential Information in the strictest confidence, and not to use it or to disclose it to any person, firm, corporation, or other third party except as necessary in carrying out my work for the Company consistent with the Company's agreement with such Associated Third Parties. I further agree to comply with any and all Company policies and guidelines that may be adopted from time to time

regarding Associated Third Parties and Associated Third Party Confidential Information. I understand that my unauthorized use or disclosure of Associated Third Party Confidential Information or violation of any Company policies during my employment may lead to disciplinary action, up to and including immediate termination and legal action by the Company.

## 3. Ownership

**A. Assignment of Inventions.** As between Company and myself, I agree that all right, title, and interest in and to any and all copyrightable material, notes, records, drawings, designs, inventions, improvements, developments, discoveries and trade secrets conceived, discovered, authored, invented, developed or reduced to practice by me, solely or in collaboration with others, during the period of time I am in the employ of the Company (including during my off-duty hours), or with the use of Company's equipment, supplies, facilities, or Company Confidential Information, and any copyrights, patents, trade secrets, mask work rights or other intellectual property rights relating to the foregoing, except as provided in **Section 3.C.** below (collectively, "**Inventions**"), are the sole property of Faraday & Future. I also agree to promptly make full written disclosure to Faraday & Future, of any Inventions, and to deliver and assign and hereby irrevocably assign fully to Faraday & Future, all of my right, title and interest in and to Inventions. I agree that this assignment includes a present conveyance to Faraday & Future, of ownership of Inventions that are not yet in existence. I further acknowledge that all original works of authorship that are made by me (solely or jointly with others) within the scope of and during the period of my employment with the Company and that are protectable by copyright are "works made for hire," as that term is defined in the United States Copyright Act. I understand and agree that the decision whether or not to commercialize or market any Inventions is within the Company's sole discretion and for the Company's sole benefit, and that no royalty or other consideration will be due to me as a result of the Company's efforts to commercialize or market any such Inventions.

**B. Pre-Existing Materials.** I have attached hereto as Exhibit A, a list describing all inventions, discoveries, original works of authorship, developments, improvements, trade secrets and other proprietary information or intellectual property rights owned by me or in which I have an interest prior to, or separate from, my employment with the Company and

2

which are subject to California Labor Code Section 2870 (attached hereto as EXHIBIT B), and which relate to the Company's proposed business, products, or research and development ("**Prior Inventions**"); or, if no such list is attached, I represent and warrant that there are no such Prior Inventions. Furthermore, I represent and warrant that if any Prior Inventions are included on EXHIBIT A, they will not materially affect my ability to perform all obligations under this Agreement. I will inform Faraday & Future, in writing before incorporating such Prior Inventions into any Invention or otherwise utilizing such Prior Invention in the course of my employment with the Company, and the Company is hereby granted a nonexclusive, royalty-free, perpetual, irrevocable, transferable worldwide license (with the right to grant and authorize sub-licenses) to make, have made, use, import, offer for sale, sell, reproduce, distribute, modify, adapt, prepare derivative works of, display, perform, and otherwise exploit such Prior Inventions, without restriction, including, without limitation, as part of or in connection with such Invention, and to practice any method related thereto. I will not incorporate any invention, improvement, development, concept, discovery, work of authorship or other proprietary information owned by any third party into any Invention without Faraday & Future's prior written permission,

**C. Moral Rights.** Any assignment to Faraday & Future, of Inventions includes all rights of attribution, paternity, integrity, modification, disclosure and withdrawal, and any other rights throughout the world that may be known as or referred to as "moral rights," "artist's rights," "droit moral," or the like (collectively, "**Moral Rights**"). To the extent that Moral Rights cannot be assigned under applicable law, I hereby waive and agree not to enforce any and all Moral Rights, including, without limitation, any limitation on subsequent modification, to the extent permitted under applicable law.

**D. Maintenance of Records.** I agree to keep and maintain adequate, current, accurate, and authentic written records of all Inventions made by me (solely or jointly with others) during the term of my employment with the Company. The records will be in the form of notes, sketches, drawings, electronic files, reports, or any other format that may be specified by the Company. As between Company and myself, the records are and will be available to and remain the sole property of Faraday & Future at all times.

**E. Further Assurances.** I agree to assist the Company,

or its designee, at the Company's expense, in every proper way to secure the Company's rights in the Inventions in any and all countries, including the disclosure to the Company of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments, and all other instruments that the Company shall deem proper or necessary in order to apply for, register, obtain, maintain, defend, and enforce such rights, and in order to deliver, assign and convey to the Company, its successors, assigns, and nominees the sole and exclusive rights, title, and interest in and to all Inventions, and testifying in a suit or other proceeding relating to such Inventions. I further agree that my obligations under this Section 3.E shall continue after the termination of this Agreement.

**F. Attorney-In-Fact.** I agree that, if the Company is unable because of my unavailability, mental or physical incapacity, or for any other reason to Secure my signature with respect to any Inventions, including, without limitation, for the purpose of applying for or pursuing any application for any United States or foreign patents or mask work or copyright registrations covering the Inventions assigned to Faraday & Future, in **Section 3.A,** then I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agent and attorney-in-fact, to act for and on my behalf to execute and file any papers and oaths, and to do all other lawfully permitted acts with respect to such Inventions to further the prosecution and issuance of patents, copyright and mask work registrations with the same legal force and effect as if executed by me. This power of attorney shall be deemed coupled with an interest, and shall be irrevocable.

**G. Exception To Assignments.** I understand that the provisions of this agreement requiring assignment of inventions to Faraday & Future. Do not apply to any invention that qualifies fully under the provisions of California labor code section 2870 (attached hereto as EXHIBIT B). I will advise Faraday & Future. Promptly in writing of any inventions that i believe meet the criteria in California labor code section 287() and are not otherwise disclosed on exhibit a.

## 4. Conflicting Obligations

**A. Current Obligations.** I agree that during the term of my employment with the Company, I will not engage in or undertake any other employment, occupation, consulting

3

relationship, or commitment that is directly related to the business in which the Company is now involved or becomes involved or has plans to become involved, nor will I engage in any other activities that conflict with my obligations to the Company.

**B. Prior Relationships.** Without limiting **Section 4.A.,** I represent and warrant that I have no other agreements, relationships, or commitments to any other person or entity that conflict with the provisions of this Agreement, my obligations to the Company under this Agreement, or my ability to become employed and perform the services for which I am being hired by the Company. I further agree that if I have signed a confidentiality agreement or similar type of agreement with any former employer or other entity, I will comply with the terms of any such agreement to the extent that its terms are lawful under applicable law. I represent and warrant that after undertaking a careful search (including searches of my computers, cell phones, electronic devices, and documents), I have returned all property and confidential information belonging to all prior employers (and/or other third parties I have performed services for in accordance with the terms of my applicable agreement). Moreover, I agree to fully indemnify the Company, its directors, officers, agents, employees, investors, shareholders, administrators, affiliates, divisions, Subsidiaries, predecessor and successor corporations, and assigns for all verdicts, judgments, settlements, and other losses incurred by any of them resulting from my breach of my obligations under any agreement with a third party to which I am a party or obligation to which I am bound, as well as any reasonable attorneys' fees and costs if the plaintiff is the prevailing party in such an action, except as prohibited by law.

## 5. Return of Company Materials

Upon separation from employment with the Company, on Company's earlier request during my employment, or at any time subsequent to my employment upon demand from the Company, I will immediately deliver to Faraday & Future and will not keep in my possession, recreate, or deliver to anyone else, any and all Company property, including, but not limited to, Company Confidential Information, Associated Third Party Confidential Information, all devices and equipment belonging to the Company (including computers, handheld electronic devices, telephone equipment, and other electronic devices), all tangible embodiments of the Inventions, all electronically

stored information and passwords to access such property, Company credit cards, records, data, notes, notebooks, reports, files, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, photographs, charts, any other documents and property, and reproductions of any of the foregoing items, including, without limitation, those records maintained pursuant to **Section 3.D,** I also consent to an exit interview to confirm my compliance with this **Article 5.**

## 6. Termination Certification

Upon separation from employment with the Company, I agree to immediately sign and deliver to the Company the "Termination Certification" attached hereto as Exhibit C. I also agree to keep Faraday & Future, advised of my home and business address for a period of three (3) years after termination of my employment with the Company, so that the Company can contact me regarding my continuing obligations provided by this Agreement.

## 7. Notification of New Employer

In the event that I leave the employ of the Company, I hereby grant consent to notification by the Company to my new employer about my obligations under this Agreement.

## 8. Solicitation of Employees

To the fullest extent permitted under applicable law, I agree that during my employment and for a period of twelve (12) months immediately following the termination of my relationship with the Company for any reason, whether voluntary or involuntary, with or without cause, I will not directly or indirectly solicit any of the Company's employees to leave their employment at the Company. I agree that nothing in this Article 8 shall affect my continuing obligations under this Agreement during and after this twelve (12) month period, including, without limitation, my obligations under Article 2.

## 9. Conflict of Interest Guidelines

I agree to diligently adhere to all policies of the Company, including the Company's insider trading policies and the Company's Conflict of Interest Guidelines. A copy of the Company's current Conflict of Interest Guidelines is attached as Exhibit D hereto, but I understand that these Conflict of

4

Interest Guidelines may be revised from time to time during my employment.

### 10. Representations

Without limiting my obligations under Section 3.E above, I agree to execute any proper oath or verify any proper document required to carry out the terms of this Agreement. I represent and warrant that my performance of all the terms of this Agreement will not breach any agreement to keep in confidence information acquired by me in confidence or in trust prior to my employment by the Company. I hereby represent and warrant that I have not entered into, and I will not enter into, any oral or written agreement in conflict herewith.

### 11. Audit

I acknowledge that I have no reasonable expectation of privacy in any computer, technology system, email, handheld device, telephone, voice mail, or documents that are used to conduct the business of the Company, All information, data, and messages created, received, sent, or stored in these systems are, at all times, the property of the Company. As such, the Company has the right to audit and search all such items and systems, without further notice to me, to ensure that the Company is licensed to use the software on the Company's devices in compliance with the Company's Software licensing policies, to ensure compliance with the Company's policies, and for any other business-related purposes in the Company's sole discretion. I understand that I am not permitted to add any unlicensed, unauthorized, or noncompliant applications to the Company's technology systems, including, without limitation, open Source or free software not authorized by the Company, and that I shall refrain from copying unlicensed Software onto the Company's technology systems or using non-licensed software or websites. I understand that it is my responsibility to comply with the Company's policies governing use of the Company's documents and the internet, email, telephone, and technology systems to which I will have access in connection with my employment, I am aware that the Company has or may acquire Software and systems that are capable of monitoring and recording all network traffic to and from any computer I may use. The Company reserves the right to access, review, copy, and delete any of the information, data, or messages accessed through these systems with or without notice to me and/or in my absence, This includes, but is not limited to, all e-mail messages sent or received, all website visits, all chat sessions, all news group activity (including groups visited, messages read, and postings by me), and all file transfers into and out of the Company's internal networks. The Company further reserves the right to retrieve previously deleted messages from e-mail or voice mail and monitor usage of the Internet, including websites visited and any information I have downloaded. In addition, the Company may review Internet and technology systems activity and analyze usage patterns, and may choose to publicize this data to assure that technology systems are devoted to legitimate business purposes.

### 12. Arbitration and Equitable Relief

A. Arbitration, in consideration of my employment with the company, its promise to arbitrate all employment-related disputes, and my receipt of the compensation, pay raises, and other benefits paid to me by the company, at present and in the future, I agree that any and all controversies, claims, or disputes with anyone (including the company and any employee, officer, director, shareholder, or benefit plan of the company, in their capacity as such or otherwise), whether brought on an individual, group, or class basis, arising out of, relating to, or resulting from my employment with the company or the termination of my employment with the company, including any breach of this agreement, shall be subject to binding arbitration under the arbitration rules set forth in California code of civil procedure section 1280 through 1294.2, including section 1281.8 (The "act"), and pursuant to California law. The federal arbitration act shall continue to apply with full force and effect notwithstanding the application of procedural rules set forth in the act. Disputes that I agree to arbitrate, and thereby agree to waive any right to a trial by jury, include any statutory claims under local, state, or federal law, including, but not limited to, claims under title vii of the civil rights act of 1964, the Americans with disabilities act of 1990, the age discrimination in employment act of 1967, the older workers benefit protection act, the sarbanes-oxley act, the worker adjustment and retraining notification act, the California fair employment and housing act, the family and medical leave act, the California family rights act, the California labor code, claims of harassment, discrimination, and wrongful termination, and any statutory or common law claims. I further understand that this agreement to arbitrate also applies to any disputes that the company may have with me.

**B. Procedure.** I agree that any arbitration will be administered by Judicial Arbitration & Mediation Services, Inc. ("JAMS"), pursuant to its employment arbitration rules & procedures (the "JAMS rules"). I agree that the arbitrator shall have the power to decide any motions brought by any party to the arbitration, including motions for summary judgment and/or adjudication, motions to dismiss and demurrers, and motions for class certification, prior to any arbitration hearing. I agree that the arbitrator shall issue a written decision on the merits. I also agree that the arbitrator shall have the power to award any remedies available under applicable law, and that the arbitrator shall award attorneys' fees and costs to the prevailing party, except as prohibited by law. I agree that the decree or award rendered by the arbitrator may be entered as a final and binding judgment in any court having jurisdiction thereof. I understand that the company will pay for any admtnistrative or hearing fees charged by the arbitrator or JAMS except that I shale, pay any filing fees associated with any arbitration that I initiate, but only so much of the filing fees as I would have instead paid had i filed a complaint in a court of law. I agree that the arbitrator shall administer and conduct any arbitration in accordance with California law, including the California code of civil procedure, and that the arbitrator shall apply substantive and procedural California law to any dispute or claim, without reference to rules of conflict of law, to the extent that the JAMS rules conflict with California law, California law shall take precedence. I agree that any arbitration under this agreement shall be conducted in Santa Clara county, California.

**C. Remedy.** Except as provided by the act and this agreement, arbitration shall be the sole, exclusive, and final remedy for any dispute between me and the company. Accordingly, exceptas provided for by the act and this agreement, neither inor the company will be permitted to pursue court action regardeng claims that are subject to arbitration.

**D. Administrative relief.** I understand that this agreement does not prohibit me from pursuing an administrative claim with a local, state, or federal administrative body or government agency that is authorized to enforce or administer laws related to employment, including, but not limited to, the department of fair employment and housing, the equal employment opportunity commission, the national labor relations board, or the workers' compensation board. This agreement does, however, preclude me from pursuing court action regarding any such claim, exceptas permitted by law,

**E. Voluntary nature of agreement.** I acknowledge and agree that I am executing this agreement voluntarily and without any duress or undue influence by the company or anyone else. I acknowledge and agree that I have received a copy of the text of California labor code section 2870 in EXHIBIT B, I further acknowledge and agree that I have carefully read this agreement and that I have asked any questions needed for me to understand the terms, consequences, and binding effect of this agreement and fully understand it, including that I am waiving my right to a jury trial. Finally, I agree that I have been provided an opportunity to seek the advice of an attorney of my choice before signing this agreement.

## 13. Miscellaneous

**A. Governing law; consent to personal jurisdiction.** This agreement will be governed by the laws of the state of California without regard to California's conflicts of law rules that may result in the application of the laws of any jurisdiction other than California. To the extent that any lawsuit is permitted under this agreement, I hereby expressly consent to the personal and exclusive jurisdiction and venue of the state and federal courts located in California for any lawsuit filed against me by the company.

**B. Assignability.** This agreement will be binding upon my heirs, executors, assigns, administrators, and other legal representatives, and will be for the benefit of the company, its successors, and its assigns. There are no intended third-party beneficiaries to this agreement, except as may be expressly otherwise stated. Notwithstanding anything to the contrary herein, Faraday & Future, may assign this Agreement and its rights and obligations under this Agreement to any successor to all or substantially all of Faraday & Future's relevant assets, whether by merger, consolidation, reorganization, reincorporation, sale of assets or stock, or otherwise.

**C. Entire Agreement.** This Agreement, together with the Exhibits herein and any executed written offer letter between me and the Company, to the extent such materials are not in conflict with this Agreement, sets forth the entire agreement and understanding between the Company and me with respect to the subject matter herein and supersedes all prior written and oral agreements, discussions, or representations between us, including, but not limited to, any

6

representations made during my interview(s) or relocation negotiations. I represent and warrant that I am not relying on any statement or representation not contained in this Agreement. Any subsequent change or changes in my duties, Salary, or compensation will not affect the validity or scope of this Agreement.

**D. Headings.** Headings are used in this Agreement for reference only and shall not be considered when interpreting this Agreement.

**E. Severability.** If a court or other body of competent jurisdiction finds, or the Parties mutually believe, any provision of this Agreement, or portion thereof, to be invalid or unenforceable, such provision will be enforced to the maximum extent permissible so as to effect the intent of the Parties, and the remainder of this Agreement will continue in full force and effect.

**F. Modification, Waiver.** No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in a writing signed by the President or CEO of Faraday & Future. and me. Waiver by Faraday & Future, of a breach of any provision of this Agreement will not operate as a waiver of any other or subsequent breach.

**G. Survivorship.** The rights and obligations of the parties to this Agreement will survive termination of my employment with the Company.

Employee:

Name (printed) _____ STEFAN KRAUSE _____   Date __3/23/2017__

Signature _____

Witness:

Name (printed) _____

Signature _____

7

# EXHIBIT B



# At-Will Employment Confidential Information Invention Assignment Arbitration Agreement

As a condition of my employment with Faraday & Future its subsidiaries, affiliates, successors or assigns (together, the "company"), and in consideration of my employment with the company and my receipt of the compensation now and hereafter paid to me by company, I agree to the following provisions of this Faraday & Future. At-will employment, confidential information, invention assignment, and arbitration agreement (this "agreement"):

## 1. At-will, employment

I understand and acknowledge that my employment with the company is for no specified term and constitutes "at-will" employment, I also understand that any representation to the contrary is unauthorized and not valid unless in writing and signed by the president or CEO of Faraday & Future. Accordingly, I acknowledge that my employment relationship may be terminated at any time, with or without good cause or for any or no cause, at my option or at the option of the company, with or without notice. I further acknowledge that the company may modify job titles, salaries, and benefits from time to time as it deems necessary.

## 2. Confidentiality

A. Definition of Confidential Information. I understand that "Company Confidential Information" means information that the Company has or will develop, acquire, create, compile, discover or own, that has value in or to the Company's business which is not generally known and which the Company wishes to maintain as confidential. Company Confidential Information includes both information disclosed by the Company to me, and information developed or learned by me during the course of my employment with Company. Confidential Information also includes all information of which the unauthorized disclosure could be detrimental to the interests of Company, whether or not such information is identified as Company Confidential Information. By example, and without limitation, Company Confidential Information includes any and all non-public information that relates to the actual or anticipated business and/or products, research or development of the Company, or to the Company's technical data, trade secrets, or know-how, including, but not limited to, research, product plans, or other information regarding the Company's products or services and markets therefor, customer lists and customers (including, but not limited to, customers of the Company on which I called or with which I may become acquainted during the term of my employment), software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances, and other business information disclosed by the Company either directly or indirectly in writing, orally or by drawings or inspection of premises, parts, equipment, or other Company property.

Notwithstanding the foregoing, Company Confidential Information shall not include any such information which I can establish (i) was publicly known or made generally available prior to the time of disclosure by Company to me; (ii) becomes publicly known or made generally available after disclosure by Company to me through no wrongful action or omission by me; or (iii) is in my rightful possession, without confidentiality obligations, at the time of disclosure by Company as shown by my then-contemporaneous written records. I understand that nothing in this Agreement is intended to limit employees' rights to discuss the terms, wages, and working conditions of their employment, as protected by applicable law.

B. Nonuse and Nondisclosure. I agree that during and after my employment with the Company, I will hold in the strictest confidence, and take all reasonable precautions to prevent any unauthorized use or disclosure of Company Confidential Information, and I will not (i) use the Company Confidential Information for any purpose whatsoever other than for the benefit of the Company in the course of my employment, or (ii) disclose the Company Confidential Information to any third party without the prior written authorization of the President, CEO, or the Board of Directors of the Company. Prior to disclosure when compelled by applicable law; I shall provide prior written notice to the President, CEO, and General Counsel of Faraday & Future (as applicable). I agree that I obtain no title

to any Company Confidential Information, and that as between Company and myself, Faraday & Future, retains all Confidential Information as the sole property of Faraday & Future. I understand that my unauthorized use or disclosure of Company Confidential Information during my employment may lead to disciplinary action, up to and including immediate termination and legal action by the Company. I understand that my obligations under this Section 2.B shall continue after termination of my employment.

C. Former Employer Confidential Information. I agree that during my employment with the Company, I will not improperly use, disclose, or induce the Company to use any proprietary information or trade secrets of any former employer or other person or entity with which I have an obligation to keep in confidence. I further agree that I will not bring onto the Company's premises or transfer onto the Company's technology systems any unpublished document, proprietary information, or trade secrets belonging to any such third party unless disclosure to, and use by, the Company has been consented to in writing by such third party.

D. Third Party Information. I recognize that the Company has received and in the future will receive from third parties associated with the Company, e.g., the Company's customers, suppliers, licensors, licensees, partners, or collaborators ("Associated Third Parties"), their confidential or proprietary information ("Associated Third Party Confidential Information") subject to a duty on the Company's part to maintain the confidentiality of such Associated Third Party Confidential Information and to use it only for certain limited purposes. By way of example, Associated Third Party Confidential Information may include the habits or practices of Associated Third Parties, the technology of Associated Third Parties, requirements of Associated Third Parties, and information related to the business conducted between the Company and such Associated Third Parties. I agree at all times during my employment with the Company and thereafter, that I owe the Company and its Associated Third Parties a duty to hold all such Associated Third Party Confidential Information in the strictest confidence, and not to use it or to disclose it to any person, firm, corporation, or other third party except as necessary in carrying out my work for the Company consistent with the Company's agreement with such Associated Third Parties. I further agree to comply with any and all Company policies and guidelines that may be adopted from time to time

regarding Associated Third Parties and Associated Third Party Confidential Information. I understand that my unauthorized use or disclosure of Associated Third Party Confidential Information or violation of any Company policies during my employment may lead to disciplinary action, up to and including immediate termination and legal action by the Company.

### 3. Ownership

A. Assignment of Inventions. As between Company and myself, I agree that all right, title, and interest in and to any and all copyrightable material, notes, records, drawings, designs, inventions, improvements, developments, discoveries and trade secrets conceived, discovered, authored, invented, developed or reduced to practice by me, solely or in collaboration with others, during the period of time I am in the employ of the Company (including during my off-duty hours), or with the use of Company's equipment, supplies, facilities, or Company Confidential Information, and any copyrights, patents, trade secrets, mask work rights or other intellectual property rights relating to the foregoing, except as provided in Section 3.C. below (collectively, "Inventions"), are the sole property of Faraday & Future. I also agree to promptly make full written disclosure to Faraday & Future, of any Inventions, and to deliver and assign and hereby irrevocably assign fully to Faraday & Future, all of my right, title and interest in and to Inventions. I agree that this assignment includes a present conveyance to Faraday & Future, of ownership of Inventions that are not yet in existence. I further acknowledge that all original works of authorship that are made by me (solely or jointly with others) within the scope of and during the period of my employment with the Company and that are protectable by copyright are "works made for hire," as that term is defined in the United States Copyright Act. I understand and agree that the decision whether or not to commercialize or market any Inventions is within the Company's sole discretion and for the Company's sole benefit, and that no royalty or other consideration will be due to me as a result of the Company's efforts to commercialize or market any such Inventions

B. Pre-Existing Materials. I have attached hereto as Exhibit A, a list describing all inventions, discoveries, original works of authorship, developments, improvements, trade secrets and other proprietary information or intellectual property rights owned by me or in which I have an interest prior to, or separate from, my employment with the Company and

which are subject to California Labor Code Section 2870 (attached hereto as EXHIBIT B), and which relate to the Company's proposed business, products, or research and development ("Prior Inventions"); or, if no such list is attached, I represent and warrant that there are no such Prior Inventions. Furthermore, I represent and warrant that if any Prior Inventions are included on EXHIBIT A, they will not materially affect my ability to perform all obligations under this Agreement. I will inform Faraday & Future, in writing before incorporating such Prior Inventions into any Invention or otherwise utilizing such Prior Invention in the course of my employment with the Company, and the Company is hereby granted a nonexclusive, royalty-free, perpetual, irrevocable, transferable worldwide license (with the right to grant and authorize sub-licenses) to make, have made, use, import, offer for sale, sell, reproduce, distribute, modify, adapt, prepare derivative works of, display, perform, and otherwise exploit such Prior Inventions, without restriction, including, without limitation, as part of or in connection with such Invention, and to practice any method related thereto. I will not incorporate any invention, improvement, development, concept, discovery, work of authorship or other proprietary information owned by any third party into any Invention without Faraday & Future's prior written permission,

**C. Moral Rights.** Any assignment to Faraday & Future, of Inventions includes all rights of attribution, paternity, integrity, modification, disclosure and withdrawal, and any other rights throughout the world that may be known as or referred to as "moral rights," "artist's rights," "droit moral," or the like (collectively, "Moral Rights"). To the extent that Moral Rights cannot be assigned under applicable law, I hereby waive and agree not to enforce any and all Moral Rights, including, without limitation, any limitation on subsequent modification, to the extent permitted under applicable law.

**D. Maintenance of Records.** I agree to keep and maintain adequate, current, accurate, and authentic written records of all Inventions made by me (solely or jointly with others) during the term of my employment with the Company. The records will be in the form of notes, sketches, drawings, electronic files, reports, or any other format that may be specified by the Company. As between Company and myself, the records are and will be available to and remain the sole property of Faraday & Future at all times.

**E. Further Assurances.** I agree to assist the Company,

or its designee, at the Company's expense, in every proper way to secure the Company's rights in the Inventions in any and all countries, including the disclosure to the Company of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments, and all other instruments that the Company shall deem proper or necessary in order to apply for, register, obtain, maintain, defend, and enforce such rights, and in order to deliver, assign and convey to the Company, its successors, assigns, and nominees the sole and exclusive rights, title, and interest in and to all Inventions, and testifying in a suit or other proceeding relating to such Inventions. I further agree that my obligations under this Section 3.E shall continue after the termination of this Agreement.

**F. Attorney-In-Fact.** I agree that, if the Company is unable because of my unavailability, mental or physical incapacity, or for any other reason to secure my signature with respect to any Inventions, including, without limitation, for the purpose of applying for or pursuing any application for any United States or foreign patents or mask work or copyright registrations covering the Inventions assigned to Faraday & Future, in Section 3.A, then I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agent and attorney-in-fact, to act for and on my behalf to execute and file any papers and oaths, and to do all other lawfully permitted acts with respect to such Inventions to further the prosecution and issuance of patents, copyright and mask work registrations with the same legal force and effect as if executed by me. This power of attorney shall be deemed coupled with an interest, and shall be irrevocable.

**G. Exception To Assignments.** I understand that the provisions of this agreement requiring assignment of inventions to Faraday & Future. Do not apply to any invention that qualifies fully under the provisions of California labor code section 2870 (attached hereto as EXHIBIT B). I will advise Faraday & Future. Promptly in writing of any inventions that I believe meet the criteria in California labor code section 287() and are not otherwise disclosed on exhibit a.

## 4. Conflicting Obligations

**A. Current Obligations.** I agree that during the term of my employment with the Company, I will not engage in or undertake any other employment, occupation, consulting

relationship, or commitment that is directly related to the business in which the Company is now involved or becomes involved or has plans to become involved, nor will I engage in any other activities that conflict with my obligations to the Company.

B. Prior Relationships. Without limiting Section 4.A., I represent and warrant that I have no other agreements, relationships, or commitments to any other person or entity that conflict with the provisions of this Agreement, my obligations to the Company under this Agreement, or my ability to become employed and perform the services for which I am being hired by the Company. I further agree that if I have signed a confidentiality agreement or similar type of agreement with any former employer or other entity, I will comply with the terms of any such agreement to the extent that its terms are lawful under applicable law. I represent and warrant that after undertaking a careful search (including searches of my computers, cell phones, electronic devices, and documents), I have returned all property and confidential information belonging to all prior employers (and/or other third parties I have performed services for in accordance with the terms of my applicable agreement). Moreover, I agree to fully indemnify the Company, its directors, officers, agents, employees, investors, shareholders, administrators, affiliates, divisions, Subsidiaries, predecessor and successor corporations, and assigns for all verdicts, judgments, settlements, and other losses incurred by any of them resulting from my breach of my obligations under any agreement with a third party to which I am a party or obligation to which I am bound, as well as any reasonable attorneys' fees and costs if the plaintiff is the prevailing party in such an action, except as prohibited by law.

5. Return of Company Materials

Upon separation from employment with the Company, on Company's earlier request during my employment, or at any time subsequent to my employment upon demand from the Company, I will immediately deliver to Faraday & Future and will not keep in my possession, recreate, or deliver to anyone else, any and all Company property, including, but not limited to, Company Confidential Information, Associated Third Party Confidential Information, all devices and equipment belonging to the Company (including computers, handheld electronic devices, telephone equipment, and other electronic devices), all tangible embodiments of the Inventions, all electronically

stored information and passwords to access such property, Company credit cards, records, data, notes, notebooks, reports, files, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, photographs, charts, any other documents and property, and reproductions of any of the foregoing items, including, without limitation, those records maintained pursuant to Section 3.D, I also consent to an exit interview to confirm my compliance with this Article 5.

6. Termination Certification

Upon separation from employment with the Company, I agree to immediately sign and deliver to the Company the "Termination Certification" attached hereto as Exhibit C. I also agree to keep Faraday & Future, advised of my home and business address for a period of three (3) years after termination of my employment with the Company, so that the Company can contact me regarding my continuing obligations provided by this Agreement.

7. Notification of New Employer

In the event that I leave the employ of the Company, I hereby grant consent to notification by the Company to my new employer about my obligations under this Agreement.

8. Solicitation of Employees

To the fullest extent permitted under applicable law, I agree that during my employment and for a period of twelve (12) months immediately following the termination of my relationship with the Company for any reason, whether voluntary or involuntary, with or without cause, I will not directly or indirectly solicit any of the Company's employees to leave their employment at the Company. I agree that nothing in this Article 8 shall affect my continuing obligations under this Agreement during and after this twelve (12) month period, including, without limitation, my obligations under Article 2.

9. Conflict of Interest Guidelines

I agree to diligently adhere to all policies of the Company, including the Company's insider trading policies and the Company's Conflict of Interest Guidelines. A copy of the Company's current Conflict of Interest Guidelines is attached as Exhibit D hereto, but I understand that these Conflict of

Interest Guidelines may be revised from time to time during my employment.

## 10. Representations

Without limiting my obligations under Section 3.E above, I agree to execute any proper oath or verify any proper document required to carry out the terms of this Agreement. I represent and warrant that my performance of all the terms of this Agreement will not breach any agreement to keep in confidence information acquired by me in confidence or in trust prior to my employment by the Company. I hereby represent and warrant that I have not entered into, and I will not enter into, any oral or written agreement in conflict herewith.

## 11. Audit

I acknowledge that I have no reasonable expectation of privacy in any computer, technology system, email, handheld device, telephone, voice mail, or documents that are used to conduct the business of the Company. All information, data, and messages created, received, sent, or stored in these systems are, at all times, the property of the Company. As such, the Company has the right to audit and search all such items and systems and further notice to me, to ensure that the Company is licensed to use the software on the Company's devices in compliance with the Company's Software licensing policies, to ensure compliance with the Company's policies, and for any other business-related purposes in the Company's sole discretion. I understand that I am not permitted to add any unlicensed, unauthorized, or noncompliant applications to the Company's technology systems, including, without limitation, open Source or free software not authorized by the Company, and that I shall refrain from copying unlicensed Software onto the Company's technology systems or using non-licensed software or websites. I understand that it is my responsibility to comply with the Company's policies governing use of the Company's documents and the internet, email, telephone, and technology systems to which I will have access in connection with my employment. I am aware that the Company has or may acquire Software and systems that are capable of monitoring and recording all network traffic to and from any computer I may use. The Company reserves the right to access, review, copy, and delete any of the information, data, or messages accessed through these systems with or without notice to me and/or in my absence. This includes, but is not limited to, all

sessions, all news group activity (including groups visited, messages read, and postings by me), and all file transfers into and out of the Company's internal networks. The Company further reserves the right to retrieve previously deleted messages from e-mail or voice mail and monitor usage of the Internet, including websites visited and any information I have downloaded. In addition, the Company may review Internet and technology systems activity and analyze usage patterns, and may choose to publicize this data to assure that technology systems are devoted to legitimate business purposes.

## 12. Arbitration and Equitable Relief

A. Arbitration, in consideration of my employment with the company, its promise to arbitrate all employment-related disputes, and my receipt of the compensation, pay raises, and other benefits paid to me by the company, at present and in the future, I agree that any and all controversies, claims, or disputes with anyone (including the company and any employee, officer, director, shareholder, or benefit plan of the company, in their capacity as such or otherwise), whether brought on an individual, group, or class basis, arising out of, relating to, or resulting from my employment with the company or the termination of my employment with the company, including any breach of this agreement, shall be subject to binding arbitration under the arbitration rules set forth in California code of civil procedure section 1280 through 1294.2, including section 1281.8 (The "act"), and pursuant to California law. The federal arbitration act shall continue to apply with full force and effect notwithstanding the application of procedural rules set forth in the act. Disputes that I agree to arbitrate, and thereby agree to waive any right to a trial by jury, include any statutory claims under local, state, or federal law, including, but not limited to, claims under title vii of the civil rights act of 1964, the Americans with disabilities act of 1990, the age discrimination in employment act of 1967, the older workers benefit protection act, the sarbanes-oxley act, the worker adjustment and retraining notification act, the California fair employment and housing act, the family and medical leave act, the California family rights act, the California labor code, claims of harassment, discrimination, and wrongful termination, and any statutory or common law claims. I further understand that this agreement to arbitrate also applies to any disputes that the company may have with me.

**B. Procedure.** I agree that any arbitration will be administered by Judicial Arbitration & Mediation Services, Inc ("JAMS"), pursuant to its employment arbitration rules & procedures (the "JAMS rules"). I agree that the arbitrator shall have the power to decide any motions brought by any party to the arbitration, including motions for summary judgment and/or adjudication, motions to dismiss and demurrers, and motions for class certification, prior to any arbitration hearing. I agree that the arbitrator shall issue a written decision on the merits. I also agree that the arbitrator shall have the power to award any remedies available under applicable law, and that the arbitrator shall award attorneys' fees and costs to the prevailing party, except as prohibited by law. I agree that the decree or award rendered by the arbitrator may be entered as a final and binding judgment in any court having jurisdiction thereof. I understand that the company will pay for any admtnistrative or hearing fees charged by the arbitrator or JAMS except that I shale, pay any filing fees associated with any arbitration that I initiate, but only so much of the filing fees as I would have instead paid had ifiled a complaint in a court of law. I agree that the arbitrator shall administer and conduct any arbitration in accordance with California law, including the California code of civil procedure, and that the arbitrator shall apply substantive and procedural California law to any dispute or claim, without reference to rules of conflict of law, to the extent that the JAMS rules conflict with California law, California law shall take precedence. I agree that any arbitration under this agreement shall be conducted in Santa Clara county, California.

**C. Remedy.** Except as provided by the act and this agreement, arbitration shall be the sole, exclusive, and final remedy for any dispute between me and the company. Accordingly, exceptas provided for by the act and this agreement, neither Inor the company will be permitted to pursue court action regardeng claims that are subject to arbitration.

**D. Administrative relief.** I understand that this agreement does not prohibit me from pursuing an administrative claim with a local, state, or federal administrative body or government agency that is authorized to enforce or administer laws related to employment, including, but not limited to, the department of fair employment and housing, the equal employment opportunity commission, the national labor relations board, or the workers' compensation board This agreement does, however, preclude me from pursuing court action regarding any such claim, exceptas permitted by law.

**E. Voluntary nature of agreement.** I acknowledge and agree that I am executing this agreement voluntarily and without any duress or undue influence by the company or anyone else. I acknowledge and agree that I have received a copy of the text of California labor code section 2870 in EXHIBIT B, I further acknowledge and agree that I have carefully read this agreement and that I have asked any questions needed for me to understand the terms, consequences, and binding effect of this agreement and fully understand it, including that I am waiving my right to a jury trial. Finally, I agree that I have been provided an opportunity to seek the advice of an attorney of my choice before signing this agreement.

## 13. Miscellaneous

**A. Governing law; consent to personal jurisdiction.** This agreement will be governed by the laws of the state of California without regard to California's conflicts of law rules that may result in the application of the laws of any jurisdiction other than California. To the extent that any lawsuit is permitted under this agreement, I hereby expressly consent to the personal and exclusive jurisdiction and venue of the state and federal courts located in California for any lawsuit filed against me by the company.

**B. Assignability.** This agreement will be binding upon my heirs, executors, assigns, administrators, and other legal representatives, and will be for the benefit of the company, its successors, and its assigns. There are no intended third-party beneficiaries to this agreement, except as may be expressly otherwise stated. Notwithstanding anything to the contrary herein, Faraday & Future, may assign this Agreement and its rights and obligations under this Agreement to any successor to all or substantially all of Faraday & Future's relevant assets, whether by merger, consolidation, reorganization, reincorporation, sale of assets or stock, or otherwise.

**C. Entire Agreement.** This Agreement, together with the Exhibits herein and any executed written offer letter between me and the Company, to the extent such materials are not in conflict with this Agreement, sets forth the entire agreement and understanding between the Company and me with respect to the subject matter herein and supersedes all prior written and oral agreements, discussions, or representations between us, including, but not limited to, any

representations made during my interview(s) or relocation negotiations. I represent and warrant that I am not relying on any statement or representation not contained in this Agreement. Any subsequent change or changes in my duties, Salary, or compensation will not affect the validity or scope of this Agreement.

**D. Headings.** Headings are used in this Agreement for reference only and shall not be considered when interpreting this Agreement.

**E. Severability.** If a court or other body of competent jurisdiction finds, or the Parties mutually believe, any provision of this Agreement, or portion thereof, to be invalid or unenforceable, such provision will be enforced to the maximum extent permissible so as to effect the intent of the Parties, and the remainder of this Agreement will continue in full force and effect.

**F. Modification, Waiver.** No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in a writing signed by the President or CEO of Faraday & Future. and me. Waiver by Faraday & Future, of a breach of any provision of this Agreement will not operate as a waiver of any other or subsequent breach.

**G. Survivorship.** The rights and obligations of the parties to this Agreement will survive termination of my employment with the Company.

Employee:

Name (printed)   *KRANZ ULRICH*    Date *07/25/2017*

Signature

Witness:

Name (printed)

Signature

# EXHIBIT C

# Faraday & Future
## AT-WILL EMPLOYMENT, CONFIDENTIAL INFORMATION, INVENTION ASSIGNMENT, AND ARBITRATION AGREEMENT

As a condition of my employment with Faraday & Future its subsidiaries, affiliates, successors or assigns (together, the "Company"), and in consideration of my employment with the Company and my receipt of the compensation now and hereafter paid to me by Company, I agree to the following provisions of this Faraday & Future At-Will Employment, Confidential Information, Invention Assignment, and Arbitration Agreement (this "Agreement"):

1. **AT-WILL EMPLOYMENT**

   I UNDERSTAND AND ACKNOWLEDGE THAT MY EMPLOYMENT WITH THE COMPANY IS FOR NO SPECIFIED TERM AND CONSTITUTES "AT-WILL" EMPLOYMENT. I ALSO UNDERSTAND THAT ANY REPRESENTATION TO THE CONTRARY IS UNAUTHORIZED AND NOT VALID UNLESS IN WRITING AND SIGNED BY THE PRESIDENT OR CEO OF FARADAY & FUTURE. ACCORDINGLY, I ACKNOWLEDGE THAT MY EMPLOYMENT RELATIONSHIP MAY BE TERMINATED AT ANY TIME, WITH OR WITHOUT GOOD CAUSE OR FOR ANY OR NO CAUSE, AT MY OPTION OR AT THE OPTION OF THE COMPANY, WITH OR WITHOUT NOTICE. I FURTHER ACKNOWLEDGE THAT THE COMPANY MAY MODIFY JOB TITLES, SALARIES, AND BENEFITS FROM TIME TO TIME AS IT DEEMS NECESSARY.

2. **CONFIDENTIALITY**

   A. *Definition of Confidential Information.* I understand that "Company Confidential Information" means information that the Company has or will develop, acquire, create, compile, discover or own, that has value in or to the Company's business which is not generally known and which the Company wishes to maintain as confidential. Company Confidential Information includes both information disclosed by the Company to me, and information developed or learned by me during the course of my employment with Company. Company Confidential Information also includes all information of which the unauthorized disclosure could be detrimental to the interests of Company, whether or not such information is identified as Company Confidential Information. By example, and without limitation, Company Confidential Information includes any and all non-public information that relates to the actual or anticipated business and/or products, research or development of the Company, or to the Company's technical data, trade secrets, or know-how, including, but not limited to, research, product plans, or other information regarding the Company's products or services and markets therefor, customer lists and customers (including, but not limited to, customers of the Company on which I called or with which I may become acquainted during the term of my employment), software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances, and other business information disclosed by the Company either directly or indirectly in writing, orally or by drawings or inspection of premises, parts, equipment, or other Company property.

Notwithstanding the foregoing, Company Confidential Information shall not include any such information which I can establish (i) was publicly known or made generally available prior to the time of disclosure by Company to me; (ii) becomes publicly known or made generally available after disclosure by Company to me through no wrongful action or omission by me; or (iii) is in my rightful possession, without confidentiality obligations, at the time of disclosure by Company as shown by my then-contemporaneous written records. I understand that nothing in this Agreement is intended to limit employees' rights to discuss the terms, wages, and working conditions of their employment, as protected by applicable law.

B. *Nonuse and Nondisclosure*. I agree that during and after my employment with the Company, I will hold in the strictest confidence, and take all reasonable precautions to prevent any unauthorized use or disclosure of Company Confidential Information, and I will not (i) use the Company Confidential Information for any purpose whatsoever other than for the benefit of the Company in the course of my employment, or (ii) disclose the Company Confidential Information to any third party without the prior written authorization of the President, CEO, or the Board of Directors of the Company. Prior to disclosure when compelled by applicable law, I shall provide prior written notice to the President, CEO, and General Counsel of Faraday & Future, (as applicable). I agree that I obtain no title to any Company Confidential Information, and that as between Company and myself, Faraday & Future retains all Confidential Information as the sole property of Faraday & Future. I understand that my unauthorized use or disclosure of Company Confidential Information during my employment may lead to disciplinary action, up to and including immediate termination and legal action by the Company. I understand that my obligations under this **Section 2.B** shall continue after termination of my employment.

C. *Former Employer Confidential Information*. I agree that during my employment with the Company, I will not improperly use, disclose, or induce the Company to use any proprietary information or trade secrets of any former employer or other person or entity with which I have an obligation to keep in confidence. I further agree that I will not bring onto the Company's premises or transfer onto the Company's technology systems any unpublished document, proprietary information, or trade secrets belonging to any such third party unless disclosure to, and use by, the Company has been consented to in writing by such third party.

D. *Third Party Information*. I recognize that the Company has received and in the future will receive from third parties associated with the Company, e.g., the Company's customers, suppliers, licensors, licensees, partners, or collaborators ("**Associated Third Parties**"), their confidential or proprietary information ("**Associated Third Party Confidential Information**") subject to a duty on the Company's part to maintain the confidentiality of such Associated Third Party Confidential Information and to use it only for certain limited purposes. By way of example, Associated Third Party Confidential Information may include the habits or practices of Associated Third Parties, the technology of Associated Third Parties, requirements of Associated Third Parties, and information related to the business conducted between the Company and such Associated Third Parties. I agree at all times during my employment with

the Company and thereafter, that I owe the Company and its Associated Third Parties a duty to hold all such Associated Third Party Confidential Information in the strictest confidence, and not to use it or to disclose it to any person, firm, corporation, or other third party except as necessary in carrying out my work for the Company consistent with the Company's agreement with such Associated Third Parties. I further agree to comply with any and all Company policies and guidelines that may be adopted from time to time regarding Associated Third Parties and Associated Third Party Confidential Information. I understand that my unauthorized use or disclosure of Associated Third Party Confidential Information or violation of any Company policies during my employment may lead to disciplinary action, up to and including immediate termination and legal action by the Company.

3.   OWNERSHIP

A.   *Assignment of Inventions.* As between Company and myself, I agree that all right, title, and interest in and to any and all copyrightable material, notes, records, drawings, designs, inventions, improvements, developments, discoveries and trade secrets conceived, discovered, authored, invented, developed or reduced to practice by me, solely or in collaboration with others, during the period of time I am in the employ of the Company (including during my off-duty hours), or with the use of Company's equipment, supplies, facilities, or Company Confidential Information, and any copyrights, patents, trade secrets, mask work rights or other intellectual property rights relating to the foregoing, except as provided in **Section 3.G** below (collectively, "**Inventions**"), are the sole property of Faraday & Future. I also agree to promptly make full written disclosure to Faraday & Future, of any Inventions, and to deliver and assign and hereby irrevocably assign fully to Faraday & Future, all of my right, title and interest in and to Inventions. I agree that this assignment includes a present conveyance to Faraday & Future, of ownership of Inventions that are not yet in existence. I further acknowledge that all original works of authorship that are made by me (solely or jointly with others) within the scope of and during the period of my employment with the Company and that are protectable by copyright are "works made for hire," as that term is defined in the United States Copyright Act. I understand and agree that the decision whether or not to commercialize or market any Inventions is within the Company's sole discretion and for the Company's sole benefit, and that no royalty or other consideration will be due to me as a result of the Company's efforts to commercialize or market any such Inventions.

B.   *Pre-Existing Materials.* I have attached hereto as Exhibit A, a list describing all inventions, discoveries, original works of authorship, developments, improvements, trade secrets and other proprietary information or intellectual property rights owned by me or in which I have an interest prior to, or separate from, my employment with the Company and which are subject to California Labor Code Section 2870 (attached hereto as Exhibit B), and which relate to the Company's proposed business, products, or research and development ("**Prior Inventions**"); or, if no such list is attached, I represent and warrant that there are no such Prior Inventions. Furthermore, I represent and warrant that if any Prior Inventions are included on Exhibit A, they will not materially affect my ability to perform all obligations under this Agreement. I will inform Faraday & Future, in writing before incorporating such Prior Inventions into any

Invention or otherwise utilizing such Prior Invention in the course of my employment with the Company, and the Company is hereby granted a nonexclusive, royalty-free, perpetual, irrevocable, transferable worldwide license (with the right to grant and authorize sublicenses) to make, have made, use, import, offer for sale, sell, reproduce, distribute, modify, adapt, prepare derivative works of, display, perform, and otherwise exploit such Prior Inventions, without restriction, including, without limitation, as part of or in connection with such Invention, and to practice any method related thereto. I will not incorporate any invention, improvement, development, concept, discovery, work of authorship or other proprietary information owned by any third party into any Invention without Faraday & Future's prior written permission.

C. *Moral Rights.* Any assignment to Faraday & Future of Inventions includes all rights of attribution, paternity, integrity, modification, disclosure and withdrawal, and any other rights throughout the world that may be known as or referred to as "moral rights," "artist's rights," "droit moral," or the like (collectively, "**Moral Rights**"). To the extent that Moral Rights cannot be assigned under applicable law, I hereby waive and agree not to enforce any and all Moral Rights, including, without limitation, any limitation on subsequent modification, to the extent permitted under applicable law.

D. *Maintenance of Records.* I agree to keep and maintain adequate, current, accurate, and authentic written records of all Inventions made by me (solely or jointly with others) during the term of my employment with the Company. The records will be in the form of notes, sketches, drawings, electronic files, reports, or any other format that may be specified by the Company. As between Company and myself, the records are and will be available to and remain the sole property of Faraday & Future at all times.

E. *Further Assurances.* I agree to assist the Company, or its designee, at the Company's expense, in every proper way to secure the Company's rights in the Inventions in any and all countries, including the disclosure to the Company of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments, and all other instruments that the Company shall deem proper or necessary in order to apply for, register, obtain, maintain, defend, and enforce such rights, and in order to deliver, assign and convey to the Company, its successors, assigns, and nominees the sole and exclusive rights, title, and interest in and to all Inventions, and testifying in a suit or other proceeding relating to such Inventions. I further agree that my obligations under this **Section 3.E** shall continue after the termination of this Agreement.

F. *Attorney-in-Fact.* I agree that, if the Company is unable because of my unavailability, mental or physical incapacity, or for any other reason to secure my signature with respect to any Inventions, including, without limitation, for the purpose of applying for or pursuing any application for any United States or foreign patents or mask work or copyright registrations covering the Inventions assigned to Faraday & Future in Section 3.A, then I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agent and attorney-in-fact, to act for and on my behalf to execute and file any papers and oaths, and to do all other lawfully permitted acts with respect to such Inventions to further the

prosecution and issuance of patents, copyright and mask work registrations with the same legal force and effect as if executed by me. This power of attorney shall be deemed coupled with an interest, and shall be irrevocable.

      G. *Exception to Assignments.* I UNDERSTAND THAT THE PROVISIONS OF THIS AGREEMENT REQUIRING ASSIGNMENT OF INVENTIONS TO FARADAY & FUTURE DO NOT APPLY TO ANY INVENTION THAT QUALIFIES FULLY UNDER THE PROVISIONS OF CALIFORNIA LABOR CODE SECTION 2870 (ATTACHED HERETO AS EXHIBIT B). I WILL ADVISE FARADAY & FUTURE PROMPTLY IN WRITING OF ANY INVENTIONS THAT I BELIEVE MEET THE CRITERIA IN CALIFORNIA LABOR CODE SECTION 2870 AND ARE NOT OTHERWISE DISCLOSED ON EXHIBIT A.

### 4. CONFLICTING OBLIGATIONS

      A. *Current Obligations.* I agree that during the term of my employment with the Company, I will not engage in or undertake any other employment, occupation, consulting relationship, or commitment that is directly related to the business in which the Company is now involved or becomes involved or has plans to become involved, nor will I engage in any other activities that conflict with my obligations to the Company.

      B. *Prior Relationships.* Without limiting **Section 4.A**, I represent and warrant that I have no other agreements, relationships, or commitments to any other person or entity that conflict with the provisions of this Agreement, my obligations to the Company under this Agreement, or my ability to become employed and perform the services for which I am being hired by the Company. I further agree that if I have signed a confidentiality agreement or similar type of agreement with any former employer or other entity, I will comply with the terms of any such agreement to the extent that its terms are lawful under applicable law. I represent and warrant that after undertaking a careful search (including searches of my computers, cell phones, electronic devices, and documents), I have returned all property and confidential information belonging to all prior employers (and/or other third parties I have performed services for in accordance with the terms of my applicable agreement). Moreover, I agree to fully indemnify the Company, its directors, officers, agents, employees, investors, shareholders, administrators, affiliates, divisions, subsidiaries, predecessor and successor corporations, and assigns for all verdicts, judgments, settlements, and other losses incurred by any of them resulting from my breach of my obligations under any agreement with a third party to which I am a party or obligation to which I am bound, as well as any reasonable attorneys' fees and costs if the plaintiff is the prevailing party in such an action, except as prohibited by law.

### 5. RETURN OF COMPANY MATERIALS

      Upon separation from employment with the Company, on Company's earlier request during my employment, or at any time subsequent to my employment upon demand from the Company, I will immediately deliver to Faraday & Future and will not keep in my possession, recreate, or deliver to anyone else, any and all Company property, including, but not limited to,

Company Confidential Information, Associated Third Party Confidential Information, all devices and equipment belonging to the Company (including computers, handheld electronic devices, telephone equipment, and other electronic devices), all tangible embodiments of the Inventions, all electronically stored information and passwords to access such property, Company credit cards, records, data, notes, notebooks, reports, files, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, photographs, charts, any other documents and property, and reproductions of any of the foregoing items, including, without limitation, those records maintained pursuant to **Section 3.D**. I also consent to an exit interview to confirm my compliance with this **Article 5**.

6. <u>TERMINATION CERTIFICATION</u>

Upon separation from employment with the Company, I agree to immediately sign and deliver to the Company the "Termination Certification" attached hereto as **Exhibit C**. I also agree to keep Faraday & Future advised of my home and business address for a period of three (3) years after termination of my employment with the Company, so that the Company can contact me regarding my continuing obligations provided by this Agreement.

7. <u>NOTIFICATION OF NEW EMPLOYER</u>

In the event that I leave the employ of the Company, I hereby grant consent to notification by the Company to my new employer about my obligations under this Agreement.

8. <u>SOLICITATION OF EMPLOYEES</u>

To the fullest extent permitted under applicable law, I agree that during my employment and for a period of twelve (12) months immediately following the termination of my relationship with the Company for any reason, whether voluntary or involuntary, with or without cause, I will not directly or indirectly solicit any of the Company's employees to leave their employment at the Company. I agree that nothing in this **Article 8** shall affect my continuing obligations under this Agreement during and after this twelve (12) month period, including, without limitation, my obligations under **Article 2**.

9. <u>CONFLICT OF INTEREST GUIDELINES</u>

I agree to diligently adhere to all policies of the Company, including the Company's insider trading policies and the Company's Conflict of Interest Guidelines. A copy of the Company's current Conflict of Interest Guidelines is attached as **Exhibit D** hereto, but I understand that these Conflict of Interest Guidelines may be revised from time to time during my employment.

10. <u>REPRESENTATIONS</u>

Without limiting my obligations under **Section 3.E** above, I agree to execute any proper oath or verify any proper document required to carry out the terms of this Agreement. I

represent and warrant that my performance of all the terms of this Agreement will not breach any agreement to keep in confidence information acquired by me in confidence or in trust prior to my employment by the Company. I hereby represent and warrant that I have not entered into, and I will not enter into, any oral or written agreement in conflict herewith.

11. **AUDIT.**

I acknowledge that I have no reasonable expectation of privacy in any computer, technology system, email, handheld device, telephone, voicemail, or documents that are used to conduct the business of the Company. All information, data, and messages created, received, sent, or stored in these systems are, at all times, the property of the Company. As such, the Company has the right to audit and search all such items and systems, without further notice to me, to ensure that the Company is licensed to use the software on the Company's devices in compliance with the Company's software licensing policies, to ensure compliance with the Company's policies, and for any other business-related purposes in the Company's sole discretion. I understand that I am not permitted to add any unlicensed, unauthorized, or non-compliant applications to the Company's technology systems, including, without limitation, open source or free software not authorized by the Company, and that I shall refrain from copying unlicensed software onto the Company's technology systems or using non-licensed software or websites. I understand that it is my responsibility to comply with the Company's policies governing use of the Company's documents and the internet, email, telephone, and technology systems to which I will have access in connection with my employment.

I am aware that the Company has or may acquire software and systems that are capable of monitoring and recording all network traffic to and from any computer I may use. The Company reserves the right to access, review, copy, and delete any of the information, data, or messages accessed through these systems with or without notice to me and/or in my absence. This includes, but is not limited to, all e-mail messages sent or received, all website visits, all chat sessions, all news group activity (including groups visited, messages read, and postings by me), and all file transfers into and out of the Company's internal networks. The Company further reserves the right to retrieve previously deleted messages from e-mail or voicemail and monitor usage of the Internet, including websites visited and any information I have downloaded. In addition, the Company may review Internet and technology systems activity and analyze usage patterns, and may choose to publicize this data to assure that technology systems are devoted to legitimate business purposes.

12. **ARBITRATION AND EQUITABLE RELIEF.**

A. *Arbitration.* IN CONSIDERATION OF MY EMPLOYMENT WITH THE COMPANY, ITS PROMISE TO ARBITRATE ALL EMPLOYMENT-RELATED DISPUTES, AND MY RECEIPT OF THE COMPENSATION, PAY RAISES, AND OTHER BENEFITS PAID TO ME BY THE COMPANY, AT PRESENT AND IN THE FUTURE, I AGREE THAT ANY AND ALL CONTROVERSIES, CLAIMS, OR DISPUTES WITH ANYONE (INCLUDING THE COMPANY AND ANY EMPLOYEE, OFFICER, DIRECTOR, SHAREHOLDER, OR BENEFIT PLAN OF THE COMPANY, IN THEIR CAPACITY AS

SUCH OR OTHERWISE), WHETHER BROUGHT ON AN INDIVIDUAL, GROUP, OR CLASS BASIS, ARISING OUT OF, RELATING TO, OR RESULTING FROM MY EMPLOYMENT WITH THE COMPANY OR THE TERMINATION OF MY EMPLOYMENT WITH THE COMPANY, INCLUDING ANY BREACH OF THIS AGREEMENT, SHALL BE SUBJECT TO BINDING ARBITRATION UNDER THE ARBITRATION RULES SET FORTH IN CALIFORNIA CODE OF CIVIL PROCEDURE SECTION 1280 THROUGH 1294.2, INCLUDING SECTION 1281.8 (THE "ACT"), AND PURSUANT TO CALIFORNIA LAW. THE FEDERAL ARBITRATION ACT SHALL CONTINUE TO APPLY WITH FULL FORCE AND EFFECT NOTWITHSTANDING THE APPLICATION OF PROCEDURAL RULES SET FORTH IN THE ACT. DISPUTES THAT I AGREE TO ARBITRATE, AND THEREBY AGREE TO WAIVE ANY RIGHT TO A TRIAL BY JURY, INCLUDE ANY STATUTORY CLAIMS UNDER LOCAL, STATE, OR FEDERAL LAW, INCLUDING, BUT NOT LIMITED TO, CLAIMS UNDER TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, THE AMERICANS WITH DISABILITIES ACT OF 1990, THE AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967, THE OLDER WORKERS BENEFIT PROTECTION ACT, THE SARBANES-OXLEY ACT, THE WORKER ADJUSTMENT AND RETRAINING NOTIFICATION ACT, THE CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT, THE FAMILY AND MEDICAL LEAVE ACT, THE CALIFORNIA FAMILY RIGHTS ACT, THE CALIFORNIA LABOR CODE, CLAIMS OF HARASSMENT, DISCRIMINATION, AND WRONGFUL TERMINATION, AND ANY STATUTORY OR COMMON LAW CLAIMS. I FURTHER UNDERSTAND THAT THIS AGREEMENT TO ARBITRATE ALSO APPLIES TO ANY DISPUTES THAT THE COMPANY MAY HAVE WITH ME.

B.  *Procedure.*  I AGREE THAT ANY ARBITRATION WILL BE ADMINISTERED BY JUDICIAL ARBITRATION & MEDIATION SERVICES, INC. ("JAMS"), PURSUANT TO ITS EMPLOYMENT ARBITRATION RULES & PROCEDURES (THE "JAMS RULES"). I AGREE THAT THE ARBITRATOR SHALL HAVE THE POWER TO DECIDE ANY MOTIONS BROUGHT BY ANY PARTY TO THE ARBITRATION, INCLUDING MOTIONS FOR SUMMARY JUDGMENT AND/OR ADJUDICATION, MOTIONS TO DISMISS AND DEMURRERS, AND MOTIONS FOR CLASS CERTIFICATION, PRIOR TO ANY ARBITRATION HEARING.  I AGREE THAT THE ARBITRATOR SHALL ISSUE A WRITTEN DECISION ON THE MERITS. I ALSO AGREE THAT THE ARBITRATOR SHALL HAVE THE POWER TO AWARD ANY REMEDIES AVAILABLE UNDER APPLICABLE LAW, AND THAT THE ARBITRATOR SHALL AWARD ATTORNEYS' FEES AND COSTS TO THE PREVAILING PARTY, EXCEPT AS PROHIBITED BY LAW.  I AGREE THAT THE DECREE OR AWARD RENDERED BY THE ARBITRATOR MAY BE ENTERED AS A FINAL AND BINDING JUDGMENT IN ANY COURT HAVING JURISDICTION THEREOF.  I UNDERSTAND THAT THE COMPANY WILL PAY FOR ANY ADMINISTRATIVE OR HEARING FEES CHARGED BY THE ARBITRATOR OR JAMS EXCEPT THAT I SHALL PAY ANY FILING FEES ASSOCIATED WITH ANY ARBITRATION THAT I INITIATE, BUT ONLY SO MUCH OF THE FILING FEES AS I WOULD HAVE INSTEAD PAID HAD I FILED A COMPLAINT IN A COURT OF LAW.  I AGREE THAT THE ARBITRATOR SHALL ADMINISTER AND

CONDUCT ANY ARBITRATION IN ACCORDANCE WITH CALIFORNIA LAW, INCLUDING THE CALIFORNIA CODE OF CIVIL PROCEDURE, AND THAT THE ARBITRATOR SHALL APPLY SUBSTANTIVE AND PROCEDURAL CALIFORNIA LAW TO ANY DISPUTE OR CLAIM, WITHOUT REFERENCE TO RULES OF CONFLICT OF LAW. TO THE EXTENT THAT THE JAMS RULES CONFLICT WITH CALIFORNIA LAW, CALIFORNIA LAW SHALL TAKE PRECEDENCE. I AGREE THAT ANY ARBITRATION UNDER THIS AGREEMENT SHALL BE CONDUCTED IN SANTA CLARA COUNTY, CALIFORNIA.

C. *Remedy.* EXCEPT AS PROVIDED BY THE ACT AND THIS AGREEMENT, ARBITRATION SHALL BE THE SOLE, EXCLUSIVE, AND FINAL REMEDY FOR ANY DISPUTE BETWEEN ME AND THE COMPANY. ACCORDINGLY, EXCEPT AS PROVIDED FOR BY THE ACT AND THIS AGREEMENT, NEITHER I NOR THE COMPANY WILL BE PERMITTED TO PURSUE COURT ACTION REGARDING CLAIMS THAT ARE SUBJECT TO ARBITRATION.

D. *Administrative Relief.* I UNDERSTAND THAT THIS AGREEMENT DOES NOT PROHIBIT ME FROM PURSUING AN ADMINISTRATIVE CLAIM WITH A LOCAL, STATE, OR FEDERAL ADMINISTRATIVE BODY OR GOVERNMENT AGENCY THAT IS AUTHORIZED TO ENFORCE OR ADMINISTER LAWS RELATED TO EMPLOYMENT, INCLUDING, BUT NOT LIMITED TO, THE DEPARTMENT OF FAIR EMPLOYMENT AND HOUSING, THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, THE NATIONAL LABOR RELATIONS BOARD, OR THE WORKERS' COMPENSATION BOARD. THIS AGREEMENT DOES, HOWEVER, PRECLUDE ME FROM PURSUING COURT ACTION REGARDING ANY SUCH CLAIM, EXCEPT AS PERMITTED BY LAW.

E. *Voluntary Nature of Agreement.* I ACKNOWLEDGE AND AGREE THAT I AM EXECUTING THIS AGREEMENT VOLUNTARILY AND WITHOUT ANY DURESS OR UNDUE INFLUENCE BY THE COMPANY OR ANYONE ELSE. I ACKNOWLEDGE AND AGREE THAT I HAVE RECEIVED A COPY OF THE TEXT OF CALIFORNIA LABOR CODE SECTION 2870 IN EXHIBIT B. I FURTHER ACKNOWLEDGE AND AGREE THAT I HAVE CAREFULLY READ THIS AGREEMENT AND THAT I HAVE ASKED ANY QUESTIONS NEEDED FOR ME TO UNDERSTAND THE TERMS, CONSEQUENCES, AND BINDING EFFECT OF THIS AGREEMENT AND FULLY UNDERSTAND IT, INCLUDING THAT *I AM WAIVING MY RIGHT TO A JURY TRIAL.* FINALLY, I AGREE THAT I HAVE BEEN PROVIDED AN OPPORTUNITY TO SEEK THE ADVICE OF AN ATTORNEY OF MY CHOICE BEFORE SIGNING THIS AGREEMENT.

13. MISCELLANEOUS

A. *Governing Law; Consent to Personal Jurisdiction.* This Agreement will be governed by the laws of the State of California without regard to California's conflicts of law rules that may result in the application of the laws of any jurisdiction other than California. To the extent that any lawsuit is permitted under this Agreement, I hereby expressly consent to the

Page 9 of 17

personal and exclusive jurisdiction and venue of the state and federal courts located in California for any lawsuit filed against me by the Company.

B.  *Assignability*.  This Agreement will be binding upon my heirs, executors, assigns, administrators, and other legal representatives, and will be for the benefit of the Company, its successors, and its assigns.  There are no intended third-party beneficiaries to this Agreement, except as may be expressly otherwise stated.  Notwithstanding anything to the contrary herein, Faraday & Future, may assign this Agreement and its rights and obligations under this Agreement to any successor to all or substantially all of Faraday & Future's relevant assets, whether by merger, consolidation, reorganization, reincorporation, sale of assets or stock, or otherwise.

C.  *Entire Agreement*.  This Agreement, together with the Exhibits herein and any executed written offer letter between me and the Company, to the extent such materials are not in conflict with this Agreement, sets forth the entire agreement and understanding between the Company and me with respect to the subject matter herein and supersedes all prior written and oral agreements, discussions, or representations between us, including, but not limited to, any representations made during my interview(s) or relocation negotiations.  I represent and warrant that I am not relying on any statement or representation not contained in this Agreement.  Any subsequent change or changes in my duties, salary, or compensation will not affect the validity or scope of this Agreement.

D.  *Headings*. Headings are used in this Agreement for reference only and shall not be considered when interpreting this Agreement.

E.  *Severability*.  If a court or other body of competent jurisdiction finds, or the Parties mutually believe, any provision of this Agreement, or portion thereof, to be invalid or unenforceable, such provision will be enforced to the maximum extent permissible so as to effect the intent of the Parties, and the remainder of this Agreement will continue in full force and effect.

F.  *Modification, Waiver*.  No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in a writing signed by the President or CEO of Faraday & Future, and me.  Waiver by Faraday & Future of a breach of any provision of this Agreement will not operate as a waiver of any other or subsequent breach.

G.  *Survivorship*.  The rights and obligations of the parties to this Agreement will survive termination of my employment with the Company.

Date: ___3/24/ 2015___

Signature: _____

SOHEL   MERCHANT
Name of Employee (typed or printed)

Witness:

Signature _____

Name (typed or printed)

## EXHIBIT A

## LIST OF PRIOR INVENTIONS
## AND ORIGINAL WORKS OF AUTHORSHIP

| Title | Date | Identifying Number or Brief Description |
|---|---|---|
| | | |

____ No inventions or improvements

____ Additional Sheets Attached

Date: _____     _____
                                  Signature

                                  _____
                                  Name of Employee (typed or printed)

Page 12 of 17

## EXHIBIT B

### CALIFORNIA LABOR CODE SECTION 2870
### INVENTION ON OWN TIME-EXEMPTION FROM AGREEMENT

"(a)    Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

(1)    Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or

(2)    Result from any work performed by the employee for the employer.

(b)    To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable."

## EXHIBIT C

## FARADAY & FUTURE, TERMINATION CERTIFICATION

This is to certify that I do not have in my possession, nor have I failed to return, any devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, any other documents or property, or reproductions of any and all aforementioned items belonging to Faraday & Future, its subsidiaries, affiliates, successors or assigns (together, the "**Company**").

I further certify that I have complied with all the terms of the Company's At-Will Employment, Confidential Information, Invention Assignment, and Arbitration Agreement signed by me, including the reporting of any inventions and original works of authorship (as defined therein) conceived or made by me (solely or jointly with others), as covered by that agreement.

I further agree that, in compliance with the At-Will Employment, Confidential Information, Invention Assignment, and Arbitration Agreement, I will preserve as confidential all Company Confidential Information and Associated Third Party Confidential Information, including trade secrets, confidential knowledge, data, or other proprietary information relating to products, processes, know-how, designs, formulas, developmental or experimental work, computer programs, databases, other original works of authorship, customer lists, business plans, financial information, or other subject matter pertaining to any business of the Company or any of its employees, clients, consultants, or licensees.

I also agree that for twelve (12) months from this date, I will not directly or indirectly solicit any of the Company's employees to leave their employment at the Company. I agree that nothing in this paragraph shall affect my continuing obligations under the At-Will Employment, Confidential Information, Invention Assignment, and Arbitration Agreement during and after this twelve (12) month period, including, without limitation, my obligations under **Article 2** (Confidentiality) thereof.

After leaving the Company's employment, I will be employed by _____ in the position of _____.

Date: _____

_____
Signature

_____
Name of Employee (typed or printed)

Page 14 of 17

Address for Notifications:

## EXHIBIT D

## FARADAY & FUTURE, CONFLICT OF INTEREST GUIDELINES

It is the policy of Faraday & Future to conduct its affairs in strict compliance with the letter and spirit of the law and to adhere to the highest principles of business ethics. Accordingly, all officers, employees, and independent contractors must avoid activities that are in conflict, or give the appearance of being in conflict, with these principles and with the interests of the Company. The following are potentially compromising situations that must be avoided:

1.     Revealing confidential information to outsiders or misusing confidential information. Unauthorized divulging of information is a violation of this policy whether or not for personal gain and whether or not harm to the Company is intended. (The At-Will Employment, Confidential Information, Invention Assignment, and Arbitration Agreement elaborates on this principle and is a binding agreement.)

2.     Accepting or offering substantial gifts, excessive entertainment, favors, or payments that may be deemed to constitute undue influence or otherwise be improper or embarrassing to the Company.

3.     Participating in civic or professional organizations that might involve divulging confidential information of the Company.

4.     Initiating or approving personnel actions affecting reward or punishment of employees or applicants where there is a family relationship or is or appears to be a personal or social involvement.

5.     Initiating or approving any form of personal or social harassment of employees.

6.     Investing or holding outside directorship in suppliers, customers, or competing companies, including financial speculations, where such investment or directorship might influence in any manner a decision or course of action of the Company.

7.     Borrowing from or lending to employees, customers, or suppliers.

8.     Acquiring real estate of interest to the Company.

9.     Improperly using or disclosing to the Company any proprietary information or trade secrets of any former or concurrent employer or other person or entity with whom obligations of confidentiality exist.

10.     Unlawfully discussing prices, costs, customers, sales, or markets with competing companies or their employees.

11.     Making any unlawful agreement with distributors with respect to prices.

12.     Improperly using or authorizing the use of any inventions that are the subject of patent claims of any other person or entity.

13.    Engaging in any conduct that is not in the best interest of the Company.

Each officer, employee, and independent contractor must take every necessary action to ensure compliance with these guidelines and to bring problem areas to the attention of higher management for review.  Violations of this conflict of interest policy may result in discharge without warning.

# EXHIBIT D

# Faraday & Future
## AT-WILL EMPLOYMENT, CONFIDENTIAL INFORMATION, INVENTION ASSIGNMENT, AND ARBITRATION AGREEMENT

As a condition of my employment with Faraday & Future its subsidiaries, affiliates, successors or assigns (together, the "Company"), and in consideration of my employment with the Company and my receipt of the compensation now and hereafter paid to me by Company, I agree to the following provisions of this Faraday & Future At-Will Employment, Confidential Information, Invention Assignment, and Arbitration Agreement (this "Agreement"):

1.  ### AT-WILL EMPLOYMENT

I UNDERSTAND AND ACKNOWLEDGE THAT MY EMPLOYMENT WITH THE COMPANY IS FOR NO SPECIFIED TERM AND CONSTITUTES "AT-WILL" EMPLOYMENT. I ALSO UNDERSTAND THAT ANY REPRESENTATION TO THE CONTRARY IS UNAUTHORIZED AND NOT VALID UNLESS IN WRITING AND SIGNED BY THE PRESIDENT OR CEO OF FARADAY & FUTURE. ACCORDINGLY, I ACKNOWLEDGE THAT MY EMPLOYMENT RELATIONSHIP MAY BE TERMINATED AT ANY TIME, WITH OR WITHOUT GOOD CAUSE OR FOR ANY OR NO CAUSE, AT MY OPTION OR AT THE OPTION OF THE COMPANY, WITH OR WITHOUT NOTICE. I FURTHER ACKNOWLEDGE THAT THE COMPANY MAY MODIFY JOB TITLES, SALARIES, AND BENEFITS FROM TIME TO TIME AS IT DEEMS NECESSARY.

2.  ### CONFIDENTIALITY

A. *Definition of Confidential Information.* I understand that "Company Confidential Information" means information that the Company has or will develop, acquire, create, compile, discover or own, that has value in or to the Company's business which is not generally known and which the Company wishes to maintain as confidential. Company Confidential Information includes both information disclosed by the Company to me, and information developed or learned by me during the course of my employment with Company. Company Confidential Information also includes all information of which the unauthorized disclosure could be detrimental to the interests of Company, whether or not such information is identified as Company Confidential Information. By example, and without limitation, Company Confidential Information includes any and all non-public information that relates to the actual or anticipated business and/or products, research or development of the Company, or to the Company's technical data, trade secrets, or know-how, including, but not limited to, research, product plans, or other information regarding the Company's products or services and markets therefor, customer lists and customers (including, but not limited to, customers of the Company on which I called or with which I may become acquainted during the term of my employment), software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances, and other business information disclosed by the Company either directly or indirectly in writing, orally or by drawings or inspection of premises, parts, equipment, or other Company property.

Notwithstanding the foregoing, Company Confidential Information shall not include any such information which I can establish: (i) was publicly known or made generally available prior to the time of disclosure by Company to me; (ii) becomes publicly known or made generally available after disclosure by Company to me through no wrongful action or omission by me; or (iii) is in my rightful possession, without confidentiality obligations, at the time of disclosure by Company as shown by my then-contemporaneous written records. I understand that nothing in this Agreement is intended to limit employees' rights to discuss the terms, wages, and working conditions of their employment, as protected by applicable law.

B. *Nonuse and Nondisclosure.* I agree that during and after my employment with the Company, I will hold in the strictest confidence, and take all reasonable precautions to prevent any unauthorized use or disclosure of Company Confidential Information, and I will not (i) use the Company Confidential Information for any purpose whatsoever other than for the benefit of the Company in the course of my employment, or (ii) disclose the Company Confidential Information to any third party without the prior written authorization of the President, CEO, or the Board of Directors of the Company. Prior to disclosure when compelled by applicable law, I shall provide prior written notice to the President, CEO, and General Counsel of Faraday & Future (as applicable). I agree that I obtain no title to any Company Confidential Information, and that as between Company and myself, Faraday & Future retains all Confidential Information as the sole property of Faraday & Future. I understand that my unauthorized use or disclosure of Company Confidential Information during my employment may lead to disciplinary action, up to and including immediate termination and legal action by the Company. I understand that my obligations under this **Section 2.B** shall continue after termination of my employment.

C. *Former Employer Confidential Information.* I agree that during my employment with the Company, I will not improperly use, disclose, or induce the Company to use any proprietary information or trade secrets of any former employer or other person or entity with which I have an obligation to keep in confidence. I further agree that I will not bring onto the Company's premises or transfer onto the Company's technology systems any unpublished document, proprietary information, or trade secrets belonging to any such third party unless disclosure to, and use by, the Company has been consented to in writing by such third party.

D. *Third Party Information.* I recognize that the Company has received and in the future will receive from third parties associated with the Company, e.g., the Company's customers, suppliers, licensors, licensees, partners, or collaborators ("**Associated Third Parties**"), their confidential or proprietary information ("**Associated Third Party Confidential Information**") subject to a duty on the Company's part to maintain the confidentiality of such Associated Third Party Confidential Information and to use it only for certain limited purposes. By way of example, Associated Third Party Confidential Information may include the habits or practices of Associated Third Parties, the technology of Associated Third Parties, requirements of Associated Third Parties, and information related to the business conducted between the Company and such Associated Third Parties. I agree at all times during my employment with

the Company and thereafter, that I owe the Company and its Associated Third Parties a duty to hold all such Associated Third Party Confidential Information in the strictest confidence, and not to use it or to disclose it to any person, firm, corporation, or other third party except as necessary in carrying out my work for the Company consistent with the Company's agreement with such Associated Third Parties. I further agree to comply with any and all Company policies and guidelines that may be adopted from time to time regarding Associated Third Parties and Associated Third Party Confidential Information. I understand that my unauthorized use or disclosure of Associated Third Party Confidential Information or violation of any Company policies during my employment may lead to disciplinary action, up to and including immediate termination and legal action by the Company.

3.   OWNERSHIP

A.   *Assignment of Inventions.* As between Company and myself, I agree that all right, title, and interest in and to any and all copyrightable material, notes, records, drawings, designs, inventions, improvements, developments, discoveries and trade secrets conceived, discovered, authored, invented, developed or reduced to practice by me, solely or in collaboration with others, during the period of time I am in the employ of the Company (including during my off-duty hours), or with the use of Company's equipment, supplies, facilities, or Company Confidential Information, and any copyrights, patents, trade secrets, mask work rights or other intellectual property rights relating to the foregoing, except as provided in **Section 3.G** below (collectively, "**Inventions**"), are the sole property of Faraday & Future. I also agree to promptly make full written disclosure to Faraday & Future of any Inventions, and to deliver and assign and hereby irrevocably assign fully to Faraday & Future all of my right, title and interest in and to Inventions. I agree that this assignment includes a present conveyance to Faraday & Future of ownership of Inventions that are not yet in existence. I further acknowledge that all original works of authorship that are made by me (solely or jointly with others) within the scope and during the period of my employment with the Company and that are protectable by copyright are "works made for hire," as that term is defined in the United States Copyright Act. I understand and agree that the decision whether or not to commercialize or market any Inventions is within the Company's sole discretion and for the Company's sole benefit, and that no royalty or other consideration will be due to me as a result of the Company's efforts to commercialize or market any such Inventions.

B.   *Pre-Existing Materials.* I have attached hereto as Exhibit A, a list describing all inventions, discoveries, original works of authorship, developments, improvements, trade secrets and other proprietary information or intellectual property rights owned by me or in which I have an interest prior to, or separate from, my employment with the Company and which are subject to California Labor Code Section 2870 (attached hereto as Exhibit B), and which relate to the Company's proposed business, products, or research and development ("**Prior Inventions**"); or, if no such list is attached, I represent and warrant that there are no such Prior Inventions. Furthermore, I represent and warrant that if any Prior Inventions are included on Exhibit A, they will not materially affect my ability to perform all obligations under this Agreement. I will inform Faraday & Future in writing before incorporating such Prior Inventions into any

Invention or otherwise utilizing such Prior Invention in the course of my employment with the Company, and the Company is hereby granted a nonexclusive, royalty-free, perpetual, irrevocable, transferable worldwide license (with the right to grant and authorize sublicenses) to make, have made, use, import, offer for sale, sell, reproduce, distribute, modify, adapt, prepare derivative works of, display, perform, and otherwise exploit such Prior Inventions, without restriction, including, without limitation, as part of or in connection with such Invention, and to practice any method related thereto. I will not incorporate any invention, improvement, development, concept, discovery, work of authorship or other proprietary information owned by any third party into any Invention without Faraday & Future's prior written permission.

C.   *Moral Rights.*  Any assignment to Faraday & Future of Inventions includes all rights of attribution, paternity, integrity, modification, disclosure and withdrawal, and any other rights throughout the world that may be known as or referred to as "moral rights," "artist's rights," "droit moral," or the like (collectively, "**Moral Rights**").  To the extent that Moral Rights cannot be assigned under applicable law, I hereby waive and agree not to enforce any and all Moral Rights, including, without limitation, any limitation on subsequent modification, to the extent permitted under applicable law.

D.   *Maintenance of Records.*  I agree to keep and maintain adequate, current, accurate, and authentic written records of all Inventions made by me (solely or jointly with others) during the term of my employment with the Company.  The records will be in the form of notes, sketches, drawings, electronic files, reports, or any other format that may be specified by the Company.  As between Company and myself, the records are and will be available to and remain the sole property of Faraday & Future at all times.

E.   *Further Assurances.*  I agree to assist the Company, or its designee, at the Company's expense, in every proper way to secure the Company's rights in the Inventions in any and all countries, including the disclosure to the Company of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments, and all other instruments that the Company shall deem proper or necessary in order to apply for, register, obtain, maintain, defend, and enforce such rights, and in order to deliver, assign and convey to the Company, its successors, assigns, and nominees the sole and exclusive rights, title, and interest in and to all Inventions, and testifying in a suit or other proceeding relating to such Inventions.  I further agree that my obligations under this **Section 3.E** shall continue after the termination of this Agreement.

F.   *Attorney-in-Fact.*  I agree that, if the Company is unable because of my unavailability, mental or physical incapacity, or for any other reason to secure my signature with respect to any Inventions, including, without limitation, for the purpose of applying for or pursuing any application for any United States or foreign patents or mask work or copyright registrations covering the Inventions assigned to Faraday & Future in **Section 3.A**, then I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agent and attorney-in-fact, to act for and on my behalf to execute and file any papers and oaths, and to do all other lawfully permitted acts with respect to such Inventions to further the

prosecution and issuance of patents, copyright and mask work registrations with the same legal force and effect as if executed by me. This power of attorney shall be deemed coupled with an interest, and shall be irrevocable.

G. *Exception to Assignments.* I UNDERSTAND THAT THE PROVISIONS OF THIS AGREEMENT REQUIRING ASSIGNMENT OF INVENTIONS TO FARADAY & FUTURE DO NOT APPLY TO ANY INVENTION THAT QUALIFIES FULLY UNDER THE PROVISIONS OF CALIFORNIA LABOR CODE SECTION 2870 (ATTACHED HERETO AS EXHIBIT B). I WILL ADVISE FARADAY & FUTURE. PROMPTLY IN WRITING OF ANY INVENTIONS THAT I BELIEVE MEET THE CRITERIA IN CALIFORNIA LABOR CODE SECTION 2870 AND ARE NOT OTHERWISE DISCLOSED ON EXHIBIT A.

4.   CONFLICTING OBLIGATIONS

A. *Current Obligations.* I agree that during the term of my employment with the Company, I will not engage in or undertake any other employment, occupation, consulting relationship, or commitment that is directly related to the business in which the Company is now involved or becomes involved or has plans to become involved, nor will I engage in any other activities that conflict with my obligations to the Company.

B. *Prior Relationships.* Without limiting Section 4.A, I represent and warrant that I have no other agreements, relationships, or commitments to any other person or entity that conflict with the provisions of this Agreement, my obligations to the Company under this Agreement, or my ability to become employed and perform the services for which I am being hired by the Company. I further agree that if I have signed a confidentiality agreement or similar type of agreement with any former employer or other entity, I will comply with the terms of any such agreement to the extent that its terms are lawful under applicable law. I represent and warrant that after undertaking a careful search (including searches of my computers, cell phones, electronic devices, and documents), I have returned all property and confidential information belonging to all prior employers (and/or other third parties I have performed services for in accordance with the terms of my applicable agreement). Moreover, I agree to fully indemnify the Company, its directors, officers, agents, employees, investors, shareholders, administrators, affiliates, divisions, subsidiaries, predecessor and successor corporations, and assigns for all verdicts, judgments, settlements, and other losses incurred by any of them resulting from my breach of my obligations under any agreement with a third party to which I am a party or obligation to which I am bound, as well as any reasonable attorneys' fees and costs if the plaintiff is the prevailing party in such an action, except as prohibited by law.

5.   RETURN OF COMPANY MATERIALS

Upon separation from employment with the Company, on Company's earlier request during my employment, or at any time subsequent to my employment upon demand from the Company, I will immediately deliver to Faraday & Future and will not keep in my possession, recreate, or deliver to anyone else, any and all Company property, including, but not limited to,

Company Confidential Information, Associated Third Party Confidential Information, all devices and equipment belonging to the Company (including computers, handheld electronic devices, telephone equipment, and other electronic devices), all tangible embodiments of the Inventions, all electronically stored information and passwords to access such property, Company credit cards, records, data, notes, notebooks, reports, files, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, photographs, charts, any other documents and property, and reproductions of any of the foregoing items, including, without limitation, those records maintained pursuant to **Section 3.D**. I also consent to an exit interview to confirm my compliance with this **Article 5**.

6.  **TERMINATION CERTIFICATION**

Upon separation from employment with the Company, I agree to immediately sign and deliver to the Company the "Termination Certification" attached hereto as **Exhibit C**. I also agree to keep Faraday & Future advised of my home and business address for a period of three (3) years after termination of my employment with the Company, so that the Company can contact me regarding my continuing obligations provided by this Agreement.

7.  **NOTIFICATION OF NEW EMPLOYER**

In the event that I leave the employ of the Company, I hereby grant consent to notification by the Company to my new employer about my obligations under this Agreement.

8.  **SOLICITATION OF EMPLOYEES**

To the fullest extent permitted under applicable law, I agree that during my employment and for a period of twelve (12) months immediately following the termination of my relationship with the Company for any reason, whether voluntary or involuntary, with or without cause, I will not directly or indirectly solicit any of the Company's employees to leave their employment at the Company. I agree that nothing in this **Article 8** shall affect my continuing obligations under this Agreement during and after this twelve (12) month period, including, without limitation, my obligations under **Article 2**.

9.  **CONFLICT OF INTEREST GUIDELINES**

I agree to diligently adhere to all policies of the Company, including the Company's insider trading policies and the Company's Conflict of Interest Guidelines. A copy of the Company's current Conflict of Interest Guidelines is attached as **Exhibit D** hereto, but I understand that these Conflict of Interest Guidelines may be revised from time to time during my employment.

10. **REPRESENTATIONS**

Without limiting my obligations under **Section 3.E** above, I agree to execute any proper oath or verify any proper document required to carry out the terms of this Agreement. I

represent and warrant that my performance of all the terms of this Agreement will not breach any agreement to keep in confidence information acquired by me in confidence or in trust prior to my employment by the Company. I hereby represent and warrant that I have not entered into, and I will not enter into, any oral or written agreement in conflict herewith.

11.   AUDIT

I acknowledge that I have no reasonable expectation of privacy in any computer, technology system, email, handheld device, telephone, voicemail, or documents that are used to conduct the business of the Company. All information, data, and messages created, received, sent, or stored in these systems are, at all times, the property of the Company. As such, the Company has the right to audit and search all such items and systems, without further notice to me, to ensure that the Company is licensed to use the software on the Company's devices in compliance with the Company's software licensing policies, to ensure compliance with the Company's policies, and for any other business-related purposes in the Company's sole discretion. I understand that I am not permitted to add any unlicensed, unauthorized, or non-compliant applications to the Company's technology systems, including, without limitation, open source or free software not authorized by the Company; and that I shall refrain from copying unlicensed software onto the Company's technology systems or using non-licensed software or websites. I understand that it is my responsibility to comply with the Company's policies governing use of the Company's documents and the internet, email, telephone, and technology systems to which I will have access in connection with my employment.

I am aware that the Company has or may acquire software and systems that are capable of monitoring and recording all network traffic to and from any computer I may use. The Company reserves the right to access, review, copy, and delete any of the information, data, or messages accessed through these systems with or without notice to me and/or in my absence. This includes, but is not limited to, all e-mail messages sent or received, all website visits, all chat sessions, all news group activity (including groups visited, messages read, and postings by me), and all file transfers into and out of the Company's internal networks. The Company further reserves the right to retrieve previously deleted messages from e-mail or voicemail and monitor usage of the Internet, including websites visited and any information I have downloaded. In addition, the Company may review Internet and technology systems activity and analyze usage patterns, and may choose to publicize this data to assure that technology systems are devoted to legitimate business purposes.

12.   ARBITRATION AND EQUITABLE RELIEF

A.   *Arbitration.* IN CONSIDERATION OF MY EMPLOYMENT WITH THE COMPANY, ITS PROMISE TO ARBITRATE ALL EMPLOYMENT-RELATED DISPUTES, AND MY RECEIPT OF THE COMPENSATION, PAY RAISES, AND OTHER BENEFITS PAID TO ME BY THE COMPANY, AT PRESENT AND IN THE FUTURE, I AGREE THAT ANY AND ALL CONTROVERSIES, CLAIMS, OR DISPUTES WITH ANYONE (INCLUDING THE COMPANY AND ANY EMPLOYEE, OFFICER, DIRECTOR, SHAREHOLDER, OR BENEFIT PLAN OF THE COMPANY, IN THEIR CAPACITY AS

SUCH OR OTHERWISE), WHETHER BROUGHT ON AN INDIVIDUAL, GROUP, OR CLASS BASIS, ARISING OUT OF, RELATING TO, OR RESULTING FROM MY EMPLOYMENT WITH THE COMPANY OR THE TERMINATION OF MY EMPLOYMENT WITH THE COMPANY, INCLUDING ANY BREACH OF THIS AGREEMENT, SHALL BE SUBJECT TO BINDING ARBITRATION UNDER THE ARBITRATION RULES SET FORTH IN CALIFORNIA CODE OF CIVIL PROCEDURE SECTION 1280 THROUGH 1294.2, INCLUDING SECTION 1281.8 (THE "ACT"), AND PURSUANT TO CALIFORNIA LAW. THE FEDERAL ARBITRATION ACT SHALL CONTINUE TO APPLY WITH FULL FORCE AND EFFECT NOTWITHSTANDING THE APPLICATION OF PROCEDURAL RULES SET FORTH IN THE ACT. DISPUTES THAT I AGREE TO ARBITRATE, AND THEREBY AGREE TO WAIVE ANY RIGHT TO A TRIAL BY JURY, INCLUDE ANY STATUTORY CLAIMS UNDER LOCAL, STATE, OR FEDERAL LAW, INCLUDING, BUT NOT LIMITED TO, CLAIMS UNDER TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, THE AMERICANS WITH DISABILITIES ACT OF 1990, THE AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967, THE OLDER WORKERS BENEFIT PROTECTION ACT, THE SARBANES-OXLEY ACT, THE WORKER ADJUSTMENT AND RETRAINING NOTIFICATION ACT, THE CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT, THE FAMILY AND MEDICAL LEAVE ACT, THE CALIFORNIA FAMILY RIGHTS ACT, THE CALIFORNIA LABOR CODE, CLAIMS OF HARASSMENT, DISCRIMINATION, AND WRONGFUL TERMINATION, AND ANY STATUTORY OR COMMON LAW CLAIMS. I FURTHER UNDERSTAND THAT THIS AGREEMENT TO ARBITRATE ALSO APPLIES TO ANY DISPUTES THAT THE COMPANY MAY HAVE WITH ME.

      B. *Procedure.* I AGREE THAT ANY ARBITRATION WILL BE ADMINISTERED BY JUDICIAL ARBITRATION & MEDIATION SERVICES, INC. ("JAMS"), PURSUANT TO ITS EMPLOYMENT ARBITRATION RULES & PROCEDURES (THE "JAMS RULES"). I AGREE THAT THE ARBITRATOR SHALL HAVE THE POWER TO DECIDE ANY MOTIONS BROUGHT BY ANY PARTY TO THE ARBITRATION, INCLUDING MOTIONS FOR SUMMARY JUDGMENT AND/OR ADJUDICATION, MOTIONS TO DISMISS AND DEMURRERS, AND MOTIONS FOR CLASS CERTIFICATION, PRIOR TO ANY ARBITRATION HEARING. I AGREE THAT THE ARBITRATOR SHALL ISSUE A WRITTEN DECISION ON THE MERITS. I ALSO AGREE THAT THE ARBITRATOR SHALL HAVE THE POWER TO AWARD ANY REMEDIES AVAILABLE UNDER APPLICABLE LAW, AND THAT THE ARBITRATOR SHALL AWARD ATTORNEYS' FEES AND COSTS TO THE PREVAILING PARTY, EXCEPT AS PROHIBITED BY LAW. I AGREE THAT THE DECREE OR AWARD RENDERED BY THE ARBITRATOR MAY BE ENTERED AS A FINAL AND BINDING JUDGMENT IN ANY COURT HAVING JURISDICTION THEREOF. I UNDERSTAND THAT THE COMPANY WILL PAY FOR ANY ADMINISTRATIVE OR HEARING FEES CHARGED BY THE ARBITRATOR OR JAMS EXCEPT THAT I SHALL PAY ANY FILING FEES ASSOCIATED WITH ANY ARBITRATION THAT I INITIATE, BUT ONLY SO MUCH OF THE FILING FEES AS I WOULD HAVE INSTEAD PAID HAD I FILED A COMPLAINT IN A COURT OF LAW. I AGREE THAT THE ARBITRATOR SHALL ADMINISTER AND

CONDUCT ANY ARBITRATION IN ACCORDANCE WITH CALIFORNIA LAW, INCLUDING THE CALIFORNIA CODE OF CIVIL PROCEDURE, AND THAT THE ARBITRATOR SHALL APPLY SUBSTANTIVE AND PROCEDURAL CALIFORNIA LAW TO ANY DISPUTE OR CLAIM, WITHOUT REFERENCE TO RULES OF CONFLICT OF LAW. TO THE EXTENT THAT THE JAMS RULES CONFLICT WITH CALIFORNIA LAW, CALIFORNIA LAW SHALL TAKE PRECEDENCE. I AGREE THAT ANY ARBITRATION UNDER THIS AGREEMENT SHALL BE CONDUCTED IN SANTA CLARA COUNTY, CALIFORNIA.

C. *Remedy.* EXCEPT AS PROVIDED BY THE ACT AND THIS AGREEMENT, ARBITRATION SHALL BE THE SOLE, EXCLUSIVE, AND FINAL REMEDY FOR ANY DISPUTE BETWEEN ME AND THE COMPANY. ACCORDINGLY, EXCEPT AS PROVIDED FOR BY THE ACT AND THIS AGREEMENT, NEITHER I NOR THE COMPANY WILL BE PERMITTED TO PURSUE COURT ACTION REGARDING CLAIMS THAT ARE SUBJECT TO ARBITRATION.

D. *Administrative Relief.* I UNDERSTAND THAT THIS AGREEMENT DOES NOT PROHIBIT ME FROM PURSUING AN ADMINISTRATIVE CLAIM WITH A LOCAL, STATE, OR FEDERAL ADMINISTRATIVE BODY OR GOVERNMENT AGENCY THAT IS AUTHORIZED TO ENFORCE OR ADMINISTER LAWS RELATED TO EMPLOYMENT, INCLUDING, BUT NOT LIMITED TO, THE DEPARTMENT OF FAIR EMPLOYMENT AND HOUSING, THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, THE NATIONAL LABOR RELATIONS BOARD, OR THE WORKERS' COMPENSATION BOARD. THIS AGREEMENT DOES, HOWEVER, PRECLUDE ME FROM PURSUING COURT ACTION REGARDING ANY SUCH CLAIM, EXCEPT AS PERMITTED BY LAW.

E. *Voluntary Nature of Agreement.* I ACKNOWLEDGE AND AGREE THAT I AM EXECUTING THIS AGREEMENT VOLUNTARILY AND WITHOUT ANY DURESS OR UNDUE INFLUENCE BY THE COMPANY OR ANYONE ELSE. I ACKNOWLEDGE AND AGREE THAT I HAVE RECEIVED A COPY OF THE TEXT OF CALIFORNIA LABOR CODE SECTION 2870 IN EXHIBIT B. I FURTHER ACKNOWLEDGE AND AGREE THAT I HAVE CAREFULLY READ THIS AGREEMENT AND THAT I HAVE ASKED ANY QUESTIONS NEEDED FOR ME TO UNDERSTAND THE TERMS, CONSEQUENCES, AND BINDING EFFECT OF THIS AGREEMENT AND FULLY UNDERSTAND IT, INCLUDING THAT *I AM WAIVING MY RIGHT TO A JURY TRIAL.* FINALLY, I AGREE THAT I HAVE BEEN PROVIDED AN OPPORTUNITY TO SEEK THE ADVICE OF AN ATTORNEY OF MY CHOICE BEFORE SIGNING THIS AGREEMENT.

13. <u>MISCELLANEOUS</u>

A. *Governing Law; Consent to Personal Jurisdiction.* This Agreement will be governed by the laws of the State of California without regard to California's conflicts of law rules that may result in the application of the laws of any jurisdiction other than California. To the extent that any lawsuit is permitted under this Agreement, I hereby expressly consent to the

personal and exclusive jurisdiction and venue of the state and federal courts located in California for any lawsuit filed against me by the Company.

B.   *Assignability.*  This Agreement will be binding upon my heirs, executors, assigns, administrators, and other legal representatives, and will be for the benefit of the Company, its successors, and its assigns.  There are no intended third-party beneficiaries to this Agreement, except as may be expressly otherwise stated.  Notwithstanding anything to the contrary herein, Faraday & Future, may assign this Agreement and its rights and obligations under this Agreement to any successor to all or substantially all of Faraday & Future's relevant assets, whether by merger, consolidation, reorganization, reincorporation, sale of assets or stock, or otherwise.

C.   *Entire Agreement.*  This Agreement, together with the Exhibits herein and any executed written offer letter between me and the Company, to the extent such materials are not in conflict with this Agreement, sets forth the entire agreement and understanding between the Company and me with respect to the subject matter herein and supersedes all prior written and oral agreements, discussions, or representations between us, including, but not limited to, any representations made during my interview(s) or relocation negotiations.  I represent and warrant that I am not relying on any statement or representation not contained in this Agreement.  Any subsequent change or changes in my duties, salary, or compensation will not affect the validity or scope of this Agreement.

D.   *Headings.*  Headings are used in this Agreement for reference only and shall not be considered when interpreting this Agreement.

E.   *Severability.*  If a court or other body of competent jurisdiction finds, or the Parties mutually believe, any provision of this Agreement, or portion thereof, to be invalid or unenforceable, such provision will be enforced to the maximum extent permissible so as to effect the intent of the Parties, and the remainder of this Agreement will continue in full force and effect.

F.   *Modification, Waiver.*  No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in a writing signed by the President or CEO of Faraday & Future, and me.  Waiver by Faraday & Future, of a breach of any provision of this Agreement will not operate as a waiver of any other or subsequent breach.

G.   *Survivorship.*  The rights and obligations of the parties to this Agreement will survive termination of my employment with the Company.

Date: __MARCH 3, 2015__

Signature _____

__RICHARD KIM__
Name of Employee (typed or printed)

Witness:

_____
Signature

_____
Name (typed or printed)

Date: _March 3, 2015_

Signature

_RICHARD   KIM_
Name of Employee (typed or printed)

Witness:

Signature

Name (typed or printed)

**EXHIBIT A**

**LIST OF PRIOR INVENTIONS
AND ORIGINAL WORKS OF AUTHORSHIP**

| Title | Date | Identifying Number or Brief Description |
|-------|------|------------------------------------------|
| - Bmw i3 production car | 2013 | - Production exterior surfaces |
| - Bmw i3 concept car | 2012 | - Concept exterior surfaces |
| - Bmw i8 concept car | 2012 | - Concept exterior surfaces |
| - Bmw i8 Spyder concept car | 2012 | - Concept exterior surfaces. |

____ No inventions or improvements

____ Additional Sheets Attached

Date: March 3, 2015

Signature

RICHARD KIM
Name of Employee (typed or printed)

Page 12 of 17

## EXHIBIT B

## CALIFORNIA LABOR CODE SECTION 2870
## INVENTION ON OWN TIME-EXEMPTION FROM AGREEMENT

"(a)    Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

(1)    Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or

(2)    Result from any work performed by the employee for the employer.

(b)    To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable."

# EXHIBIT C

## FARADAY & FUTURE, TERMINATION CERTIFICATION

This is to certify that I do not have in my possession, nor have I failed to return, any devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, any other documents or property, or reproductions of any and all aforementioned items belonging to Faraday & Future, its subsidiaries, affiliates, successors or assigns (together, the "**Company**").

I further certify that I have complied with all the terms of the Company's At-Will Employment, Confidential Information, Invention Assignment, and Arbitration Agreement signed by me, including the reporting of any inventions and original works of authorship (as defined therein) conceived or made by me (solely or jointly with others), as covered by that agreement.

I further agree that, in compliance with the At-Will Employment, Confidential Information, Invention Assignment, and Arbitration Agreement, I will preserve as confidential all Company Confidential Information and Associated Third Party Confidential Information, including trade secrets, confidential knowledge, data, or other proprietary information relating to products, processes, know-how, designs, formulas, developmental or experimental work, computer programs, databases, other original works of authorship, customer lists, business plans, financial information, or other subject matter pertaining to any business of the Company or any of its employees, clients, consultants, or licensees.

I also agree that for twelve (12) months from this date, I will not directly or indirectly solicit any of the Company's employees to leave their employment at the Company. I agree that nothing in this paragraph shall affect my continuing obligations under the At-Will Employment, Confidential Information, Invention Assignment, and Arbitration Agreement during and after this twelve (12) month period, including, without limitation, my obligations under **Article 2** (Confidentiality) thereof.

After   leaving   the   Company's   employment,   I   will   be   employed   by

_____ in the position of

_____

Date: _____

_____
Signature

_____
Name of Employee (typed or printed)

Address for Notifications:

_____

_____

## EXHIBIT D

## FARADAY & FUTURE: CONFLICT OF INTEREST GUIDELINES

It is the policy of Faraday & Future to conduct its affairs in strict compliance with the letter and spirit of the law and to adhere to the highest principles of business ethics. Accordingly, all officers, employees, and independent contractors must avoid activities that are in conflict, or give the appearance of being in conflict, with these principles and with the interests of the Company. The following are potentially compromising situations that must be avoided:

1.  Revealing confidential information to outsiders or misusing confidential information. Unauthorized divulging of information is a violation of this policy whether or not for personal gain and whether or not harm to the Company is intended. (The At-Will Employment, Confidential Information, Invention Assignment, and Arbitration Agreement elaborates on this principle and is a binding agreement.)

2.  Accepting or offering substantial gifts, excessive entertainment, favors, or payments that may be deemed to constitute undue influence or otherwise be improper or embarrassing to the Company.

3.  Participating in civic or professional organizations that might involve divulging confidential information of the Company.

4.  Initiating or approving personnel actions affecting reward or punishment of employees or applicants where there is a family relationship or is or appears to be a personal or social involvement.

5.  Initiating or approving any form of personal or social harassment of employees.

6.  Investing or holding outside directorship in suppliers, customers, or competing companies, including financial speculations, where such investment or directorship might influence in any manner a decision or course of action of the Company.

7.  Borrowing from or lending to employees, customers, or suppliers.

8.  Acquiring real estate of interest to the Company.

9.  Improperly using or disclosing to the Company any proprietary information or trade secrets of any former or concurrent employer or other person or entity with whom obligations of confidentiality exist.

10. Unlawfully discussing prices, costs, customers, sales, or markets with competing companies or their employees.

11. Making any unlawful agreement with distributors with respect to prices.

12. Improperly using or authorizing the use of any inventions that are the subject of patent claims of any other person or entity.

13.    Engaging in any conduct that is not in the best interest of the Company.

Each officer, employee, and independent contractor must take every necessary action to ensure compliance with these guidelines and to bring problem areas to the attention of higher management for review.   Violations of this conflict of interest policy may result in discharge without warning.

# EXHIBIT E

**Faraday & Future**
**AT-WILL EMPLOYMENT, CONFIDENTIAL INFORMATION,**
**INVENTION ASSIGNMENT, AND ARBITRATION AGREEMENT**

As a condition of my employment with Faraday & Future its subsidiaries, affiliates, successors or assigns (together, the "Company"), and in consideration of my employment with the Company and my receipt of the compensation now and hereafter paid to me by Company, I agree to the following provisions of this Faraday & Future At-Will Employment, Confidential Information, Invention Assignment, and Arbitration Agreement (this "Agreement"):

1. **AT-WILL EMPLOYMENT**

I UNDERSTAND AND ACKNOWLEDGE THAT MY EMPLOYMENT WITH THE COMPANY IS FOR NO SPECIFIED TERM AND CONSTITUTES "AT-WILL" EMPLOYMENT. I ALSO UNDERSTAND THAT ANY REPRESENTATION TO THE CONTRARY IS UNAUTHORIZED AND NOT VALID UNLESS IN WRITING AND SIGNED BY THE PRESIDENT OR CEO OF FARADAY & FUTURE. ACCORDINGLY, I ACKNOWLEDGE THAT MY EMPLOYMENT RELATIONSHIP MAY BE TERMINATED AT ANY TIME, WITH OR WITHOUT GOOD CAUSE OR FOR ANY OR NO CAUSE, AT MY OPTION OR AT THE OPTION OF THE COMPANY, WITH OR WITHOUT NOTICE. I FURTHER ACKNOWLEDGE THAT THE COMPANY MAY MODIFY JOB TITLES, SALARIES, AND BENEFITS FROM TIME TO TIME AS IT DEEMS NECESSARY.

2. **CONFIDENTIALITY**

A. *Definition of Confidential Information.* I understand that "Company Confidential Information" means information that the Company has or will develop, acquire, create, compile, discover or own, that has value in or to the Company's business which is not generally known and which the Company wishes to maintain as confidential. Company Confidential Information includes both information disclosed by the Company to me, and information developed or learned by me during the course of my employment with Company. Company Confidential Information also includes all information of which the unauthorized disclosure could be detrimental to the interests of Company, whether or not such information is identified as Company Confidential Information. By example, and without limitation, Company Confidential Information includes any and all non-public information that relates to the actual or anticipated business and/or products, research or development of the Company, or to the Company's technical data, trade secrets, or know-how, including, but not limited to, research, product plans, or other information regarding the Company's products or services and markets therefor, customer lists and customers (including, but not limited to, customers of the Company on which I called or with which I may become acquainted during the term of my employment), software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances, and other business information disclosed by the Company either directly or indirectly in writing, orally or by drawings or inspection of premises, parts, equipment, or other Company property.

Notwithstanding the foregoing, Company Confidential Information shall not include any such information which I can establish (i) was publicly known or made generally available prior to the time of disclosure by Company to me; (ii) becomes publicly known or made generally available after disclosure by Company to me through no wrongful action or omission by me; or (iii) is in my rightful possession, without confidentiality obligations, at the time of disclosure by Company as shown by my then-contemporaneous written records. I understand that nothing in this Agreement is intended to limit employees' rights to discuss the terms, wages, and working conditions of their employment, as protected by applicable law.

B. *Nonuse and Nondisclosure.* I agree that during and after my employment with the Company, I will hold in the strictest confidence, and take all reasonable precautions to prevent any unauthorized use or disclosure of Company Confidential Information, and I will not (i) use the Company Confidential Information for any purpose whatsoever other than for the benefit of the Company in the course of my employment, or (ii) disclose the Company Confidential Information to any third party without the prior written authorization of the President, CEO, or the Board of Directors of the Company. Prior to disclosure when compelled by applicable law, I shall provide prior written notice to the President, CEO, and General Counsel of Faraday & Future (as applicable). I agree that I obtain no title to any Company Confidential Information, and that as between Company and myself, Faraday & Future, retains all Confidential Information as the sole property of Faraday & Future. I understand that my unauthorized use or disclosure of Company Confidential Information during my employment may lead to disciplinary action, up to and including immediate termination and legal action by the Company. I understand that my obligations under this **Section 2.B** shall continue after termination of my employment.

C. *Former Employer Confidential Information.* I agree that during my employment with the Company, I will not improperly use, disclose, or induce the Company to use any proprietary information or trade secrets of any former employer or other person or entity with which I have an obligation to keep in confidence. I further agree that I will not bring onto the Company's premises or transfer onto the Company's technology systems any unpublished document, proprietary information, or trade secrets belonging to any such third party unless disclosure to, and use by, the Company has been consented to in writing by such third party.

D. *Third Party Information.* I recognize that the Company has received and in the future will receive from third parties associated with the Company, e.g., the Company's customers, suppliers, licensors, licensees, partners, or collaborators ("Associated Third Parties"), their confidential or proprietary information ("Associated **Third Party Confidential Information**") subject to a duty on the Company's part to maintain the confidentiality of such Associated Third Party Confidential Information and to use it only for certain limited purposes. By way of example, Associated Third Party Confidential Information may include the habits or practices of Associated Third Parties, the technology of Associated Third Parties, requirements of Associated Third Parties, and information related to the business conducted between the Company and such Associated Third Parties. I agree at all times during my employment with

the Company and thereafter, that I owe the Company and its Associated Third Parties a duty to hold all such Associated Third Party Confidential Information in the strictest confidence, and not to use it or to disclose it to any person, firm, corporation, or other third party except as necessary in carrying out my work for the Company consistent with the Company's agreement with such Associated Third Parties. I further agree to comply with any and all Company policies and guidelines that may be adopted from time to time regarding Associated Third Parties and Associated Third Party Confidential Information. I understand that my unauthorized use or disclosure of Associated Third Party Confidential Information or violation of any Company policies during my employment may lead to disciplinary action, up to and including immediate termination and legal action by the Company.

3.   OWNERSHIP

A.   *Assignment of Inventions.* As between Company and myself, I agree that all right, title, and interest in and to any and all copyrightable material, notes, records, drawings, designs, inventions, improvements, developments, discoveries and trade secrets conceived, discovered, authored, invented, developed or reduced to practice by me, solely or in collaboration with others, during the period of time I am in the employ of the Company (including during my off-duty hours), or with the use of Company's equipment, supplies, facilities, or Company Confidential Information, and any copyrights, patents, trade secrets, mask work rights or other intellectual property rights relating to the foregoing, except as provided in Section 3.G below (collectively, "Inventions"), are the sole property of Faraday & Future. I also agree to promptly make full written disclosure to Faraday & Future of any Inventions, and to deliver and assign and hereby irrevocably assign fully to Faraday & Future all of my right, title and interest in and to Inventions. I agree that this assignment includes a present conveyance to Faraday & Future of ownership of Inventions that are not yet in existence. I further acknowledge that all original works of authorship that are made by me (solely or jointly with others) within the scope of and during the period of my employment with the Company and that are protectable by copyright are "works made for hire," as that term is defined in the United States Copyright Act. I understand and agree that the decision whether or not to commercialize or market any Inventions is within the Company's sole discretion and for the Company's sole benefit, and that no royalty or other consideration will be due to me as a result of the Company's efforts to commercialize or market any such Inventions.

B.   *Pre-Existing Materials.* I have attached hereto as Exhibit A, a list describing all inventions, discoveries, original works of authorship, developments, improvements, trade secrets and other proprietary information or intellectual property rights owned by me or in which I have an interest prior to, or separate from, my employment with the Company and which are subject to California Labor Code Section 2870 (attached hereto as Exhibit B), and which relate to the Company's proposed business, products, or research and development ("Prior Inventions"); or, if no such list is attached, I represent and warrant that there are no such Prior Inventions. Furthermore, I represent and warrant that if any Prior Inventions are included on Exhibit A, they will not materially affect my ability to perform all obligations under this Agreement. I will inform Faraday & Future in writing before incorporating such Prior Inventions into any

Invention or otherwise utilizing such Prior Invention in the course of my employment with the Company, and the Company is hereby granted a nonexclusive, royalty-free, perpetual, irrevocable, transferable worldwide license (with the right to grant and authorize sublicenses) to make, have made, use, import, offer for sale, sell, reproduce, distribute, modify, adapt, prepare derivative works of, display, perform, and otherwise exploit such Prior Inventions, without restriction, including, without limitation, as part of or in connection with such Invention, and to practice any method related thereto. I will not incorporate any invention, improvement, development, concept, discovery, work of authorship or other proprietary information owned by any third party into any Invention without Faraday & Future's prior written permission.

C. *Moral Rights.* Any assignment to Faraday & Future of Inventions includes all rights of attribution, paternity, integrity, modification, disclosure and withdrawal, and any other rights throughout the world that may be known as or referred to as "moral rights," "artist's rights," "droit moral," or the like (collectively, "Moral Rights"). To the extent that Moral Rights cannot be assigned under applicable law, I hereby waive and agree not to enforce any and all Moral Rights, including, without limitation, any limitation on subsequent modification, to the extent permitted under applicable law.

D. *Maintenance of Records.* I agree to keep and maintain adequate, current, accurate, and authentic written records of all Inventions made by me (solely or jointly with others) during the term of my employment with the Company. The records will be in the form of notes, sketches, drawings, electronic files, reports, or any other format that may be specified by the Company. As between Company and myself, the records are and will be available to and remain the sole property of Faraday & Future at all times.

E. *Further Assurances.* I agree to assist the Company, or its designee, at the Company's expense, in every proper way to secure the Company's rights in the Inventions in any and all countries, including the disclosure to the Company of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments, and all other instruments that the Company shall deem proper or necessary in order to apply for, register, obtain, maintain, defend, and enforce such rights, and in order to deliver, assign and convey to the Company, its successors, assigns, and nominees the sole and exclusive rights, title, and interest in and to all Inventions, and testifying in a suit or other proceeding relating to such Inventions. I further agree that my obligations under this **Section 3.E** shall continue after the termination of this Agreement.

F. *Attorney-in-Fact.* I agree that, if the Company is unable because of my unavailability, mental or physical incapacity, or for any other reason to secure my signature with respect to any Inventions, including, without limitation, for the purpose of applying for or pursuing any application for any United States or foreign patents or mask work or copyright registrations covering the Inventions assigned to Faraday & Future in **Section 3.A**, then I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agent and attorney-in-fact, to act for and on my behalf to execute and file any papers and oaths, and to do all other lawfully permitted acts with respect to such Inventions to further the

prosecution and issuance of patents, copyright and mask work registrations with the same legal force and effect as if executed by me. This power of attorney shall be deemed coupled with an interest, and shall be irrevocable.

G.   *Exception to Assignments.*   I UNDERSTAND THAT THE PROVISIONS OF THIS AGREEMENT REQUIRING ASSIGNMENT OF INVENTIONS TO FARADAY & FUTURE DO NOT APPLY TO ANY INVENTION THAT QUALIFIES FULLY UNDER THE PROVISIONS OF CALIFORNIA LABOR CODE SECTION 2870 (ATTACHED HERETO AS EXHIBIT B).  I WILL ADVISE FARADAY & FUTURE PROMPTLY IN WRITING OF ANY INVENTIONS THAT I BELIEVE MEET THE CRITERIA IN CALIFORNIA LABOR CODE SECTION 2870 AND ARE NOT OTHERWISE DISCLOSED ON EXHIBIT A.

4.   CONFLICTING OBLIGATIONS

A.   *Current Obligations.*   I agree that during the term of my employment with the Company, I will not engage in or undertake any other employment, occupation, consulting relationship, or commitment that is directly related to the business in which the Company is now involved or becomes involved or has plans to become involved, nor will I engage in any other activities that conflict with my obligations to the Company.

B.   *Prior Relationships.*   Without limiting Section 4.A, I represent and warrant that I have no other agreements, relationships, or commitments to any other person or entity that conflict with the provisions of this Agreement, my obligations to the Company under this Agreement, or my ability to become employed and perform the services for which I am being hired by the Company.  I further agree that if I have signed a confidentiality agreement or similar type of agreement with any former employer or other entity, I will comply with the terms of any such agreement to the extent that its terms are lawful under applicable law.  I represent and warrant that after undertaking a careful search (including searches of my computers, cell phones, electronic devices, and documents), I have returned all property and confidential information belonging to all prior employers (and/or other third parties I have performed services for in accordance with the terms of my applicable agreement).  Moreover, I agree to fully indemnify the Company, its directors, officers, agents, employees, investors, shareholders, administrators, affiliates, divisions, subsidiaries, predecessor and successor corporations, and assigns for all verdicts, judgments, settlements, and other losses incurred by any of them resulting from my breach of my obligations under any agreement with a third party to which I am a party or obligation to which I am bound, as well as any reasonable attorneys' fees and costs if the plaintiff is the prevailing party in such an action, except as prohibited by law.

5.   RETURN OF COMPANY MATERIALS

Upon separation from employment with the Company, on Company's earlier request during my employment, or at any time subsequent to my employment upon demand from the Company, I will immediately deliver to Faraday & Future and will not keep in my possession, recreate, or deliver to anyone else, any and all Company property, including, but not limited to,

Company Confidential Information, Associated Third Party Confidential Information, all devices and equipment belonging to the Company (including computers, handheld electronic devices, telephone equipment, and other electronic devices), all tangible embodiments of the Inventions, all electronically stored information and passwords to access such property, Company credit cards, records, data, notes, notebooks, reports, files, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, photographs, charts, any other documents and property, and reproductions of any of the foregoing items, including, without limitation, those records maintained pursuant to **Section 3.D.** I also consent to an exit interview to confirm my compliance with this **Article 5.**

6. TERMINATION CERTIFICATION

Upon separation from employment with the Company, I agree to immediately sign and deliver to the Company the "Termination Certification" attached hereto as **Exhibit C.** I also agree to keep Faraday & Future. advised of my home and business address for a period of three (3) years after termination of my employment with the Company, so that the Company can contact me regarding my continuing obligations provided by this Agreement.

7. NOTIFICATION OF NEW EMPLOYER

In the event that I leave the employ of the Company, I hereby grant consent to notification by the Company to my new employer about my obligations under this Agreement.

8. SOLICITATION OF EMPLOYEES

To the fullest extent permitted under applicable law, I agree that during my employment and for a period of twelve (12) months immediately following the termination of my relationship with the Company for any reason, whether voluntary or involuntary, with or without cause, I will not directly or indirectly solicit any of the Company's employees to leave their employment at the Company. I agree that nothing in this **Article 8** shall affect my continuing obligations under this Agreement during and after this twelve (12) month period, including, without limitation, my obligations under Article 2.

9. CONFLICT OF INTEREST GUIDELINES

I agree to diligently adhere to all policies of the Company, including the Company's insider trading policies and the Company's Conflict of Interest Guidelines. A copy of the Company's current Conflict of Interest Guidelines is attached as **Exhibit D** hereto, but I understand that these Conflict of Interest Guidelines may be revised from time to time during my employment.

10. REPRESENTATIONS

Without limiting my obligations under Section 3.E above, I agree to execute any proper oath or verify any proper document required to carry out the terms of this Agreement. I

represent and warrant that my performance of all the terms of this Agreement will not breach any agreement to keep in confidence information acquired by me in confidence or in trust prior to my employment by the Company. I hereby represent and warrant that I have not entered into, and I will not enter into, any oral or written agreement in conflict herewith.

**11.    AUDIT**

I acknowledge that I have no reasonable expectation of privacy in any computer, technology system, email, handheld device, telephone, voicemail, or documents that are used to conduct the business of the Company. All information, data, and messages created, received, sent, or stored in these systems are, at all times, the property of the Company. As such, the Company has the right to audit and search all such items and systems, without further notice to me, to ensure that the Company is licensed to use the software on the Company's devices in compliance with the Company's software licensing policies, to ensure compliance with the Company's policies, and for any other business-related purposes in the Company's sole discretion. I understand that I am not permitted to add any unlicensed, unauthorized, or non-compliant applications to the Company's technology systems, including, without limitation, open source or free software not authorized by the Company, and that I shall refrain from copying unlicensed software onto the Company's technology systems or using non-licensed software or websites. I understand that it is my responsibility to comply with the Company's policies governing use of the Company's documents and the internet, email, telephone, and technology systems to which I will have access in connection with my employment.

I am aware that the Company has or may acquire software and systems that are capable of monitoring and recording all network traffic to and from any computer I may use. The Company reserves the right to access, review, copy, and delete any of the information, data, or messages accessed through these systems with or without notice to me and/or in my absence. This includes, but is not limited to, all e-mail messages sent or received, all website visits, all chat sessions, all news group activity (including groups visited, messages read, and postings by me), and all file transfers into and out of the Company's internal networks. The Company further reserves the right to retrieve previously deleted messages from e-mail or voicemail and monitor usage of the Internet, including websites visited and any information I have downloaded. In addition, the Company may review Internet and technology systems activity and analyze usage patterns, and may choose to publicize this data to assure that technology systems are devoted to legitimate business purposes.

**12.    ARBITRATION AND EQUITABLE RELIEF**

A.    *Arbitration.* IN CONSIDERATION OF MY EMPLOYMENT WITH THE COMPANY, ITS PROMISE TO ARBITRATE ALL EMPLOYMENT-RELATED DISPUTES, AND MY RECEIPT OF THE COMPENSATION, PAY RAISES, AND OTHER BENEFITS PAID TO ME BY THE COMPANY, AT PRESENT AND IN THE FUTURE, I AGREE THAT ANY AND ALL CONTROVERSIES, CLAIMS, OR DISPUTES WITH ANYONE (INCLUDING THE COMPANY AND ANY EMPLOYEE, OFFICER, DIRECTOR, SHAREHOLDER, OR BENEFIT PLAN OF THE COMPANY, IN THEIR CAPACITY AS

SUCH OR OTHERWISE), WHETHER BROUGHT ON AN INDIVIDUAL, GROUP, OR CLASS BASIS, ARISING OUT OF, RELATING TO, OR RESULTING FROM MY EMPLOYMENT WITH THE COMPANY OR THE TERMINATION OF MY EMPLOYMENT WITH THE COMPANY, INCLUDING ANY BREACH OF THIS AGREEMENT, SHALL BE SUBJECT TO BINDING ARBITRATION UNDER THE ARBITRATION RULES SET FORTH IN CALIFORNIA CODE OF CIVIL PROCEDURE SECTION 1280 THROUGH 1294.2, INCLUDING SECTION 1281.8 (THE "ACT"), AND PURSUANT TO CALIFORNIA LAW. THE FEDERAL ARBITRATION ACT SHALL CONTINUE TO APPLY WITH FULL FORCE AND EFFECT NOTWITHSTANDING THE APPLICATION OF PROCEDURAL RULES SET FORTH IN THE ACT. DISPUTES THAT I AGREE TO ARBITRATE, AND THEREBY AGREE TO WAIVE ANY RIGHT TO A TRIAL BY JURY, INCLUDE ANY STATUTORY CLAIMS UNDER LOCAL, STATE, OR FEDERAL LAW, INCLUDING, BUT NOT LIMITED TO, CLAIMS UNDER TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, THE AMERICANS WITH DISABILITIES ACT OF 1990, THE AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967, THE OLDER WORKERS BENEFIT PROTECTION ACT, THE SARBANES-OXLEY ACT, THE WORKER ADJUSTMENT AND RETRAINING NOTIFICATION ACT, THE CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT, THE FAMILY AND MEDICAL LEAVE ACT, THE CALIFORNIA FAMILY RIGHTS ACT, THE CALIFORNIA LABOR CODE, CLAIMS OF HARASSMENT, DISCRIMINATION, AND WRONGFUL TERMINATION, AND ANY STATUTORY OR COMMON LAW CLAIMS. I FURTHER UNDERSTAND THAT THIS AGREEMENT TO ARBITRATE ALSO APPLIES TO ANY DISPUTES THAT THE COMPANY MAY HAVE WITH ME.

B. *Procedure.* I AGREE THAT ANY ARBITRATION WILL BE ADMINISTERED BY JUDICIAL ARBITRATION & MEDIATION SERVICES, INC. ("JAMS"), PURSUANT TO ITS EMPLOYMENT ARBITRATION RULES & PROCEDURES (THE "JAMS RULES"). I AGREE THAT THE ARBITRATOR SHALL HAVE THE POWER TO DECIDE ANY MOTIONS BROUGHT BY ANY PARTY TO THE ARBITRATION, INCLUDING MOTIONS FOR SUMMARY JUDGMENT AND/OR ADJUDICATION, MOTIONS TO DISMISS AND DEMURRERS, AND MOTIONS FOR CLASS CERTIFICATION, PRIOR TO ANY ARBITRATION HEARING. I AGREE THAT THE ARBITRATOR SHALL ISSUE A WRITTEN DECISION ON THE MERITS. I ALSO AGREE THAT THE ARBITRATOR SHALL HAVE THE POWER TO AWARD ANY REMEDIES AVAILABLE UNDER APPLICABLE LAW, AND THAT THE ARBITRATOR SHALL AWARD ATTORNEYS' FEES AND COSTS TO THE PREVAILING PARTY, EXCEPT AS PROHIBITED BY LAW. I AGREE THAT THE DECREE OR AWARD RENDERED BY THE ARBITRATOR MAY BE ENTERED AS A FINAL AND BINDING JUDGMENT IN ANY COURT HAVING JURISDICTION THEREOF. I UNDERSTAND THAT THE COMPANY WILL PAY FOR ANY ADMINISTRATIVE OR HEARING FEES CHARGED BY THE ARBITRATOR OR JAMS EXCEPT THAT I SHALL PAY ANY FILING FEES ASSOCIATED WITH ANY ARBITRATION THAT I INITIATE, BUT ONLY SO MUCH OF THE FILING FEES AS I WOULD HAVE INSTEAD PAID HAD I FILED A COMPLAINT IN A COURT OF LAW. I AGREE THAT THE ARBITRATOR SHALL ADMINISTER AND

CONDUCT ANY ARBITRATION IN ACCORDANCE WITH CALIFORNIA LAW, INCLUDING THE CALIFORNIA CODE OF CIVIL PROCEDURE, AND THAT THE ARBITRATOR SHALL APPLY SUBSTANTIVE AND PROCEDURAL CALIFORNIA LAW TO ANY DISPUTE OR CLAIM, WITHOUT REFERENCE TO RULES OF CONFLICT OF LAW. TO THE EXTENT THAT THE JAMS RULES CONFLICT WITH CALIFORNIA LAW, CALIFORNIA LAW SHALL TAKE PRECEDENCE. I AGREE THAT ANY ARBITRATION UNDER THIS AGREEMENT SHALL BE CONDUCTED IN SANTA CLARA COUNTY, CALIFORNIA.

C. *Remedy.* EXCEPT AS PROVIDED BY THE ACT AND THIS AGREEMENT, ARBITRATION SHALL BE THE SOLE, EXCLUSIVE, AND FINAL REMEDY FOR ANY DISPUTE BETWEEN ME AND THE COMPANY. ACCORDINGLY, EXCEPT AS PROVIDED FOR BY THE ACT AND THIS AGREEMENT, NEITHER I NOR THE COMPANY WILL BE PERMITTED TO PURSUE COURT ACTION REGARDING CLAIMS THAT ARE SUBJECT TO ARBITRATION.

D. *Administrative Relief.* I UNDERSTAND THAT THIS AGREEMENT DOES NOT PROHIBIT ME FROM PURSUING AN ADMINISTRATIVE CLAIM WITH A LOCAL, STATE, OR FEDERAL ADMINISTRATIVE BODY OR GOVERNMENT AGENCY THAT IS AUTHORIZED TO ENFORCE OR ADMINISTER LAWS RELATED TO EMPLOYMENT, INCLUDING, BUT NOT LIMITED TO, THE DEPARTMENT OF FAIR EMPLOYMENT AND HOUSING, THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, THE NATIONAL LABOR RELATIONS BOARD, OR THE WORKERS' COMPENSATION BOARD. THIS AGREEMENT DOES, HOWEVER, PRECLUDE ME FROM PURSUING COURT ACTION REGARDING ANY SUCH CLAIM, EXCEPT AS PERMITTED BY LAW.

E. *Voluntary Nature of Agreement.* I ACKNOWLEDGE AND AGREE THAT I AM EXECUTING THIS AGREEMENT VOLUNTARILY AND WITHOUT ANY DURESS OR UNDUE INFLUENCE BY THE COMPANY OR ANYONE ELSE. I ACKNOWLEDGE AND AGREE THAT I HAVE RECEIVED A COPY OF THE TEXT OF CALIFORNIA LABOR CODE SECTION 2870 IN EXHIBIT B. I FURTHER ACKNOWLEDGE AND AGREE THAT I HAVE CAREFULLY READ THIS AGREEMENT AND THAT I HAVE ASKED ANY QUESTIONS NEEDED FOR ME TO UNDERSTAND THE TERMS, CONSEQUENCES, AND BINDING EFFECT OF THIS AGREEMENT AND FULLY UNDERSTAND IT, INCLUDING THAT *I AM WAIVING MY RIGHT TO A JURY TRIAL.* FINALLY, I AGREE THAT I HAVE BEEN PROVIDED AN OPPORTUNITY TO SEEK THE ADVICE OF AN ATTORNEY OF MY CHOICE BEFORE SIGNING THIS AGREEMENT.

13. MISCELLANEOUS

A. *Governing Law; Consent to Personal Jurisdiction.* This Agreement will be governed by the laws of the State of California without regard to California's conflicts of law rules that may result in the application of the laws of any jurisdiction other than California. To the extent that any lawsuit is permitted under this Agreement, I hereby expressly consent to the

personal and exclusive jurisdiction and venue of the state and federal courts located in California for any lawsuit filed against me by the Company.

B.   *Assignability.*   This Agreement will be binding upon my heirs, executors, assigns, administrators, and other legal representatives, and, will be for the benefit of the Company, its successors, and its assigns. There are no intended third-party beneficiaries to this Agreement, except as may be expressly otherwise stated.   Notwithstanding anything to the contrary herein, Faraday & Future, may assign this Agreement and its rights and obligations under this Agreement to any successor to all or substantially all of Faraday & Future's relevant assets, whether by merger, consolidation, reorganization, reincorporation, sale of assets or stock, or otherwise.

C.   *Entire Agreement.*   This Agreement, together with the Exhibits herein and any executed written offer letter between me and the Company, to the extent such materials are not in conflict with this Agreement, sets forth the entire agreement and understanding between the Company and me with respect to the subject matter herein and supersedes all prior written and oral agreements, discussions, or representations between us, including, but not limited to, any representations made during my interview(s) or relocation negotiations.  I represent and warrant that I am not relying on any statement or representation not contained in this Agreement. Any subsequent change or changes in my duties, salary, or compensation will not affect the validity or scope of this Agreement.

D.   *Headings.* Headings are used in this Agreement for reference only and shall not be considered when interpreting this Agreement.

E.   *Severability.*   If a court or other body of competent jurisdiction finds, or the Parties mutually believe, any provision of this Agreement, or portion thereof, to be invalid or unenforceable, such provision will be enforced to the maximum extent permissible so as to effect the intent of the Parties, and the remainder of this Agreement will continue in full force and effect.

F.   *Modification, Waiver.*   No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in a writing signed by the President or CEO of Faraday & Future, and me.  Waiver by Faraday & Future, of a breach of any provision of this Agreement will not operate as a waiver of any other or subsequent breach.

G.   *Survivorship.*   The rights and obligations of the parties to this Agreement will survive termination of my employment with the Company.

Date: 05-18-2015

_____
Signature

CHRISTOPH   KUTTNER
Name of Employee (typed or printed)

Witness:

_____
Signature

_____
Name (typed or printed)

Page 11 of 17

## EXHIBIT A

### LIST OF PRIOR INVENTIONS
### AND ORIGINAL WORKS OF AUTHORSHIP

| Title | Date | Identifying Number or Brief Description |
|-------|------|-----------------------------------------|
|       |      |                                         |

X   No inventions or improvements

____ Additional Sheets Attached

Date: 05 - 18 - 2015

Signature

CHRISTOPH KÜTTNER
Name of Employee (typed or printed)

Page 12 of 17

## EXHIBIT B

### CALIFORNIA LABOR CODE SECTION 2870
### INVENTION ON OWN TIME-EXEMPTION FROM AGREEMENT

"(a)   Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

(1)   Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or

(2)   Result from any work performed by the employee for the employer.

(b)   To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable."

**EXHIBIT C**

**FARADAY & FUTURE, TERMINATION CERTIFICATION**

This is to certify that I do not have in my possession, nor have I failed to return, any devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, any other documents or property, or reproductions of any and all aforementioned items belonging to Faraday & Future, its subsidiaries, affiliates, successors or assigns (together, the "Company").

I further certify that I have complied with all the terms of the Company's At-Will Employment, Confidential Information, Invention Assignment, and Arbitration Agreement signed by me, including the reporting of any inventions and original works of authorship (as defined therein) conceived or made by me (solely or jointly with others), as covered by that agreement.

I further agree that, in compliance with the At-Will Employment, Confidential Information, Invention Assignment, and Arbitration Agreement, I will preserve as confidential all Company Confidential Information and Associated Third Party Confidential Information, including trade secrets, confidential knowledge, data, or other proprietary information relating to products, processes, know-how, designs, formulas, developmental or experimental work, computer programs, databases, other original works of authorship, customer lists, business plans, financial information, or other subject matter pertaining to any business of the Company or any of its employees, clients, consultants, or licensees.

I also agree that for twelve (12) months from this date, I will not directly or indirectly solicit any of the Company's employees to leave their employment at the Company. I agree that nothing in this paragraph shall affect my continuing obligations under the At-Will Employment, Confidential Information, Invention Assignment, and Arbitration Agreement during and after this twelve (12) month period, including, without limitation, my obligations under Article 2 (Confidentiality) thereof.

After   leaving   the   Company's   employment,   I   will   be   employed   by _____ in the position of _____

Date: _____

Signature _____

Name of Employee (typed or printed)

Page 14 of 17

Address for Notifications:

**EXHIBIT D**

**FARADAY & FUTURE CONFLICT OF INTEREST GUIDELINES**

It is the policy of Faraday & Future to conduct its affairs in strict compliance with the letter and spirit of the law and to adhere to the highest principles of business ethics. Accordingly, all officers, employees, and independent contractors must avoid activities that are in conflict, or give the appearance of being in conflict, with these principles and with the interests of the Company. The following are potentially compromising situations that must be avoided:

1.      Revealing confidential information to outsiders or misusing confidential information. Unauthorized divulging of information is a violation of this policy whether or not for personal gain and whether or not harm to the Company is intended. (The At-Will Employment, Confidential Information, Invention Assignment, and Arbitration Agreement elaborates on this principle and is a binding agreement.)

2.      Accepting or offering substantial gifts, excessive entertainment, favors, or payments that may be deemed to constitute undue influence or otherwise be improper or embarrassing to the Company.

3.      Participating in civic or professional organizations that might involve divulging confidential information of the Company.

4.      Initiating or approving personnel actions affecting reward or punishment of employees or applicants where there is a family relationship or is or appears to be a personal or social involvement.

5.      Initiating or approving any form of personal or social harassment of employees.

6.      Investing or holding outside directorship in suppliers, customers, or competing companies, including financial speculations, where such investment or directorship might influence in any manner a decision or course of action of the Company.

7.      Borrowing from or lending to employees, customers, or suppliers.

8.      Acquiring real estate of interest to the Company.

9.      Improperly using or disclosing to the Company any proprietary information or trade secrets of any former or concurrent employer or other person or entity with whom obligations of confidentiality exist.

10.      Unlawfully discussing prices, costs, customers, sales, or markets with competing companies or their employees.

11.      Making any unlawful agreement with distributors with respect to prices.

12.      Improperly using or authorizing the use of any inventions that are the subject of patent claims of any other person or entity.

13.     Engaging in any conduct that is not in the best interest of the Company.

Each officer, employee, and independent contractor must take every necessary action to ensure compliance with these guidelines and to bring problem areas to the attention of higher management for review.   Violations of this conflict of interest policy may result in discharge without warning.

# EXHIBIT F

Date: 09/06/2016

Signature

IRVING W. STRICKLAND
Name of Employee (typed or printed)

Witness:

Signature

Name (typed or printed)

## EXHIBIT A

### LIST OF PRIOR INVENTIONS
### AND ORIGINAL WORKS OF AUTHORSHIP

| Title | Date | Identifying Number or Brief Description |
|-------|------|----------------------------------------|
|       |      |                                        |

X   No inventions or improvements

_____   Additional Sheets Attached

Date: SEPT 5 2016

_____
Signature

IRVING W. STRICKLAND
Name of Employee (typed or printed)

Page 12 of 17

**PROOF OF SERVICE**

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action.  My business address is 1609 James M. Wood Boulevard, 2nd Floor, Los Angeles, California 90015.

On February 9, 2018, I served the foregoing document described as FIRST AMENDED DEMAND FOR ARBITRATION AND STATEMENT OF CLAIM FOR: 1. BREACH OF CONTRACT; 2. BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING; 3. BREACH OF FIDUCIARY DUTY; 4. CIVIL CONSPIRACY TO COMMIT BREACH OF FIDUCIARY DUTY; 5. MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF DEFEND TRADE SECRETS ACT; 6. CIVIL CONSPIRACY TO COMMIT MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF DEFEND TRADE SECRETS ACT; 7. UNFAIR BUSINESS PRACTICES (Cal. Bus. & Prof. Code § 17200, *et seq.*) on each interested party, as follows:

> Stefan Krause
> Evelozcity, Inc.
> 207 East El Segundo Boulevard
> El Segundo, California 90245

[X]     (BY PERSONAL SERVICE) I delivered such envelope by hand to the offices of each interested party.

Executed on February 9, 2018, at Los Angeles, California.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

NATIONWIDE LEGAL

AURELIAN  BELICIU
_____
(Type or print name)

_____
(Signature)

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

10446174

1

## **PROOF OF SERVICE**

2        I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action.  My business address is 1609 James M. Wood Boulevard, 2nd

3 Floor, Los Angeles, California 90015.

4        On February 9, 2018, I served the foregoing document described as FIRST AMENDED DEMAND FOR ARBITRATION AND STATEMENT OF CLAIM FOR: 1. BREACH OF

5 CONTRACT; 2. BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING; 3. BREACH OF FIDUCIARY DUTY; 4. CIVIL CONSPIRACY TO COMMIT

6 BREACH OF FIDUCIARY DUTY; 5. MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF DEFEND TRADE SECRETS ACT; 6. CIVIL CONSPIRACY TO COMMIT

7 MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF DEFEND TRADE SECRETS ACT; 7. UNFAIR BUSINESS PRACTICES (Cal. Bus. & Prof. Code § 17200, *et seq.*)

8 on each interested party, as follows:

9               Ulrich Kranz
               Evelozcity, Inc.

10              207 East El Segundo Boulevard
              El Segundo, California 90245

11

12      [X]     (BY PERSONAL SERVICE) I delivered such envelope by hand to the offices of each interested party.

13

14        Executed on February 9, 2018, at Los Angeles, California.

15        I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

16      NATIONWIDE LEGAL

17   *AURELIAN  BELICIU*

18        (Type or print name)                 (Signature)

19

20

21

22

23

24

25

26

27

28

**PROOF OF SERVICE**

1

2       I am employed in the County of Los Angeles, State of California.  I am over the age of 18
and not a party to the within action.  My business address is 1609 James M. Wood Boulevard, 2nd

3   Floor, Los Angeles, California 90015.

4       On February 9, 2018, I served the foregoing document described as FIRST AMENDED
DEMAND FOR ARBITRATION AND STATEMENT OF CLAIM FOR: 1. BREACH OF

5   CONTRACT; 2. BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR
DEALING; 3. BREACH OF FIDUCIARY DUTY; 4. CIVIL CONSPIRACY TO COMMIT

6   BREACH OF FIDUCIARY DUTY; 5. MISAPPROPRIATION OF TRADE SECRETS IN
VIOLATION OF DEFEND TRADE SECRETS ACT; 6. CIVIL CONSPIRACY TO COMMIT

7   MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF DEFEND TRADE
SECRETS ACT; 7. UNFAIR BUSINESS PRACTICES (Cal. Bus. & Prof. Code § 17200, *et seq.*)

8   on each interested party, as follows:

9             Richard Kim
              Evelozcity, Inc.

10           207 East El Segundo Boulevard
            El Segundo, California 90245

11

12     ☒    (BY PERSONAL SERVICE) I delivered such envelope by hand to the offices of
             each interested party.

13

14   Executed on February 9, 2018, at Los Angeles, California.

       I declare under penalty of perjury under the laws of the State of California that the

15   foregoing is true and correct.

16    NATIONWIDE LEGAL

17   *AURELIAN BELICIU*

18        (Type or print name)                     (Signature)

19

20

21

22

23

24

25

26

27

28

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

10446174

## PROOF OF SERVICE

1

2      I am employed in the County of Los Angeles, State of California. I am over the age of 18
and not a party to the within action. My business address is 1609 James M. Wood Boulevard, 2nd
3   Floor, Los Angeles, California 90015.

4      On February 9, 2018, I served the foregoing document described as FIRST AMENDED
DEMAND FOR ARBITRATION AND STATEMENT OF CLAIM FOR: 1. BREACH OF
5   CONTRACT; 2. BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR
DEALING; 3. BREACH OF FIDUCIARY DUTY; 4. CIVIL CONSPIRACY TO COMMIT
6   BREACH OF FIDUCIARY DUTY; 5. MISAPPROPRIATION OF TRADE SECRETS IN
VIOLATION OF DEFEND TRADE SECRETS ACT; 6. CIVIL CONSPIRACY TO COMMIT
7   MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF DEFEND TRADE
SECRETS ACT; 7. UNFAIR BUSINESS PRACTICES (Cal. Bus. & Prof. Code § 17200, *et seq.*)
8   on each interested party, as follows:

9              Sohel Merchant
              Evelozcity, Inc.
10             207 East El Segundo Boulevard
              El Segundo, California 90245
11

12   ☒     (BY PERSONAL SERVICE) I delivered such envelope by hand to the offices of
              each interested party.
13

14   Executed on February 9, 2018, at Los Angeles, California.

      I declare under penalty of perjury under the laws of the State of California that the
15   foregoing is true and correct.

16   NATIONWIDE LEGAL

17   AURELIAN   JELICIU
18        (Type or print name)                                    (Signature)

19

20

21

22

23

24

25

26

27

28

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

10446174

## PROOF OF SERVICE

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action.  My business address is 1609 James M. Wood Boulevard, 2nd Floor, Los Angeles, California 90015.

On February 9, 2018, I served the foregoing document described as FIRST AMENDED DEMAND FOR ARBITRATION AND STATEMENT OF CLAIM FOR: 1. BREACH OF CONTRACT; 2. BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING; 3. BREACH OF FIDUCIARY DUTY; 4. CIVIL CONSPIRACY TO COMMIT BREACH OF FIDUCIARY DUTY; 5. MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF DEFEND TRADE SECRETS ACT; 6. CIVIL CONSPIRACY TO COMMIT MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF DEFEND TRADE SECRETS ACT; 7. UNFAIR BUSINESS PRACTICES (Cal. Bus. & Prof. Code § 17200, *et seq.*) on each interested party, as follows:

Irving (Bill) Strickland
Evelozcity, Inc.
207 East El Segundo Boulevard
El Segundo, California 90245

X (BY PERSONAL SERVICE) I delivered such envelope by hand to the offices of each interested party.

Executed on February 9, 2018, at Los Angeles, California.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

NATIONWIDE LEGAL

AURELIAN   BELION
(Type or print name)                                              (Signature)

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

10446174

**PROOF OF SERVICE**

1

2      I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action.  My business address is 1609 James M. Wood Boulevard, 2nd

3  Floor, Los Angeles, California 90015.

4      On February 9, 2018, I served the foregoing document described as FIRST AMENDED DEMAND FOR ARBITRATION AND STATEMENT OF CLAIM FOR: 1. BREACH OF

5  CONTRACT; 2. BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING; 3. BREACH OF FIDUCIARY DUTY; 4. CIVIL CONSPIRACY TO COMMIT

6  BREACH OF FIDUCIARY DUTY; 5. MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF DEFEND TRADE SECRETS ACT; 6. CIVIL CONSPIRACY TO COMMIT

7  MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF DEFEND TRADE SECRETS ACT; 7. UNFAIR BUSINESS PRACTICES (Cal. Bus. & Prof. Code § 17200, *et seq.*)

8  on each interested party, as follows:

9            Christoph Kuttner
              Evelozcity, Inc.

10           207 East El Segundo Boulevard
           El Segundo, California 90245

11

12    ☒    (BY PERSONAL SERVICE) I delivered such envelope by hand to the offices of each interested party.

13

14      Executed on February 9, 2018, at Los Angeles, California.

15      I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

16    NATIONWIDE LEGAL

17  *AURELIAN   BELICIU*

18        (Type or print name)             (Signature)

19

20

21

22

23

24

25

26

27

28

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

10446174