QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Charles K. Verhoeven (Bar No. 170151)
  charlesverhoeven@quinnemanuel.com
  David A. Perlson (Bar No. 209502)
  davidperlson@quinnemanuel.com
  James Judah (Bar No. 257112)
  jamesjudah@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California  94111
Telephone:  (415) 875-6600
Facsimile:  (415) 875-6700

  Duane R. Lyons (Bar No. 125091)
  duanelyons@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California  90017
Telephone:  (213) 443-3000
Facsimile:  (213) 443-3100

Attorneys for Plaintiff
FARADAY&FUTURE, INC.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| FARADAY&FUTURE, INC.,<br><br>          Plaintiff,<br><br>     vs.<br><br>EVELOZCITY, INC.,<br><br>          Defendant. | CASE NO. 2:18-CV-00737 DMG (RAOx)<br><br>**FARADAY&FUTURE, INC.'S SUPPLEMENTAL BRIEF IN OPPOSITION TO DEFENDANT EVELOZCITY, INC.'S MOTION TO DISQUALIFY QUINN EMANUEL**<br><br>**FILED UNDER SEAL PURSUANT TO ORDER OF THE COURT DATED MAY 8, 2018** |

1

## <u>TABLE OF CONTENTS</u>

2

<u>Page</u>

3

TABLE OF AUTHORITIES ..........................................................................ii

4

INTRODUCTION ..................................................................................... 1

5

ARGUMENT .............................................................................................3

6

I.   None of the Five Details Mr. Wolstan Struggled to Recall at the
7       April 27 Hearing Qualify as Material Secrets Warranting
        Disqualification ............................................................................ 3

8
        1.   EVelozcity's "Mass Market[ing]" of an Electric Car ...........3
9
10      2.   Mr. Krause and Mr. Kranz Going to EVelozcity ..................4

11      3.   Faraday's Non-Solicitation Agreements ................................5

12      4.   EVelozcity's Use of a Screening Checklist ...........................5

13      5.   EVelozcity's Use of a (Still Unnamed) Recruiter .................6

14  II.  Mr. Wolstan's New Recollections of Specific Details at the April 27
        Hearing Were Not Credible.................................................................7

15  III. Given That Testimony from Both Sides Confirms Nothing Material and
16      Confidential Was Communicated in the December 12 Call, There Is No
        Place for a "Presumption" That Something Else Occurred .....................9

17  CONCLUSION..................................................................................... 10

18

19

20

21

22

23

24

25

26

27

28

UNDER SEAL: FARADAY'S SUPPLEMENTAL MEMORANDUM IN OPPOSITION TO MOTION TO DISQUALIFY

# TABLE OF AUTHORITIES

**Page**

## Cases

*CrossFit Inc. v. JB&AP CFLA BIZ LLC*,
  No. CV 13-01374 DMG (RNBx), 2013 WL 12142635 (C.D. Cal. Oct. 24, 2013) .......................................................................................................... 1

*Credit Suisse First Boston Corp. v. Grunwald*,
  400 F.3d 1119 (9th Cir. 2005) .................................................................. 10

*EEOC v. Peters' Bakery*,
  No. 13-cv-04507-BLF, 2014 WL 7272943 (N.D. Cal. Dec. 22, 2014) ................ 3

*Fremont Indem. Co. v. Fremont Gen. Corp.*,
  143 Cal. App. 4th 50 (2006) ...................................................................... 2

*ITC Textile Ltd. v. J.C. Penney Co.*,
  No. CV 12-2975-DMG (FFMx), 2013 WL 12130554 (C.D. Cal. Dec. 6, 2013) ........................................................................................................ 10

*Kuyou Sports Goods Co. v. Fountain Inc.*,
  No. SACV 17-00426 JVS(KESx), 2017 WL 5172239 (C.D. Cal. June 19, 2017) .................................................................................................... 1, 9

*Laryngeal Mask Co. v. Ambu A/S*,
  No. 07-CV-1988-DMS (NLS), 2008 WL 558561 (S.D. Cal. Feb. 25, 2008) ........................................................................................................ 1

*Med-Trans Corp. v. Cal. City*,
  156 Cal. App. 4th 655, *as modified* (Nov. 19, 2007) ............................ 2, 9

*People ex rel. Dep't of Corps. v. SpeeDee Oil Change Sys., Inc.*.
  20 Cal. 4th 1135 (1999) ......................................................................... 1, 9

*Toyota Motor Sales v. Super. Ct.*,
  46 Cal. App. 4th 778 (1996) ................................................................ 8, 10

## Statutory Authorities

18 U.S.C. § 1833 ......................................................................................... 8

Cal. Bus. & Prof. Code § 16600 ................................................................. 8

## Additional Authorities

Restatement (Third). *Law Governing Lawyers*, § 59 (2000) ........................ 6

Restatement (Third). *Law Governing Lawyers* § 132 (2000) ....................... 2

Faraday and Quinn Emanuel have worked in good faith to accommodate EVelozcity's stated concerns about its confidences:   The two attorneys on the December 12, 2017 pitch call have had no contact with the litigation team, and Faraday has acquiesced in sealed hearings and conditional sealing of materials that often contain no confidential information.   But after two hearings and two rounds of briefing, EVelozcity cannot show material confidences were communicated to Quinn Emanuel. As set forth below, each of the five specific pieces of information EVelozcity now argues qualify as material confidences was publicly known, was not kept confidential from Faraday, and/or is a generic "best practice" that cannot qualify as a material secret.   After two attempts, EVelozcity has not shown that anything said to Quinn Emanuel could cause EVelozcity  prejudice in this case or justify what the Court has termed the "drastic" remedy of disqualification. *See CrossFit Inc. v. JB&AP CFLA BIZ*, 2013 WL 12142635 at *2 (C.D. Cal. 2013).

The Ninth Circuit has made clear the Court has discretion on motions to disqualify and, despite EVelozcity's efforts, this is not a close call.   EVelozcity's supplemental memorandum does not attempt to meet the standard set forth by the California Supreme Court in *SpeeDee Oil*—the standard responsive to the Court's question about an attorney-client relationship:   EVelozcity had to show Mr. Baumann and Ms. Cafferata "knowingly obtain[ed] material confidential information from the client and render[ed] legal advice or services as a result" to be deemed to "represent" EVelozcity for conflict purposes.  20 Cal. 4th 1135, 1148 (1999).   The record is clear they did not.  *See, e.g.*, Baumann Decl. ¶ 10; Cafferata Decl. ¶¶ 5, 9; 4/27/18 Sealed Tr. ("Tr.") 56:21-57:4, 58:13-60:3, 62:4-7, 66:21-67:6.   Further, as made clear in the most recent case from this District addressing preliminary calls with counsel (which EVelozcity does not even cite), Judge Selna's decision in *Kuyou Sports Goods Co. v. Fountain Inc.*, 2017 WL 5172239 at *2 (C.D. Cal. 2017), EVelozcity had to show that Quinn Emanuel received "secrets" that still matter in the litigation.  *Id.* at *3; *see also Laryngeal Mask Co. v. Ambu A/S*, 2008 WL 558561 at *6 (S.D. Cal. 2008) ("[M]atters

of public record or . . . that [] become moot upon filing the lawsuit and the required initial disclosures" are not "confidences that could give . . . a strategic advantage."); *Med-Trans Corp. v. Cal. City*, 156 Cal. App. 4th 655, 667 (2007) (same).

At the April 27, 2018 hearing, Mr. Wolstan tried to support the conclusory statements in his prior declarations about "confidential" information by adding new details about a call four-and-a-half months earlier. His actual memory of the call obviously was fuzzy, and his revelation of new, specific details for the first time on April 27 raised a number of credibility issues. *See infra* pp. 7-8. But even crediting everything Mr. Wolstan said, none of the five bits of information he now says were conveyed can satisfy the disqualification standard:

• EVelozcity's plan to "mass market" an electric vehicle was disclosed on its website in November 2017, and not kept secret from Faraday, *see infra* pp. 3-4;

• Mr. Krause's and Mr. Kranz's plan to compete with Faraday at a company called "EVelozcity" was also not kept secret from Faraday, and was part of a media blitz that resulted in a series of public articles by December 20, 2017;

• Faraday's employee agreements (including their terms and dates) obviously were never secret from Faraday;

• EVelozcity's use of a "best practices" employee checklist, details of which were not discussed, is hardly a secret; it is a well known "best practice"; and

• EVelozcity's use of a (still unnamed) recruiting firm to hire employees is another well known "best practice" that cannot qualify as a material secret.

Nothing above is "material" in the sense that it is "directly at issue in, or ha[s] some critical importance to" this case. *Fremont Indem. Co. v. Fremont Gen. Corp.*, 143 Cal. App. 4th 50, 69 (2006); Restatement (Third) of the *Law Governing Lawyers* § 132 (2000) (it must "materially advance the client's position in the subsequent matter to use [the alleged] confidential information"). EVelozcity has not shown that Quinn Emanuel obtained material secrets that create an unfair advantage now; it has not even tried to meet that standard. The drastic disqualification remedy is unwarranted.

### I.     None of the Five Details Mr. Wolstan Struggled to Recall at the April 27 Hearing Qualify as Material Secrets Warranting Disqualification

Mr. Wolstan conceded that his memory of the December 12 call was imperfect. He was not even able to dispute whether 99% of it had been devoted to Ms. Cafferata "auditioning"[1] and speaking about her experience and the firm's expertise in trade secret and employee mobility cases.   Tr. 26:1-29:17, 56:16-57:4, 61:21-62:1. Nonetheless, Mr. Wolstan claimed for the first time on April 27, that he had shared five specific confidences with Quinn Emanuel.   None of the specifics Mr. Wolstan now claims to have disclosed, however, qualifies as confidential and material:

1. EVelozcity's "Mass Market[ing]" of an Electric Car:  Mr. Wolstan asserted for the first time on April 27 that he had disclosed "the confidential fact that EVelozcity intended to manufacture and sell a mass market electric vehicle."  ECF 85-1, 7. Mr. Wolstan conceded this information was not confidential when he had signed his two declarations, and could not explain why he omitted it from them.  Tr. 33:16-35:19.

Regardless, EVelozcity's plan to mass market an electric vehicle, concededly not confidential now, also was not confidential on December 12.  By November 2017, it was no secret that EVelozcity planned to produce and market electric vehicles.  Id. 35:10-14.  It also was no secret that EVelozcity planned to sell its vehicles to a "mass market," which EVelozcity's public website[2] declared as of November 30, 2017:

---

[1]  EVelozcity misrepresents *EEOC v. Peters' Bakery*, 2014 WL 7272943 (N.D. Cal. 2014), in making the counterintuitive claim that Mr. Wolstan auditioning multiple law firms somehow supports "an inference of disclosure" to Quinn Emanuel.  ECF 85-1, 8-9.  In *Peters' Bakery*, the party seeking disqualification had communicated with several firms, and records from some firms showed they had received confidential information. 2014 WL 7272943 at *6.  The court sensibly concluded that "[o]ne can reasonably infer that . . . [the movant] shared similar information" with other firms.  *Id.*  Here, there is no evidence that Mr. Wolstan shared anything confidential with other firms.

[2]  Mr. Chatterjee's statements at the April 13, 2018 hearing that EVelozcity did not have a public website as of the December 12 call, 4/13/18 Sealed Tr. 7:9-11, are now conceded to have been untrue.  Tr. 31:23-32:2.

1  "EVELOZCITY is an electric vehicle company setting out to change the way the world

2  moves." *Id.* 33:1-15; *see also* Pl.'s Ex. 7.  There is no bigger mass market for electric

3  vehicles than "the world."  Mr. Wolstan also conceded that EVelozcity's plan to mass

4  market electric vehicles had to be public soon because that was "an essential part of the

5  story of who [EVelozcity is] and what [it is] going to be doing." Tr. 36:22-37:23.

6       In fact, EVelozcity's product plans were not even kept confidential from Faraday

7  prior to the December 12 call.  On November 27, 2017, Mr. Krause emailed Mr. Kranz

8  (to a Faraday email address accessible by Faraday), stating EVelozcity's goal was to be

9  associated with "urban, car guys, young, affordable, cool."  Olivar Decl. Ex. A.

10  Mr. Wolstan's April 2018 view that EVelozcity's plan to market an affordable vehicle

11  was secret in December 2017, is a fiction; it was not even hidden from Faraday.

12       2.  Mr. Krause and Mr. Kranz Going to EVelozcity:  On April 27, Mr. Wolstan

13  asserted for the first time that he disclosed "the future plans of Stefan Krause and

14  Ulrich Kranz." ECF 85-1, 7.  Here, too, Mr. Wolstan conceded this information was

15  not confidential at the time he left it out of his two prior declarations, Tr. 41:9-11, and

16  that it inevitably would become public "if the company were to go forward." *Id.* 52:17-

17  20.  Indeed, as of the December 12 call, EVelozcity must have been in the midst of a

18  media campaign to disclose this very information, given that multiple publications

19  touted Mr. Krause's and Mr. Kranz's affiliation with EVelozcity in articles released

20  December 20, 2017.  Olivar Decl. Ex B ("Sources have told *Electrek* that [Mr. Krause]

21  launched his own electric car startup called 'EVELOZCITY.'"); *see also id.* Exs. C-E.

22       Once again, Mr. Krause's and Mr. Kranz's affiliation with EVelozcity had not

23  even been kept confidential from Faraday before December 12, 2017.  In October 2017,

24  Mr. Krause sent an email to an investment banker from his Faraday address confirming

25  "part of the team will leave" and that he had "finished the alternative" to compete with

26  Faraday.  Olivar Decl. Ex. F.  And by November 2017, Mr. Krause sent EVelozcity's

27  name and logos to Mr. Kranz's Faraday email (again available to Faraday), along with

28  his plan to "position and differentiate ourselves from FF."  Olivar Decl. Ex. A.

3. Faraday's Non-Solicitation Agreements:  The third claimed secret is that Mr. Wolstan shared "the terms of a specific nonsolicitation provision that could potentially expose EVelozcity and its employees to liability."  ECF 85-1, 5.  It is undisputed that the non-solicitation clause is in *Faraday's employee agreements*.  Tr. at 21:12-22:13. Faraday's own agreements (including their dates[3]) cannot qualify as confidences for purposes of this motion.  Indeed, EVelozcity concedes elsewhere that what is "known to both parties in the litigation" is not "private or confidential in nature."  ECF 85-1, 6.

Speculation that Faraday *might* bring certain claims was also not confidential.  It was publicly known in November 2017, that Faraday was exploring litigation.  Pl.'s Exs. 3 & 4 (article and press release noting "FF is currently taking legal actions").  And it is not surprising that trade secret and employee mobility are the "types of claims [that might] arise" when employees move to a competitor.  Tr. 58:5-9.  At any rate, Faraday's actual claims were filed and public before Quinn Emanuel became Faraday's counsel.  ECF 1.  There is no suggestion that anything said on December 12, 2017, gave Faraday an unfair advantage in preparing its claims or in this litigation.

4. EVelozcity's Use of a Screening Checklist:  There is no dispute that best practices were discussed on December 12 call, but the consistent testimony has been that discussion of those practices came from Quinn Emanuel.  Mr. Baumann testified— as he and Ms. Cafferata have throughout this proceeding, *see* Tr. 58:13-59:12; Baumann Decl. ¶¶ 10(b)-(c); Cafferata Decl. ¶¶ 5, 9—that *Ms. Cafferata* communicated to Mr. Wolstan onboarding best practices, including "what is best to do when onboarding new employees to a company . . . don't bring trade secrets with you . . . and document [they]'re not bringing trade secrets with [them], have them check their personal accounts."  Tr. 58:19-59:3.  Mr. Baumann denied Mr. Wolstan disclosed "any specific practices that EVelozcity was following" or "share[d] . . . any paperwork that

---

[3]  Although EVelozcity claims that "Ms. Cafferata asked additional details about the timing of the nonsolicitation agreements," ECF 85-1, 5, 9, Mr. Baumann testified that he did not "recall discussing any specific dates of agreements."  Tr. 61:14-19.

1  EVelozcity was using."[4]  *Id.* 59:4-9.  Mr. Wolstan could not recall whether discussion

2  of best practices was initiated by himself or by Ms. Cafferata.  *Id.* 43:4-44:7.

3        Nevertheless, at the April 27 hearing, Mr. Wolstan testified, again for the first

4  time, that he informed Quinn Emanuel that EVelozcity was using certain best

5  employment practices, including a "checklist-screening procedure."  ECF 85-1, 2.

6  Mr. Wolstan said he relayed that EVelozcity was providing each new employee with a

7  "checklist" listing locations that may contain confidential information, such as personal

8  e-mail and cloud accounts, and that each employee was to certify that he or she could

9  not access confidential information in those locations.  Tr. 12:25-13:18.  But even if

10  this testimony is credited, obvious best practices such as those identified are hardly

11  material and confidential.  Thompson Reuters' *Trade Secrets and Confidential*

12  *Information Best Practices at Hiring Checklist*, for example, counsels employers to

13  "[c]reate rules and requirements that discourage new employees from using or

14  disclosing a former employer's trade secret[s]," including "encouraging applicants to

15  conduct an extensive search for any such materials" and "remind[ing] the employee to

16  delete . . . confidential information from . . . electronic device[s]."  Olivar Decl. Ex. G

17  at 4.  It also recommends that the employer obtain employee certifications.  *Id.* at 5.

18  "[G]enerally known" information such as this is not confidential.  Restatement (Third)

19  of the *Law Governing Lawyers* § 59 (2000).

20        5. EVelozcity's Use of a (Still Unnamed) Recruiter:  Mr. Wolstan testified for

21  the first time at the April 27 hearing that he told Quinn Emanuel on December 12, that

22  EVelozcity was using a "third-party recruitment firm."  ECF 85-1, 2; *see also* Tr. 18:4-

23  _____

24      [4]  EVelozcity incorrectly asserts that "nothing supports the notion Mr. Wolstan ever

    solicited advice *about general onboarding*" or "shows he was looking for a second

25  opinion."  ECF 85-1, 3 n.3.  In reality, all four declarations confirm that Mr. Wolstan

    sought advice about general onboarding, *see* Wolstan Decl. ¶ 4; Baumann Decl.

26  ¶¶ 10(b)-(d); Cafferata Decl. ¶¶ 5, 8-9; Wolstan Reply Decl. ¶¶ 4, 7, 9, and Mr. Wolstan

    himself testified that he "was considering retaining another firm for a second look" at

27  onboarding procedures.  Wolstan Reply Decl. ¶ 9.

28

10.  There is no claim that the name of the firm, or any specifics, were ever revealed.[5] Again, this was not mentioned in the prior declarations, and it is contradicted by other evidence.  *E.g.*, Tr. 62:4-7 ("I didn't know there was a third party recruiting firm until it came up right in this hearing."); *see also* Cafferata Decl. ¶ 9; Baumann Decl. ¶ 10(c).

Regardless, use of a recruiting firm is another obvious best practice that is generally known and cannot be considered material and confidential.   Thompson Reuters' *Recruiting and Hiring: A Procedural Checklist*, for example, advises employers to "Consider Engaging a Recruiter."  Olivar Decl. Ex. H at 6-7.  Among the reasons is "[t]he employer may be conducting a confidential search."  *Id.* at 6.  Not only is the generic practice of using a recruiting firm well known, but EVelozcity cannot explain how knowledge that EVelozcity was using a typical practice to safeguard against "baseless" claims could give Faraday an unfair advantage.  Wolstan Reply Decl. ¶ 8; *see also* Tr. 11:20-12:14.

## II.   Mr. Wolstan's New Recollections of Specific Details at the April 27 Hearing Were Not Credible

As shown above, even if taken as true, Mr. Wolstan's testimony does not support disqualification.   But it is important to note that, in contrast to Mr. Baumann and Ms. Cafferata, who testified credibly and whose truthfulness Evelozcity has not questioned, Mr. Wolstan's new testimony about details from the December 12 call was not credible for a number of reasons:

•      On April 27, after two weeks preparing with counsel, Mr. Wolstan testified for the first time to several "new" facts not in either of his prior declarations.

•      Although several of the "new" facts were public as of the filing of his declarations, Mr. Wolstan could not explain why the new details emerged for the first time only at the April 27 hearing.  *See* Tr. 33:16-35:19, 41:9-11.

---

[5]   Mr. Wolstan concededly did not disclose the recruiting firm's identity, the names of employees being recruited, any agreements with the firm or employees, or "the reason [for engaging a recruiter]."  Tr. 21:6-11, 47:21-48:10.

• Mr. Wolstan's notes of the December 12 call—which also did not surface until April 27—support Mr. Baumann's and Ms. Cafferata's version of the call, not Mr. Wolstan's:  they reflect well-known statutory provisions and "best practices" regarding trade secrets and employee mobility.  *Compare* Ex. C ("Copy of notice & prepared documentation.") *with* Tr. 58:13-59:12 (Ms. Cafferata advised best practices include "document[ing new employees a]re not bringing trade secrets"); *compare* Ex. C ("Defense of Trade Secrets Act → change to give notice of immunity → implicates atty's fees and punitive") *with* 18 U.S.C. § 1833 *and* Tr. 56:21-57:4 (Ms. Cafferata "talked about recent changes in the Trade Secrets Act"); *compare* Ex. C ("16.60 → public policy against restrictive mobility") *with* Cal. Bus. & Prof. Code § 16600.[6]

• Mr. Wolstan admitted he was auditioning Quinn Emanuel and that he could not remember enough to dispute that the majority of the call—perhaps even 99%—was devoted to discussing Ms. Cafferata's experience and expertise in trade secret and employee mobility matters.  *See* Tr. 26:1-29:17, 56:16-57:4, 61:21-62:1.

• Mr. Wolstan was at best imprecise regarding details, even details readily available to him.  For example, in his April 9 declaration, Mr. Wolstan swore "Mr. Baumann used the wording, 'free legal advice' in his text to me – they were not my words."  Ex. B ¶ 15.  This misrepresents Mr. Baumann's text, which did not use those words.  Baumann Decl. Ex. A, 5 ("Figured some free research would be useful.").

Although not necessary to deny the motion, the Court should find Mr. Wolstan's testimony adding new details months after the call not credible.  *Toyota Motor Sales v. Super. Ct.*, 46 Cal. App. 4th 778, 783 (1996) ("Credibility [on a motion to disqualify], even when based upon conflicting declarations, is determined by the trial court.").

---

[6]  EVelozcity's argument that some of Mr. Baumann's testimony supports Mr. Woltsan's recollection, ECF 85-1, 3 n.3, ignores most of the record; Mr. Baumann and Ms. Cafferata consistently testified that Mr. Wolstan "did not provide any information about specific hiring practices at EVelozcity" and discussion of best practices was initiated by Ms. Cafferata.  Baumann Decl. ¶ 10(c); Cafferata Decl. ¶ 9. Mr. Wolstan conceded this may have been the case.  Tr. 43:20-44:7.

### III. Given That Testimony from Both Sides Confirms Nothing Material and Confidential Was Communicated in the December 12 Call, There Is No Place for a "Presumption" That Something Else Occurred

As the Court recognized at the April 13 hearing, the key question is "whether or not the communications that were exchanged were in fact confidential." 4/13/18 Sealed Tr. 11:21-24. That is the correct standard for contacts like the December 12 call, as confirmed in *Kuyou Sports Goods*: "[W]here the former contact . . . was a preliminary conversation that did not result in professional employment or services, the party seeking disqualification must show, directly or by reasonable inference, that the attorney acquired confidential information." 2017 WL 5172239, at *3 (quoting *Med-Trans*, 156 Cal. App. 4th at 668 (citing *SpeeDee Oil*, 20 Cal. 4th at 1148-49)).

Because it cannot show anything was communicated beyond "information . . . available to the public or third parties," *id.*, EVelozcity argues for a presumption that conflicts with the actual evidence. It invites the Court to "infer[]" that material secrets were disclosed based on the "'nature' of the relationship." ECF 85-1, 1-2, 8-10. Here, where both sides have testified to the substance of the call, this puts the cart before the horse. Mr. Wolstan purported to testify to the entirety of the communication, straining to provide details that had never before surfaced. Tr. 6:19-53:8. Ms. Cafferata and Mr. Baumann also testified to the substance of the call. Baumann Decl. ¶ 10; Cafferata Decl. ¶¶ 5, 9; Tr. 56:21-57:4, 58:13-60:3, 62:4-7, 66:21-67:6. Because both sides testified to the actual content of the communication, no inferences are left to be drawn; the only question is whether the information actually conveyed qualifies as confidential and material to the ongoing litigation. 4/13/18 Sealed Tr. 11:21-24.

Although whether Quinn Emanuel received actual, ongoing "secrets" is the key issue, the preliminary call on December 12, did not establish an attorney-client relationship. There is no indication Mr. Wolstan ever believed that Quinn Emanuel was EVelozcity's counsel; to the contrary, EVelozcity was represented by Goodwin Procter before and after the call. Tr. 13:23-25, 42:20-22. The Quinn Emanuel attorneys believed EVelozcity had decided to retain its incumbent firm, and that Mr. Wolstan had

obtained "free research" from a friend.  *See id.* 60:4-10, 66:17-67:6; *see also* Baumann Decl. ¶ 12; Cafferata Decl. ¶ 8.  As the Court noted at the April 13 hearing, this distinguishes the Court's prior ruling in *ITC Textile Ltd. v. J.C. Penney Co.*, 2013 WL 12130554 (C.D. Cal. 2013), in which both the attorney and prospective client believed an attorney-client relationship existed.  *Id.* at *3; 4/13/18 Open Tr. at 9:20-10:3.

That Ms. Cafferata and Mr. Baumann provided Mr. Wolstan with generally applicable legal principles ("legal advice") of the sort contained in a CLE seminar or practical legal treatise does not mean anyone at Quinn Emanuel was "heavily involved in the facts," "performed legal work," or "provided their insights about the legal claims and defenses."  ECF 85-1.[7]  The general legal points in the email provided to the Court and the generic "advice" speak for themselves, and do not rise to the level of legal work supporting disqualification. 4/13/18 Open Tr. 5:21-23 (Mr. Baumann's email was advice at "a very high level of generality as to what the basic case law is in this area").

### CONCLUSION

Nothing Mr. Wolstan communicated to Quinn Emanuel on December 12, 2017, qualifies as a material confidence warranting disqualification.  EVelozcity has not met its burden of showing that anything communicated remains a secret and would provide an unfair advantage.  There is no basis for the drastic remedy of disqualification.

DATED:  May 11, 2018

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By: */s/ Harry A. Olivar, Jr.*
_____
Harry A. Olivar, Jr.
Attorneys for FARADAY&FUTURE, INC.

---

[7]  EVelozcity cites two unpublished California appellate decisions, *Allstate Home Loans, Inc. v. Vasquez*, 2005 WL 798189, and *Zizzo v. Superior Court*, 2013 WL 313916—that cannot be cited in this Circuit.  *See CS First Boston Corp. v. Grunwald*, 400 F.3d 1119, 1126 n.8 (9th Cir. 2005) ("[A]n unpublished opinion cannot be cited to or relied on by other courts.").  Beyond the two uncitable cases (both distinguishable in any event), EVelozcity does not support this portion of its argument.