UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| | | | |
|---|---|---|---|
| Case No. | **CV 18-737-DMG (RAOx)** | Date | May 30, 2018 |
| Title | *Faraday&Future, Inc. v. Evelozcity, Inc.* | Page | 1 of 14 |

Present: The Honorable   DOLLY M. GEE, UNITED STATES DISTRICT JUDGE

| KANE TIEN | NOT REPORTED |
|---|---|
| Deputy Clerk | Court Reporter |
| Attorneys Present for Plaintiff(s) | Attorneys Present for Defendant(s) |
| None Present | None Present |

**Proceedings: IN CHAMBERS - [REDACTED] ORDER RE DEFENDANT'S MOTION TO DISQUALIFY COUNSEL FOR PLAINTIFF FARADAY&FUTURE, INC. [46]**

Currently before the Court is Defendant EVelozcity, Inc.'s ("EV") motion to disqualify ("MTD") Quinn Emanuel Urquhart & Sullivan, LLP ("Quinn") as counsel for Plaintiff Faraday&Future, Inc. ("FF") due to an alleged non-waivable conflict of interest. [Doc. # 46.] The motion has been fully briefed and the parties have been heard. [Doc. ## 52 ("Opp'n"), 59 ("Reply"), 66 (minutes of motion hearing), 83 (minutes of evidentiary hearing), 89 ("EV Supp'l Br."), 90 ("FF Supp'l Br.").] The Court now renders its decision.

## I.
## PROCEDURAL BACKGROUND

On January 29, 2018, FF filed suit against EV. [Doc. # 1.] That same day, attorneys Iian D. Jablon, Harry A. Mittleman, and Jonathan B. Waxman of the law firm Irell & Manella LLP ("Irell") entered their appearances on behalf of FF. On February 20, 2018, attorneys from the law firm Goodwin Procter LLP ("Goodwin") appeared on behalf of EV. [Doc. ## 11–15.]

After EV moved to compel arbitration on February 20, 2018 [Doc. # 19], FF filed the operative first amended complaint ("FAC") on March 9, 2018 [Doc. # 25].

On March 9, 2018, Quinn attorneys made appearances in this case on behalf of FF. [Doc. ## 21–24]. On March 12 and 13, 2018, Goodwin attorneys learned of the communications between EV and Quinn attorneys that are central to this motion. Boock Decl. at ¶¶ 4–5 [Doc. # 46-1]. On March 15, 2018, Goodwin attorney Neel Chatterjee notified Quinn of the alleged conflict and demanded that it withdraw as counsel for FF. *Id.* at ¶ 6; *see* Ex. AA to Boock Decl. [Doc. # 46-2] (March 15, 2018 letter).

On March 21, 2018, Irell moved to substitute attorney Charles K. Verhoeven of Quinn as counsel for Plaintiff. [Doc. # 36 ("MTS").] That same day, EV filed an objection and

Case 2:18-cv-00737-DMG-RAO   Document 98   Filed 05/30/18   Page 2 of 14   Page ID #:1091

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 18-737-DMG (RAOx) | Date | May 30, 2018 |
|---|---|---|---|
| Title | *Faraday&Future, Inc. v. Evelozcity, Inc.* | Page | 2 of 14 |

opposition, which indicated EV's intent to file a motion to disqualify Quinn based on the purported non-waivable conflict of interest. [Doc. # 38.] On March 22, 2018, the Court established a briefing schedule such that EV could file any such disqualification motion on an expedited basis. [Doc. # 39.] Therein, the Court stated that it would resolve Irell's request for substitution at the same time as the motion for disqualification. *Id.*

EV filed the instant MTD on March 29, 2018. [Doc. # 46.] The Court has reviewed *in camera* several documents associated with the motion. [Doc. ## 56–57, 63–65 (under seal).]

On April 13, 2018, the Court held a hearing on the MTD, during which counsel for the parties presented argument. [Doc. # 66.] At the hearing, the Court expressed its inclination to deny the motion based on the then-current record. Public Hr'g Tr., April 13, 2018, at 4:13–4:22 [Doc. # 76]. Crediting defense counsel's contention that an evidentiary hearing would materially supplement the record, the Court scheduled an evidentiary hearing at EV's request. Sealed Hr'g Tr., April 13, 2018, at 13:23–14:5 [Doc. # 77 (under seal)].

On April 27, 2018, the Court held an evidentiary hearing on the matter, during which each side presented witnesses. After the hearing, the Court ordered supplemental briefing. [Doc. # 83.] Both sides timely filed supplemental briefs and supporting documents. [Doc. ## 89–92.]

## II.
## FACTUAL BACKGROUND

The underlying action concerns the alleged misappropriation of trade secrets related to FF's artificial intelligence ("AI") electric vehicle technologies. FAC at ¶ 1. Specifically, in the fall of 2017, FF's former employees, Stefan Krause and Ulrich Kranz, began planning their departure from FF and the establishment of a competing enterprise, EV. *See id.* at ¶¶ 8–9. FF contends that EV encouraged and directed former FF employees to copy and take FF's confidential and proprietary technical information and to disclose such information for EV's benefit. *Id.* at ¶¶ 9–10.

Communications between EV in-house lawyers with Quinn attorneys underlie the instant motion. Specifically, they include the December 2017 discussions between EV general counsel Andrew Wolstan, Quinn associate Jack Baumann, and Quinn partner Diane Cafferata, which took place before FF filed suit against EV.[1]

---

[1] EV also introduced evidence of Quinn–EV communications by way of Gchat conversations between Quinn associate, Brad Estes, and EV in-house attorney, Brionna Ned. [Doc. ## 46-9, 52-7–52-9, 57.] EV does not rely on those conversations in support of the MTD. The Court therefore does not address them.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| | | | |
|---|---|---|---|
| Case No. | CV 18-737-DMG (RAOx) | Date | May 30, 2018 |
| Title | *Faraday&Future, Inc. v. Evelozcity, Inc.* | Page | 3 of 14 |

**A.    Facts Known to the Public in November and December 2017**

By mid-November 2017, Krause and Kranz's contentious resignations from FF were public knowledge. *See* Pl's Hr'g Ex. 3 (FF Press Release) at 3 (publicizing on November 10, 2017 Krause's and Kranz's termination from FF and that FF "is currently taking legal actions as a result" of the alleged misconduct); Pl's Hr'g Ex. 4 ("*Verge* Article") at 2–3 (reporting on November 10, 2017 facts about Krause's public response to FF's press release, including that he "h[as] retained legal counsel and will be exploring all options available").[2]

On November 30, 2017, EV's website read, "EVELOZCITY is an electric vehicle company setting out to change the way the world moves." Pl's Hr'g Ex. 7.

As of December 20, 2017, some publications reported that Kranz and Krause, along with "several other high-profile employees," left FF and were starting an electric car start-up called "EVELOZCITY" that would focus on "deliver[ing] the most competitive, capable, connected and clean mobility device for the next generation." Exs. B ("*Electrek* Article"), C ("*Jalopnik* Article") to Olivar Supp'l Decl. [Doc. ## 92-2, 92-3]. The *Electrek* Article reported that "[t]he circumstance surrounding [EV] is apparently directly linked to Krause's departure from FF;" Krause "was able to raise funds using the groundwork that he had done on the previous deals that he tried to close for FF, but that ended up failing;" and "[EV] is going to be where some of [FF's top] talent is going to end up." *Electrek* Article at 2–4. The article also linked to EV's website. *Id.* at 3. *Jalopnik* pulled several facts from the *Electrek* Article, but also added that public records show EV was incorporated on November 7, 2017 and that the website makes the venture "[s]ound[] very much like a [FF] spin-off." Ex. C at 3–4.

Days later, other publications reported similar news about EV. *See* Exs. D ("*CleanTechnica* Article"), E ("*HybridCars* Article") to Olivar Decl. [Doc. ## 92-4, 92-5]. On December 21, 2017, *CleanTechnica* honed in on EV's marketing of a "clean mobility device" and the "tantalizing ways of inviting" people to apply for a job. *CleanTechnica* Article at 3–4. *HybridCars*' December 22, 2017 publication focused on the website's "Careers" page, noting that when a viewer clicks "Apply" the website automatically composes an e-mail from the user addressed to "careers@evelozcity.com with no further instructions." *See HybridCars* Article at 3.

---

[2] "Courts may take judicial notice of publications introduced to 'indicate what was in the public realm at the time . . . .'" *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010) (quoting *Premier Growth Fund v. All. Capital Mgmt.*, 435 F.3d 396, 401 n.15 (3d Cir. 2006)).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| | | | |
|---|---|---|---|
| Case No. | **CV 18-737-DMG (RAOx)** | Date | May 30, 2018 |
| Title | *Faraday&Future, Inc. v. Evelozcity, Inc.* | Page | 4 of 14 |

**B.     The December 2017 Communications**

On December 6, 2017, before FF filed suit, EV's general counsel, Andrew Wolstan, contacted his childhood friend and Quinn associate, Jack Baumann, by text message to set up an introductory call about a "trade secret and employee mobility" matter for which EV sought, potentially, to retain outside counsel.  Wolstan Decl. at ¶ 3 [Doc. # 46-6]; Baumann Decl. at ¶¶ 2–3 [Doc. # 52-4].  Wolstan requested the call "with the intention of receiving legal advice" and "exploring the retention of Quinn as [EV's] counsel."  Wolstan Reply Decl. at ¶ 7 [Doc. # 59-1].  Baumann responded the following morning, also by text message, and the two spoke briefly over the phone.  Baumann Decl. at ¶ 4; Wolstan Decl. at ¶ 7 (December 7 phone call lasted eight minutes).

During that phone call, Wolstan stated that he and several other FF employees were leaving, or had already left, FF's employ and that FF may bring non-solicitation or trade secret claims against EV.  Bauman Decl. at ¶ 4.  Specifically, EV "was considering hiring additional former FF employees in the future and wanted to understand the legal implications of doing so" and "to ensure it abided by the law and did not run afoul of any legal obligations the employees had with FF or any other company."  Wolstan Decl. at ¶ 5.  Wolstan believed the "information [he] provided [during the phone call] was confidential, and [he] would not have disclosed th[e] information if [he] thought otherwise."  Wolstan Reply Decl. at ¶ 8.  Wolstan asked about the cost of suit and indicated that EV already had outside counsel but that the entity may hire additional counsel if FF brought suit.  Bauman Decl. at ¶ 4.  Wolstan also indicated he wanted to include a partner in a more in-depth discussion.  *Id.* at ¶ 5.

On the morning of December 12, 2017, Wolstan contacted Baumann to set up a phone call for that day because EV "ha[d] a call with investors where [Wolstan] [was] presenting [EV's] outside counsel options . . . for a potential case."  Baumann Decl. at ¶ 7.  They scheduled the conference call for 4:30 p.m.  *Id.* at ¶ 9; Wolstan Decl. at ¶ 11.

Prior to the call, Baumann emailed to Wolstan pre-prepared Quinn marketing materials concerning the firm's successes in defending trade secret and non-solicitation cases, and estimated ranges of litigation costs for trade secret misappropriation cases based on publicly available reports.[3]  *See* Baumann Decl. at ¶¶ 5–9.  Because Wolstan wanted to include a partner in the discussion, Baumann contacted Quinn partner Diane Cafferata, whom Baumann believed "would be a great fit for th[e] case," and Baumann included a link to Cafferata's online firm biography in the email.  *Id.* at ¶¶ 5, 9; Wolstan Decl. at ¶ 10 (alteration in original).  Neither Cafferata nor Baumann conducted any legal research in preparation for the phone call because

---

[3] Wolstan asserts that he did not know the estimated ranges were copied from any other source; he believed the numbers reflected Quinn's defensive costs.  Wolstan Reply Decl. at ¶ 11.

| | | |
|---|---|---|
| CV-90 | **CIVIL MINUTES—GENERAL** | Initials of Deputy Clerk <u>KT</u> |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| | | | |
|---|---|---|---|
| Case No. | CV 18-737-DMG (RAOx) | Date | May 30, 2018 |
| Title | *Faraday&Future, Inc. v. Evelozcity, Inc.* | Page | 5 of 14 |

they understood the call to involve a general discussion of Quinn's capabilities and litigation experience in the relevant practice areas. Baumann Decl. at ¶ 10. Baumann also contends that he never received sufficient information to determine how much money may be at stake in any potential lawsuit. *Id.* at ¶ 9.

The December 12 conference call lasted approximately 43 minutes. Wolstan Decl. at ¶ 11. The parties dispute what was said during the call. The parties' respective versions of what transpired during their conference call are reflected in the hearing transcripts. Therefore, the Court need not repeat those communications here. Suffice it to say that the Court paid close attention to the testimony and has reviewed the transcript in the course of preparing this Order.

After the conference call, Cafferata suggested that Baumann "demonstrate [Quinn's] responsiveness" to the matter by following up with "general" legal research on non-solicitation agreements. Cafferata Decl. at ¶ 10; Baumann Decl. at ¶ 11. Baumann conducted approximately one hour of legal research and prepared an email that summarized general California principles on the enforceability of non-solicitation agreements and the remedies recoverable in such cases. Baumann Decl. at ¶ 11; *see also* Ex. A to Wolstan Decl. at 3–4 [Doc. # 56 (reviewed *in camera*, now under seal)] (Baumann's legal summary of non-solicitation issues discussed during the conference call). Baumann sent the email to Wolstan on December 13, 2017 and copied Cafferata. Baumann Decl. at ¶ 11; Ex. A to Wolstan Decl. at 3–4.

When Baumann did not hear back from Wolstan after sending the December 13 email, Baumann sent Wolstan a text message on December 18, 2017 to confirm receipt. Baumann Decl. at ¶ 12; Ex. A to Baumann Decl. [Doc. # 63 (under seal)] (text message conversation). Wolstan acknowledged receipt. Baumann Decl. at ¶ 12. In response, Baumann stated that he "[f]igured some free research would be useful" and asked Wolstan to "[l]et [Quinn] know if [EV] need[s] anything else from" the firm. *Id.* (first and second alterations in original). Wolstan replied that there was a meeting that day and the following day to discuss a "go forward plan." *Id.* Wolstan did not contact Baumann further about the matter. *Id.* Because Wolstan had indicated that EV already had outside counsel, Baumann assumed Wolstan "had been looking for some free legal research and basic background information from [Baumann] as a friend to prepare for his call." *Id.* Hearing nothing further, Baumann did not follow up with Wolstan again. *Id.*

Ultimately, EV chose not to hire Quinn to represent it. Wolstan Decl. at ¶ 15. Instead, EV retained Goodwin as defense counsel. *See, e.g.*, Boock Decl. at ¶ 1.

On January 30, 2018, Wolstan received a letter from Irell that notified him he could not work on the EV–FF litigation because of his previous employment with FF as a lawyer. *Id.* at

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| | | | |
|---|---|---|---|
| Case No. | **CV 18-737-DMG (RAOx)** | Date | May 30, 2018 |
| Title | *Faraday&Future, Inc. v. Evelozcity, Inc.* | Page | 6 of 14 |

¶ 17; Ex. B to Wolstan Decl. [Doc. # 46-8]. Consequently, Goodwin did not learn of the Wolstan–Quinn communications until March 13, 2018. Boock Decl. at ¶ 4.

Despite their contention that Wolstan disclosed no confidential information, Cafferata and Baumann have been "walled off" from the FF litigation team, and they are prohibited from discussing with any Quinn personnel other than Conflicts Counsel, Harry Olivar, and his associate, Sarah Dubina, any information about the December 2017 communications with Wolstan. Baumann Decl. at ¶ 13; Cafferata Decl. at ¶ 11.

### III.
### LEGAL STANDARD

Courts have "the primary responsibility for overseeing the conduct of the attorneys who appear before it." *San Gabriel Basin Water Quality Auth. V. Aerojet-Gen. Corp.*, 105 F. Supp. 2d 1095, 1101 (C.D. Cal. 2000). Accordingly, the decision to disqualify counsel "is within the trial court's discretion limited by applicable legal principles." *W. Sugar Coop. v. Archer-Daniels-Midland Co.*, 98 F. Supp. 3d 1074, 1080 (C.D. Cal. 2015). Disqualification is a strongly disfavored and "drastic measure," which "should only be imposed when absolutely necessary." *Concat LP v. Unilever, PLC*, 350 F. Supp.2d 796, 814 (N.D. Cal. 2004).

State law governs motions to disqualify counsel. *W. Sugar*, 98 F. Supp. 3d at 1080. This District has adopted the "State Bar Act, the Rules of Professional Conduct of the State Bar of California, and the decisions of any court applicable thereto." C.D. Cal. L.R. 83–3.1.2. As the California Supreme Court said in a seminal case on the subject:

> Ultimately, disqualification motions involve a conflict between the clients' right to counsel of their choice and the need to maintain ethical standards of professional responsibility. The paramount concern must be to preserve public trust in the scrupulous administration of justice and the integrity of the bar. The important right to counsel of one's choice *must* yield to ethical considerations that affect the fundamental principles of our judicial process.

*People ex rel. Dep't of Corp. v. SpeeDee Oil Chang Sys., Inc.*, 20 Cal. 4th 1135, 1145 (1999).

Under California law, "[t]he burden is on the party seeking disqualification to establish the [existence of an] attorney-client relationship." *See Koo v. Rubio's Rests., Inc.*, 109 Cal. App. 4th 719, 729 (2003). "The district court is permitted to resolve disputed factual issues in deciding a motion for disqualification and must make findings supported by substantial evidence." *Visa U.S.A., Inc. v. First Data Corp.*, 241 F. Supp. 2d 1100, 1104 (N.D. Cal. 2003).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| | | | |
|---|---|---|---|
| Case No. | CV 18-737-DMG (RAOx) | Date | May 30, 2018 |
| Title | *Faraday&Future, Inc. v. Evelozcity, Inc.* | Page | 7 of 14 |

## IV.
## DISCUSSION

This motion concerns California Rule of Professional Conduct 3-310(E), which provides that "[a] member [of the State Bar of California] shall not, without the informed written consent of the client or former client, accept employment adverse to the client or former client where, by reason of the representation of the client or former client, the member has obtained confidential information material to the employment." Cal. R. Prof. Conduct RR. 1-100(B)(2) ("member" defined), 3-310(E) (2017).

California legal principles on successive representation are at issue in this case. *See W. Sugar*, 98 F. Supp. 3d at 1080 (disqualification motions generally concern either "successive" or "simultaneous" representation of adverse parties). Successive representation arises where "a former client seeks to have a previous attorney disqualified from serving as counsel to a successive client in litigation adverse to the interests of the first client." *Flatt v. Superior Court*, 9 Cal. 4th 275, 283 (1994). Discussing the ramifications of successive representation under Rule 3-310, the California Supreme Court explained in *Flatt* that

> [w]here the requisite substantial relationship between the subjects of the prior and the current representations can be demonstrated, access to confidential information by the attorney in the course of the first representation . . . is *presumed* and disqualification of the attorney's representation of the second client is mandatory; indeed, the disqualification extends vicariously to the entire firm.

*Id.* According to EV, because there is a substantial—indeed an identical—relationship between the legal and factual issues in this lawsuit and the December 2017 communications, the presumption of access to confidential information applies and Quinn must be disqualified.

While the Court agrees that there is a substantial relationship between the subjects of this lawsuit and Quinn's communications with EV in this matter, that fact does not directly answer the disqualification question in this case. The substantial relationship test presupposes actual representation—*i.e.*, the existence of an attorney–client relationship that gives rise to the fiduciary duties of confidentiality and loyalty. *See Med-Trans Corp., Inc. v. City of Cal. City*, 156 Cal. App. 4th 655, 665–66 (2007) (finding there is "no question" that the attorney's involvement and communications with the purported prior client were "direct and personal" for purposes of deciding whether to apply the substantial relationship test or the modified substantial relationship test, but stating that "before [the court] can determine whether the trial court correctly applied the substantial relationship test in the present case, further analysis is necessary because of the fact that the prior meeting [between attorney and movant] was apparently in the nature of a preliminary consultation which did not result in professional employment of the

Case 2:18-cv-00737-DMG-RAO Document 98 Filed 05/30/18 Page 8 of 14 Page ID #:1097

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 18-737-DMG (RAOx) | Date | May 30, 2018 |
|---|---|---|---|
| Title | Faraday&Future, Inc. v. Evelozcity, Inc. | Page | 8 of 14 |

attorney"); *City Nat'l Bank v. Adams*, 96 Cal. App. 4th 315, 327–28 (2002) (discussion of the presumption of the exchange of confidential information in the context of established attorney–client relations).

California courts have long held that Rule 3-310, and therefore the successive representation presumption, does not apply where the movant fails to establish a fiduciary obligation arising from the attorney–client relationship. *See, e.g.*, *Oaks Mgmt. Corp. v. Superior Court*, 145 Cal. App. 4th 453, 465 (2006) ("[R]ule 3-310 controls conflicts of interest and disqualification motions *only in the context of attorney-client relationships*."); *Koo*, 109 Cal. App. 4th at 729 ("Disqualification was not proper unless an attorney-client relationship existed . . . ."); *Strasbourger Pearson Tulcin Wolff Inc. v. Wiz Tech., Inc.*, 69 Cal. App. 4th 1399, 1404 (1999) ("An attorney-client relationship must have existed before disqualification is proper."); *In re Lee G.*, 1 Cal. App. 4th 17, 27 (1991) ("[Rule 3-310] never becomes applicable where the party seeking the attorney's disqualification fails to establish that such party was or is 'represented' by the attorney 'in a manner giving rise to an attorney–client relationship.'" (quoting *Civil Service Com. v. Superior Court*, 163 Cal. App. 3d 70, 77 (1984))); *Grove v. Grove Valve & Regulator Co.*, 213 Cal. App. 2d 646, 652 (1963) (listing as an exception to professional rules regarding successive representation, "where the relationship of attorney and client was never in fact created between the attorney and the complaining party"); *see also Hicks v. Drew*, 117 Cal. 305, 307–08 (1897) ("The relation of attorney and client, under these circumstances, never existed between the parties, and no disqualification was created by these acts.").

Yet, it is also well-established that, under certain circumstances, "the mere consultation with a prospective client *may* create a disqualifying conflict of interest for a lawyer." *In re Tevis*, 347 B.R. 679, 692 (9th Cir. B.A.P. 2006) (emphasis added); *see SpeeDee Oil*, 20 Cal. 4th at 1147–48 ("The fiduciary relationship existing between lawyer and client extends to preliminary consultations by a prospective client with a view to retention of the lawyer, although actual employment does not result." (quoting *Westinghouse Elec. Corp. v. Kerr-McGee Corp.*, 580 F.2d 1311, 1319 (7th Cir. 1978))).

"The primary concern is whether and to what extent the attorney acquired confidential information." *SpeeDee Oil*, 20 Cal. 4th at 1148. Accordingly, the dispositive inquiry for determining whether "[a]n attorney represents a client[] for purposes of a conflict of interest analysis" is whether "the attorney knowingly obtains material confidential information from the client and renders legal advice or services as a result." *Id.*; *see also Med-Trans*, 156 Cal. App. 4th at 668 ("[F]or purposes of a conflict of interest analysis, where the former contact with the attorney was a preliminary conversation that did not result in professional employment or services, the party seeking disqualification must show, directly or by reasonable inference, that the attorney acquired confidential information in the conversation.").

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| | | | |
|---|---|---|---|
| Case No. | CV 18-737-DMG (RAOx) | Date | May 30, 2018 |
| Title | *Faraday&Future, Inc. v. Evelozcity, Inc.* | Page | 9 of 14 |

Thus, this Court must determine whether Quinn obtained material confidential information from EV attorneys and subsequently offered legal advice or provided legal services. The parties heavily dispute this point. EV argues that Wolstan's pre-suit communications with Baumann and Cafferata established an attorney–client relationship. Quinn counters that EV has failed to carry its burden of showing that it disclosed material confidential information during the preliminary consultation and that Quinn attorneys offered legal advice as a result of any such confidential disclosures.

California's interpretation of confidential information as used in Rule 3-310(E) tracks the California Evidence Code and California Business and Professions Code section 6068(e)(1). *See* Cal. Bar Formal Ethics Opinion 1993-133; Cal. R. Prof. Conduct 3-100(A). Thus, whether EV disclosed confidential information depends on whether Wolstan conveyed information that, "so far as [he] [was] aware," is not disclosed to any third parties, as well as any information "which the client has requested to be inviolate or the disclosure of which might be embarrassing or detrimental to the client" "without regard to the nature and source of the information or the fact that others share the knowledge." Cal. Evid. Code § 952; Cal. Bar Formal Ethics Opinion 1993-133; Cal. Bar Formal Ethics Opinion 1984-84.

Where the allegedly confidential information disclosed during the initial meeting subsequently becomes a matter of public record or is disclosed to third parties, the disqualification movant cannot rely on such disclosures as confidential information that gives rise to an attorney–client relationship. *See Kuyou Sports Goods Co. v. Fountain Inc.*, No. SACV 17-00426 JVS (KESx), 2017 WL 5172239, at *3 (C.D. Cal. June 19, 2017) (concluding that publicly available information does not constitute confidential or secret information for purposes of Rule 3-310(E)); *Laryngeal Mask Co. v. Ambu A/S*, No. 07-CV-1988-DMS (NLSx), 2008 WL 558561, at *6 (S.D. Cal. Feb. 25, 2008) ("[C]ertain statements were matters of public record or concerned issues that would become moot upon filing the lawsuit and the required initial disclosures" and therefore could not "give Defendants . . . a strategic advantage.").[4]

To be "material" for disqualification purposes, the information "must be found to be directly at issue in, or have some critical importance to," the litigation. *Fremont Indem. Co. v. Fremont Gen. Corp.*, 143 Cal. App. 4th 50, 69 (2006).

---

[4] EV contends that the confidentiality inquiry focuses on the nature of the information at the time of its communication, regardless of whether the information is later disclosed to third parties or the public. The authority cited for this proposition pertains to an *existing* attorney–client privilege and is therefore inapposite. *See People v. Clark*, 50 Cal. 3d 583, 621 (1990); *Venture Law Grp. V. Superior Court*, 118 Cal. App. 4th 96, 102 (2004). In contrast, the authority cited above in the Court's decision concerns confidentiality in the context of California Rule of Professional Conduct 3-310(E) and the *SpeeDee Oil* disqualification standard—precisely the issue the Court asked the parties to brief.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 18-737-DMG (RAOx)** | Date | May 30, 2018 |
|---|---|---|---|
| Title | *Faraday&Future, Inc. v. Evelozcity, Inc.* | Page | 10 of 14 |

EV points to this Court's ruling in *ITC Textile Ltd. v. J.C. Penney Co.*, in support of its position and contends that the facts there are analogous to those here. The Court disagrees. In *ITC*, this Court determined that disqualification was mandatory based on the *presumption* of exchange of confidential information. Case No. CV 12-2975-DMG (FFMx), 2013 WL 12130554, at *2–3 (C.D. Cal. Dec. 6, 2013). While *ITC*, like the instant case, involved the question of whether an attorney–client relationship resulted from a preliminary consultation, this Court found dispositive there the fact that "both sides, for at least a brief time, believed that an attorney–client relationship did in fact exist." *Id.* at *2. Indeed, this Court observed that it need not determine whether legal advice was provided, for the purpose of determining whether a *prima facie* attorney–client relationship existed under *SpeeDee Oil*,[5] because of the evidence that both sides believed that one existed. *See id.* Consequently, because "the nature of the representation [was] such that confidences *could have* been exchanged between the lawyer and the client," and because the law firm subject to potential disqualification did not show "that there was *no opportunity* for confidential information to be divulged," the exception to the presumption did not apply. *Id.* at *3 (quoting *City Nat'l Bank*, 96 Cal. App. 4th at 327). Notably, however, the Court's discussion of the application of the presumption followed its express finding that an attorney–client relationship existed. *ITC* therefore does not support disqualification on the facts presented here.

In this case, Wolstan reached out to Baumann because he was interested in possibly retaining Quinn to defend EV in a potential future lawsuit by FF. Wolstan states that he provided Quinn with confidential information on various topics and received legal advice in response.[6] Even if the Court were to credit Wolstan's account of the conference call and the confidential nature of the information allegedly disclosed, the Court concludes that he did not share material confidential information that was not later disclosed through news reports, the

---

[5] This Court quoted *Beery v. State Bar*, 43 Cal. 3d 802, 811–12 (1987), for the proposition that "[w]hen a party seeking legal advice consults an attorney at law and secures that advice[] the relation of attorney and client is established *prima facie*." *ITC*, 2013 WL 12130554, at *2. *SpeeDee Oil* relied upon *Beery* in part when announcing the standard for determining whether an attorney–client relationship exists. *SpeeDee Oil*, 20 Cal. 4th at 1148.

[6] EV also specifically asserts that Quinn provided EV with "a litigation cost estimate[] and a risk assessment," but, as explained above in the Factual Background, the estimate ranges provided came from publicly available sources. MTD at 16. Additionally, Baumann's declaration explains that Wolstan never provided him with sufficient information to determine how much money was at issue, and Wolstan's declaration in support of the Reply does not controvert this statement. Wolstan's belief that the provided litigation estimates were reflective of Quinn's defense costs does not make them so, despite EV's contention to the contrary. *See, e.g.*, *Laryngeal Mask*, 2008 WL 558561, at *8 (cited by EV, Reply at 22) (noting that potential clients' beliefs about the confidential nature of *their* disclosures were reasonable). In any event, the dispositive question here is whether confidential information was in fact disclosed. Only after a finding of such disclosure does the Court consider whether legal services or advice were rendered "as a result." *SpeeDee Oil*, 20 Cal. 4th at 1148.

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| | | | |
|---|---|---|---|
| Case No. | CV 18-737-DMG (RAOx) | Date | May 30, 2018 |
| Title | *Faraday&Future, Inc. v. Evelozcity, Inc.* | Page | 11 of 14 |

parties' conduct, or this lawsuit. For example, Krause's and Kranz's affiliation with EV as well as EV's plans to produce a "mass market" electric vehicle, were in the public realm within eight days after the conference call and over a month before FF filed suit. Further, as Wolstan admitted in the evidentiary hearing, their roles as EV officers were publicly disclosed well before this lawsuit began. *See* Evid. Hr'g at 53:17–20.

In support of its supplemental briefing, FF also points to a November 27, 2017 email from Krause to Kranz, with a third person copied on the email. *See* Ex. A to Bolt Decl. [Doc. # 90-1 (under seal)] (email in original language); Ex. A to Olivar Supp'l Decl. [Doc. # 90-3 (under seal)] (certified English translation). In the email, Krause suggested ███████████ ███████████████████████████████. Ex. A to Olivar Supp'l Decl. ███████████████████████████████████ *Id.* Krause sent the email to Kranz's FF email account, and the email was located on FF's servers and accessible to the party as of the time of its receipt. Bolt Decl. at ¶ 4 [Doc. # 91]. Although this email is not dispositive of the confidential nature of EV's product plans, it shows that before December 12, 2017, FF had access to EV's plans to market an affordable electric vehicle, which Wolstan insists were confidential and unavailable to anyone outside of EV's team. *See Thygeson v. U.S. Bancorp*, No. CV-03-467-ST, 2004 WL 2066746, at *19–20 (D. Or. Sept. 15, 2004) (no reasonable expectation of privacy in emails saved on network employer created and could access).

Relatedly, Krause sent an email from his FF email account on October 28, 2017 that foreshadowed a mass resignation of FF employees. *See* Ex. B to Bolt Decl. [90-2 (under seal)] (email in original language); Ex. F to Olivar Supp'l Decl. [Doc. # 90-4 (under seal)] (certified English translation). The email provides that ███████████████████████████████ ███████████████████████████████ Ex. F to Olivar Supp'l Decl. For the same reasons just discussed, FF therefore had access to allegedly confidential information long before the December 12 call.

Furthermore, information about FF employees' nonsolicitation obligations was never confidential in the first place. EV appears to admit as much. *See* EV Supp'l Br. at 10 ("Nothing about an asset known to both parties in the litigation . . . was private or confidential in nature."). FF and the employees who entered into those agreements have knowledge of the agreements. And those agreements now comprise part of the public record in this case. [*E.g.*, Doc. # 19-3.] Thus, any information Baumann conveyed in the December 19 email about California law regarding employee mobility and nonsolicitation issues does not qualify as legal advice rendered as a result of an attorney's knowing receipt of material confidential information. *See SpeeDee Oil*, 20 Cal. 4th at 1148; *In re Marriage of Zimmerman*, 16 Cal. App. 4th 556, 564 (1993)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| | | | |
|---|---|---|---|
| Case No. | **CV 18-737-DMG (RAOx)** | Date | May 30, 2018 |
| Title | *Faraday&Future, Inc. v. Evelozcity, Inc.* | Page | 12 of 14 |

("While [counsel] may have offered appellant his initial impressions of the case, he obviously was not called upon to formulate a legal strategy and, by the very limited nature of his contact with appellant, could not have gained detailed knowledge of the pertinent facts and legal principles.");[7] *see also Med-Trans Corp.*, 156 Cal. App. 4th at 669 ("To the extent [attorney] offered his opinions about [movant's] ambulance permit application, such unsolicited advice in the context of this limited meeting was obviously no more than his 'initial impressions.'" (quoting *Zimmerman*, *supra*)).

Wolstan's alleged disclosures about EV's hiring and onboarding practices present a closer call. That information certainly consists of well-known employer best practices. *E.g.*, Ex. G to Olivar Supp'l Decl. at 5–6 [Doc. # 92-7] (recommending the employer "[c]reate rules and requirements that discourage new employees from using or disclosing a former employer's trade secret, confidential, or prorprietary information," such as "encouraging applicants to conduct an extensive search for" "thumb drives, PDAs, smartphones, and documents attached to emails and hard copies that include information from the previous employer;" "remind[ing] the employee to delete copies of customer lists or other confidential information from their . . . electronic devices;" and drafting a certification form new employees must sign); Ex. H to Olivar Supp'l Decl. at 7–8 [Doc. # 92-8] (suggesting that companies "[c]onsider [e]ngaging a [r]ecruiter" because "[t]he employer may be conducting a confidential search" for new employees, as well as "[d]ocument[ing] the engagement [of a recruiter] with a service agreement that . . . [i]ncludes confidentiality" and other clauses).

Yet, while Wolstan did not disclose specifics about the recruiting firm's identity, names of recruits, language within the nondisclosure agreements or the EV-recruiter retention agreement, or even why EV hired a recruiter, EV's implementation of such standard hiring and onboarding safeguards appears to be "directly at issue" and of "critical importance"—and therefore material—to the litigation. *Fremont*, 143 Cal. App. 4th at 69; *see* Evid. Hr'g at 22:6–11, 48:21–49:10. Indeed, it seems that such practices would form the basis of EV's defense to FF's trade secrets misappropriation claim. While the confidentiality of this information likely "would become moot upon filing . . . the required initial disclosures," the Court cannot conclusively make such a finding at this early stage of litigation where EV has yet to file an Answer and the parties have not made their initial disclosures or commenced discovery.

---

[7] In its Reply, EV argues that *Zimmerman* is unpersuasive in part because the California Supreme Court in *SpeeDee Oil* "distinguished" the case "and declined to follow it." Reply at 14. Yet, the *SpeeDee Oil* Court found that the *Zimmerman* Court "properly focused on whether the woman [movant] established, directly or by reasonable inference, that in the telephone conversation [counsel] acquired confidences." *SpeeDee Oil*, 20 Cal. 4th at 1148–49. Ultimately, the Supreme Court determined that *Zimmerman* was factually inapposite to the underlying preliminary consultation in the case at bar, but the *SpeeDee Oil* Court spoke approvingly of the Court of Appeal's analysis. *See id.* at 1149.

Case 2:18-cv-00737-DMG-RAO Document 98 Filed 05/30/18 Page 13 of 14 Page ID #:1102

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 18-737-DMG (RAOx)** | Date | May 30, 2018 |
|---|---|---|---|
| Title | *Faraday&Future, Inc. v. Evelozcity, Inc.* | Page | 13 of 14 |

*Laryngeal Mask*, 2008 WL 558561, at *6; *see* Doc. # 67 (included in FF's list of "[d]iscovery [s]ubjects" is "[EV]'s knowledge and encouragement of the activities of its employees who are former FF employees, including but not limited to the downloading and/or copying, of FF's trade secret materials and subsequent disclosure of these materials to [EV]").

In any event, the Court need not analyze the issue further because the Court credits Baumann's and Cafferata's account of the conference call. Their more specific and substantive declarations, as well as their consistent hearing testimony, directly contradict Wolstan's assertions as to the disclosure of confidential information. *See, e.g.*, Evid. Hr'g at 63:4–7 ████████ 68:9–12 ████████. Baumann's email—the purported source of legal advice—further supports Baumann's and Cafferata's account of the preliminary conversations as consisting of a general discussion of California law related to trade secrets and non-solicitation agreements. *See* Ex. A to Wolstan Decl. at 3–4. It appears that, at most, Baumann and Cafferata learned about the non-solicitation provision within FF's employment agreement, which is not confidential as discussed above. Moreover, Cafferata's nearly 20 years of experience as a litigator and her intimate familiarity with Quinn's procedures to avoid conflicts and unintentional confidential disclosures lend substantial credibility to her attestation that she would have used the Quinn Assessment Waiver if the conversation had gone above the level of generality, and to her insistent in-court testimony that Wolstan's conference call disclosures did not rise above such a level. Cafferata Decl. at ¶¶ 2–4; Evid. Hr'g at 67:23–68:1.

Additionally, the discrepancy between Wolstan's veiled and consistently vague declarations (despite the opportunity to provide further specifics *in camera*) and his detailed and forthcoming hearing testimony is troubling. Moreover, his testimony on cross-examination reveals that his beliefs and assertions about what information was or was not publicly known at the time of the conference call, and when certain information became publicly available, are not accurate. *See* Evid. Hr'g at 32:23–35:5 (EV's plans to market electric cars, the existence of and information on its website), 36:10–37:12 (EV's plans to produce mass market electric vehicles), 38:24–43:6 (Krause's and Kranz's termination from FF and affiliation with EV). Given Wolstan's strong recollection on direct examination of very specific information he allegedly disclosed during the conference call, his inability on cross-examination to recall other information about the call and other facts is suspect and strains credulity. *See, e.g., id.* at 30:5–17, 44:4–45:7. The Court has also observed at least one verifiable misrepresentation in Wolstan's declaration that further weakens his credibility. *Compare* Wolstan Reply Decl. at ¶ 15 ("Mr. Baumann used the wording, 'free legal advice' in his text to me—they were not my

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 18-737-DMG (RAOx)** | Date | May 30, 2018 |
|---|---|---|---|
| Title | *Faraday&Future, Inc. v. Evelozcity, Inc.* | Page | 14 of 14 |

words."), *with* Ex. A to Baumann Decl. (the exact wording of Baumann's text message was, ███████████████████████).

Although the Court concludes that Wolstan, Baumann, and Cafferata participated in the December 12 conference call in hopes of establishing an attorney–client relationship at a later point, EV has failed to meet its burden to show that Quinn obtained confidential information through their communications and rendered legal services as a result of that preliminary call. Rather, the communications and resulting emails in this case are more analogous to those non-confidential disclosures and resulting initial impressions in *Zimmerman* and *Med-Trans Corp.*, where the California Courts of Appeal found no exchange of confidential information or resulting legal advice. Thus, no attorney–client relationship was formed as a result of the preliminary contacts, and the substantial relationship test does not mandate disqualification of Quinn as FF's counsel.

## V.
## CONCLUSION

In light of the foregoing, the Motion to Disqualify [Doc. # 46] is **DENIED**, and Irell's Motion to Substitute Counsel [Doc. # 36] is **GRANTED**. The Court reminds both sides of their review obligations under the May 8, 2018 Order [Doc. # 88].

The Court has redacted certain portions of the public version of this Order which were subject to sealing orders. Within 10 days from the date of this Order, the parties shall file a joint report to inform the Court whether the Order should remain in its redacted form or can be unredacted in whole or in part.

**IT IS SO ORDERED.**