# EXHIBIT E

| | |
|---|---|
| 1 | QUINN EMANUEL URQUHART & SULLIVAN, LLP |
| | Charles K. Verhoeven (Bar No. 170151) |
| 2 | charlesverhoeven@quinnemanuel.com |
| | David A. Perlson (Bar No. 209502) |
| 3 | davidperlson@quinnemanuel.com |
| | James Judah (Bar No. 257112) |
| 4 | jamesjudah@quinnemanuel.com |
| | 50 California Street, 22nd Floor |
| 5 | San Francisco, California 94111-4788 |
| | Telephone: (415) 875-6600 |
| 6 | Facsimile: (415) 875-6700 |
| 7 | Duane Lyons (Bar No. 125091) |
| | duanelyons@quinnemanuel.com |
| 8 | 865 S. Figueroa St., 10th Floor |
| | Los Angeles, California 90017 |
| 9 | Telephone: (213) 443-3000 |
| | Facsimile: (213) 443-3100 |

Attorneys for Plaintiff
Faraday&Future, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | | |
|---|---|---|
| FARADAY&FUTURE, INC. | ) | Case No. 2:18-cv-00737 |
| | ) | |
| Plaintiff, | ) | FIRST AMENDED COMPLAINT |
| | ) | FOR MISAPPROPRIATION OF |
| vs. | ) | TRADE SECRETS IN VIOLATION |
| | ) | OF DEFEND TRADE SECRETS |
| EVELOZCITY, INC.; | ) | ACT |
| | ) | |
| Defendant. | ) | |
| | ) | DEMAND FOR JURY TRIAL |

08273-00001/9906698.1

COMPLAINT

**Exhibit E
Page 35**

Plaintiff Faraday&Future, Inc. ("FF"), by and through its counsel of record, hereby alleges as follows:

## I. INTRODUCTION

1. This is an action for misappropriation of trade secrets relating to FF's highly advanced artificial intelligence ("AI") electric vehicle technologies. Founded in May 2014, FF has invested hundreds of thousands of work hours and approximately $1 billion in developing the next generation of AI electric vehicles, also known as smart mobility ecosystems. These cutting-edge vehicles will target many different segments of the consumer vehicle market. Ultimately, FF's mission is to create forward-thinking vehicles that integrate clean energy, artificial intelligence, and the internet. To that end, FF has built from scratch an impressive enterprise staffed with well over 800 employees from the most respected companies in the internet, technology, automotive, aerospace, and energy industries, and FF is presently on track to release its first production vehicle – the high-tech "FF-91" – by the beginning of 2019.

2. Since 2014, FF has focused its efforts and resources on creating a truly unique AI electric vehicle experience that could be compared to spending time in a very high-tech residence. In this regard, the primary similarity between FF's AI electric vehicles and those offered by current consumer vehicle manufacturers is that both are capable of getting a driver and passengers from point A to point B. Beyond that, however, FF is creating a user experience that has never before been offered in a commercially-available vehicle – one in which a very fast, quiet, and environmentally-clean vehicle will drive and park itself, creating an electronic chauffeur-driven experience that frees the "driver" and passengers to focus on things besides the act of driving, and to enjoy in-car amenities that have no close counterpart in current consumer vehicles.

3. Simply put, FF is not just a car manufacturer, but also a cutting-edge technology company that is developing new products that are different than

anything the world has ever seen. The host of trade secrets that FF has developed since 2014 would be highly valuable to any competitor in the electric vehicle space, especially since the market for AI electric vehicles is brand new and evolving quickly. Obtaining some or all of FF's technologies would allow a competitor to unfairly capitalize on FF's tremendous amount of capital investment, allowing the competitor to bypass the expenditure of literally years of development time and approximately $1 billion in research and development costs that FF has put into its venture. Just by way of example, FF has developed valuable trade secrets in proprietary variable platform architecture ("VPA"), battery technology, power-train, safety features, autonomous driving, internet of vehicles technology, and proprietary software and source code. FF also has valuable trade secrets in its financial and business information including, but not limited to, confidential information regarding FF's costs, materials, vendors, and business plans. All of this information has taken FF substantial time and money to develop, and has been the subject of FF's reasonable and diligent efforts to maintain secrecy. Obtaining all or any of this information would be extremely valuable to competitors.

4. FF's business has already achieved substantial milestones. In January 2017 at the Consumer Electronics Show in Las Vegas, FF debuted a prototype of its initial vehicle, the FF-91, which is designed to compete with the top electric cars on the market today, boasting 1050 horsepower and a zero to 60 mile per hour time of 2.39 seconds. These stats would make the FF-91 the fastest commercially available sports utility vehicle in the world. Since that debut in January 2017, FF has made significant progress on the FF-91, and the updated FF-91 is now on track to be commercially available to the public by the end of the year. In fact, a January 9, 2018 report on the FF-91 by Roadshow relays that the FF-91 will be "one of the coolest looking cars out on the road," and after a test-drive, Roadshow remarked, "acceleration is absolutely remarkable, especially in a car of this size."

5. Moreover, while the FF-91 is FF's current high-end "flagship" vehicle, the proprietary technology and know-how that FF has developed to design, build and market the FF-91 will also be applied to other forthcoming FF vehicles, including future models that are primarily intended for mass-market users. FF has expended substantial resources in developing those other vehicles as well, most of which are still two or more years away from being available to consumers.

6. In or about March 2017, FF hired Stefan Krause ("Krause") to serve as FF's Chief Financial Officer ("CFO"). Krause, who is a citizen of Germany, had previously served as CFO of BMW Group and as the CFO of Deutsche Bank, and was primarily retained by FF to assist the company with fundraising efforts. As one of FF's most senior executives, FF reposed immense trust and confidence in Krause, providing him with broad exposure to the company's most sensitive intellectual property, strategic planning, and other proprietary and confidential information.

7. Soon after hiring Krause, and upon Krause's recommendation, in or about late June 2017, FF hired Ulrich Kranz ("Kranz") to serve as its Chief Technology Officer ("CTO"). Mr. Kranz is also a German national who had previously served as an executive at BMW, and who was a long-term acquaintance of Krause. Just as with Krause, as one of FF's most senior executives, FF reposed immense trust and confidence in Kranz, providing him with broad exposure to the company's most sensitive intellectual property, strategic planning, and other proprietary and confidential information.

8. In the fall of 2017, CFO Krause and CTO Kranz demanded that FF's acting CEO Jia Yueting ("YT") step down and hand over operational control of the company to them. To this end, Krause and Kranz told numerous FF personnel that the company would soon run out of money and that no additional financing would be possible unless YT agreed to step aside. These statements proved to be untrue, as FF did secure additional financing in the fall without YT stepping down. However, even while they continued to negotiate with FF management, Krause and Kranz,

along with a few executives who were loyal to them, began covertly soliciting a large number of FF employees, including several key executives and technical personnel, to leave with them and work at defendant EVelozcity, Inc. ("EVelozcity"), a new competing venture that was incorporated in early November 2017 and that is located only a few miles from FF.

9. Beginning around the time of its incorporation in early November 2017, EVelozcity and the former FF executives who started it have surreptitiously solicited at least 20 or more FF employees (many of whom were relatively senior) to leave FF and join EVelozcity. On information and belief, many of the FF employees whom EVelozcity and/or its founders have improperly solicited in turn have improperly copied and taken highly valuable and proprietary FF trade secrets shortly before their respective departures, and then falsely denied to FF personnel that they intended to join EVelozcity. FF is informed and believes that the improperly solicited FF employees have, at EVelozcity's encouragement and direction, copied and taken FF's trade secret and technical information and disclosed and used that information for the benefit of EVelozcity's business. Indeed, it appears that EVelozcity's business plan is to hire as many senior FF personnel as possible, have them copy and take FF's proprietary information that has been developed at great trouble and expense on their way out the door, and then use those trade secrets to unfairly compete with FF.

10. In addition, FF is informed and believes that EVelozcity has deliberately taken and publicly disclosed some of FF's confidential information in order to harm FF. Just recently, portions of a highly sensitive and confidential internal FF document that discusses, among other things, expected pricing and release dates, was leaked on the internet. That leaked document had been created by one of the first former FF employees who joined EVelozcity. On information and belief, EVelozcity encouraged the taking and the subsequent leaking of FF's trade secrets in order to harm FF and to give EVelozcity an unfair advantage.

11. In light of EVelozcity's misappropriation of FF's trade secrets, FF brings this action to prevent any further misuse of its proprietary information and technology, and to obtain compensation for its damages and for EVelozcity's unjust enrichment resulting from EVelozcity's unlawful conduct.

## II. PARTIES

12. Plaintiff Faraday&Future, Inc. is a California company with its principal place of business located in Gardena, California. FF is a global mobility company that develops smart, connected, electric vehicles, and other related technology components.

13. EVelozcity, Inc. is a Delaware company with its principal place of business located in El Segundo, California. EVelozcity purports to be an AI electric vehicle startup company.

## III. JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction over FF's federal trade secret claim pursuant to 18 U.S.C. §§ 1836-39 *et seq.* and 28 U.S.C. §§ 1331 and 1343.

15. This Court has personal jurisdiction over the Defendant by virtue of the fact that the Defendant's principal place of business is located within the Central District of California.

16. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 (b)-(d), and 18 U.S.C. § 1965.

## IV. FACTUAL ALLEGATIONS

**A. FF Invests Substantial Time And Resources In The Development Of Its AI Electric Vehicles And Intellectual Property**

17. Since its formation in 2014, FF has invested hundreds of thousands of work hours and approximately $1 billion in developing a proprietary line of AI electric vehicles and related technology that is expected to become available to the public starting by the end of the year, when FF rolls out its model FF-91 production

vehicle. In preparation to build a full line of advanced AI electric vehicles, the likes of which the world has never seen before, FF has developed highly valuable trade secret technologies and financial and business information. These trade secrets include, just by way of example, FF's proprietary variable platform architecture ("VPA") and VPA2 technology, battery technology, power-train, safety features, autonomous driving, internet of vehicles technology, and proprietary software and source code. FF also has valuable trade secrets in its financial and business information including, but not limited to, confidential information regarding FF's costs, materials, vendors, and business plans.

18. FF takes great care in guarding its proprietary, confidential, and trade secret information and technologies. For example, all FF employees are required to sign robust confidentiality agreements as conditions of their employment at FF. Likewise, access to FF's offices is strictly controlled and monitored. Visitors must have pre-authorization even to enter the company's parking lot, which is secured by fences and security guards, and must then sign confidentiality agreements and submit to being photographed in order to enter FF's offices. Employees likewise must pass through security to access FF's offices, and must have a company-issued keycard in order to move around within the facility. Some particularly sensitive areas at FF's offices are further limited so that only select FF employees may access them. Likewise, FF's computer systems are themselves password and firewall protected, so that only authorized users can access the company's systems. Moreover, sensitive technological information on FF's computer systems is routinely stored such that it is only available to a handful of FF employees with specific need to access the information. FF also requires all contractors, consultants, vendors, investors, and manufacturers to sign confidentiality agreements before any confidential or proprietary trade secret information is disclosed to them.

Case 2:18-cv-00737-DMG-RAO Document 25-1 Filed 06/12/18 Page 15 of 26 Page ID #:509

B.  **EVelozcity Encourages Departing FF Employees To Engage in Wholesale Theft of Trade Secrets and Uses Them in EVelozcity's Business and to Harm FF**

19.  As discussed above, FF hired Krause to serve as its CFO in or about March 2017, and then hired Kranz a few months later to serve as the company's CTO. In his role as FF's CFO, Krause held numerous meetings with potential investors in the summer and fall of 2017. But nearly from the outset, Krause made it clear that he was unhappy with merely serving as CFO, arguing to FF executives that he should instead be promoted to CEO. Then, in the fall of 2017, both Krause and Kranz reported to numerous FF employees that those financing discussions had purportedly hit a dead end, and that no investors would be willing to invest in FF unless the company's acting CEO would agree to step down. Krause and Kranz urged many senior FF employees to join them in demanding that FF's acting CEO step down and allow them to lead a substantial reorganization of the company and its management, even though Krause and Kranz had only been with the company for a few months.

20.  Krause's and Kranz's statements that FF could not obtain funding unless YT gave up control of the company proved to be false. To the contrary, FF did obtain additional financing in November 2017, despite the fact that YT had not stepped down. Though they continued to negotiate with FF's management, Krause and Kranz, along with a handful of other FF executives who were loyal to them, began covertly soliciting multiple FF employees to leave with them and work at Defendant EVelozcity, a new competing venture that was incorporated on or about November 7, 2017, and that is located just a few miles from FF's offices.

21.  On or about November 6, 2017, EVelozcity registered the domain name www.evelozcity.com. That same day, Krause requested that FF's then Senior Director of Human Resources backdate his resignation from FF by approximately two weeks. On information and belief, Krause made this request in an attempt to

cover up the fact that he had been secretly working on behalf of EVelozcity while still employed by FF.

22. On or about November 7, 2017, EVelozcity was officially incorporated with the Delaware Secretary of State by FF's former Senior Corporate Counsel, Andrew Wolstan, who later joined EVelozcity. EVelozcity's publicly-stated mission is to: "Design, develop and deliver the most competitive, capable, connected and clean mobility device for the next generation." In other words, EVelozcity's stated business mission is to compete directly with FF. Moreover, according to a December 20, 2017 news report, "Sources say that [Krause] was able to raise funds [for EVelozcity] using the groundwork that he had done on the previous deals [at FF]." In other words, it appears that Krause and Kranz are funding EVelozcity by soliciting investments from the same investors that they met with in the fall of 2017 when working for FF, and that they are "pitching" those investors and others on technology that Krause and Kranz learned about at FF, and that EVelozcity has stolen from FF.

23. Beginning around the time of its incorporation in early November 2017, EVelozcity and the former FF executives who started it have surreptitiously solicited at least 20 or more FF employees (some of whom were relatively senior executives) to leave FF and join EVelozcity. Based on preliminary forensic analysis, on information and belief, several of the FF employees whom EVelozcity and/or its founders have improperly solicited, copied, and stole highly valuable and proprietary FF trade secrets shortly before their respective departures, and then falsely denied to FF personnel that they intended to join EVelozcity.

24. In particular, based on a preliminary forensic analysis, FF is informed and believes that the improperly-solicited FF employees have, at EVelozcity's encouragement and direction, copied and taken large amounts of FF's trade secret information, and then have disclosed and used that information for the benefit of EVelozcity's business and to the detriment of FF.

08273-00001/9906698.1

Exhibit E[8] - COMPLAINT
Page 43

25. Simply by way of example, William "Bill" Strickland was a senior FF executive whose employment relationship with FF terminated on or about November 17, 2017, and who is now apparently employed by EVelozcity. Shortly before leaving FF for EVelozcity, it appears that Mr. Strickland copied and took potentially *thousands* of FF's most sensitive electronic documents from his FF computer and FF's servers. Forensic analysis has shown that Mr. Strickland accessed and apparently copied onto a portable USB drive and/or a personal Google drive substantial amounts of FF trade secret information that included at least: plans for parts in vehicles, material specs, cost lists, financial spreadsheets, information about FF's proprietary VPA system, confidential power train information, vendor information, and many other categories of confidential and proprietary trade secret information. FF is informed and believes that Mr. Strickland took FF's trade secrets at the encouragement and direction of EVelozcity, and that EVelozcity has wrongfully possessed, disclosed and used FF's trade secrets.

26. In addition, on or about December 15, 2016, in the course of his duties for FF, Mr. Strickland had prepared a "proprietary and confidential" document with a "Program Status Review" of the FF-91. That presentation contained highly confidential and trade secret information regarding, among other things, FF's expected costs and release dates. However, shortly after Mr. Strickland's departure from FF, confidential portions of this presentation were leaked on the internet. In short, it appears that Mr. Strickland illicitly copied and took this document around the time of his departure from FF, and that EVelozcity encouraged the leaking of that secret information to aid EVelozcity and/or to damage FF.

27. Christoph Kuttner was likewise a FF employee, whose employment relationship with FF terminated on December 1, 2017. On information and belief, Mr. Kuttner left FF for the purpose of joining EVelozcity, and is currently employed by EVelozcity. Shortly before leaving FF for EVelozcity, Mr. Kuttner plugged multiple external storage devices into his FF computer and, while they were

inserted, accessed (and apparently copied and took) several files and folders containing trade secret and confidential FF information, including engineering files for several future vehicles in FF's anticipated product line. There was no legitimate reason for Mr. Kuttner to take these files with him and, on information and belief, EVelozcity encouraged and directed Mr. Kuttner to copy and take FF's trade secrets and other confidential information, and EVelozcity is now using them to unfairly compete with FF.

28. Sohel Merchant is yet another former FF employee whose employment relationship with FF terminated on December 1, 2017, and who on information and belief is now employed by EVelozcity. A preliminary forensic analysis has shown that soon before leaving FF for EVelozcity, Mr. Merchant researched on the internet how he could "wipe" particular files from his FF computers. Mr. Merchant then downloaded a program called "Eraser" to perform targeted wipes of both his FF laptop and desktop computers. In addition to "wiping" information from those computers, it appears that Mr. Merchant likely also copied and took a large amount of confidential and proprietary technical information and FF materials on external drives shortly before his departure to EVelozcity. FF is informed and believes that these actions were undertaken to benefit EVelozcity and/or to harm FF.

29. In short, it appears that EVelozcity is attempting to hire as many senior FF personnel as possible, have them copy and take FF's proprietary information that has been developed at great trouble and expense by FF, and then use those trade secrets to unfairly compete with FF. In this regard, EVelozcity has apparently not only encouraged departing FF employees to take trade secret information with them, but has also coached the departed employees to falsely deny to FF personnel (when asked, such as during exit interviews) that they intend to join EVelozcity.

30. EVelozcity, which was formed by former FF executives, knows that disclosure of FF's trade secrets to EVelozcity is highly improper and illegal. On information and belief, however, EVelozcity has used and continues to use FF's trade secrets in EVelozcity's work and/or has disclosed and continues to disclose FF's trade secrets. Moreover, it is apparent from EVelozcity's conduct that it intends to continue to misappropriate FF's confidential and trade secret technology and information.

**C. FF Has Been, And Will Be, Severely Harmed By EVelozcity's Misappropriation Of FF's Confidential And Proprietary Trade Secret Information**

31. FF developed its trade secrets at great expense, and through years of painstaking research, experimentation, and trial and error. Those secrets confer an economic benefit on FF from not being known or readily discoverable by others. EVelozcity has misappropriated FF's trade secrets by encouraging FF employees to take them from FF and bring them to EVelozcity, by disclosing FF's trade secrets without authorization, and by using FF's trade secrets without authorization to benefit EVelozcity's business. This has and will continue to unjustly enrich EVelozcity and cause injury to FF. If EVelozcity is not enjoined from continuing these ongoing acts of misappropriation, EVelozcity will continue to be unjustly enriched and will cause further severe and irreparable harm to FF. Without the Court's intervention, EVelozcity will capitalize unfairly on FF's trade secrets to get a significant and improper head start in its competing venture.

32. There is also a real threat that if EVelozcity is not stopped, then it will cause further wrongful disclosures of FF's confidential and proprietary information, which will destroy the value of FF's trade secrets.

33. With this action, FF seeks to vindicate its rights, preclude any further misuse of its confidential, proprietary, and trade secret information, and obtain

compensation for its damages and for EVelozcity's unjust enrichment resulting from its unlawful conduct.

## FIRST CAUSE OF ACTION

### Violation of Defend Trade Secrets Act

34. FF incorporates all of the above paragraphs as though fully set forth herein.

35. FF owns and possesses certain confidential, proprietary, and trade secret information, as alleged above. Simply by way of example, FF has trade secrets in its proprietary VPA, the variable platform architecture technology that serves as the base of FF's AI electric vehicle. FF's next generation of this VPA (i.e., VPA2) is highly scalable, and therefore can serve as the base for vehicles of different dimensions and sizes. Among other things, VPA2 technology will greatly reduce the production costs and production time for electric vehicles that are built on FF's proprietary base. FF also has highly valuable trade secrets in its battery technology, autonomous driving, internet of vehicles technology, power-train, safety features, and proprietary software and source code related to, among other things, the interaction of electronics within the vehicles. FF similarly has valuable trade secrets in its related financial and business information including, but not limited to, its costs, margins, components, and vendor lists.

36. FF's confidential, proprietary, and trade secret information relates to products and services used, sold, shipped and/or ordered in, or intended to be used, sold, shipped and/or ordered in, interstate or foreign commerce.

37. FF has taken reasonable measures to keep such information secret and confidential. Due to these security measures, FF's confidential and proprietary trade secret information is not available for others to use through any legitimate means.

38. FF's confidential, proprietary, and trade secret information derives independent economic value from not being generally known to, and not being

Case 2:18-cv-00737-DMG-RAO Document 25-7 Filed 06/12/18 Page 14 of 15 Page ID #:815
Case 2:18-cv-00737-DMG-RAO Document 136-7 Filed 09/13/18 Page 14 of 15 Page ID #:1643

readily ascertainable through proper means by, another person who could obtain economic value from the disclosure or use of the information.

39. In violation of FF's rights, EVelozcity misappropriated FF's confidential, proprietary and trade secret information in the improper and unlawful manner as alleged herein. EVelozcity's misappropriation of FF's confidential, proprietary, and trade secret information was intentional, knowing, willful, malicious, fraudulent, and oppressive. EVelozcity has attempted and continues to attempt to conceal its misappropriation.

40. On information and belief, if EVelozcity is not stopped, EVelozcity will continue to misappropriate and use FF's trade secret information for its own benefit and to FF's detriment.

41. As the direct and proximate result of EVelozcity's conduct, FF has suffered and, if EVelozcity's conduct is not stopped, will continue to suffer, severe competitive harm, irreparable injury, and significant damages, in an amount to be proven at trial. Because FF's remedy at law is inadequate, FF seeks, in addition to damages, temporary, preliminary, and permanent injunctive relief to recover and protect its confidential, proprietary, and trade secret information and to protect other legitimate business interests. FF's business operates in a competitive market and will continue suffering irreparable harm absent injunctive relief.

42. FF has been damaged by all of the foregoing and is entitled to an award of exemplary damages and attorney's fees.

**PRAYER FOR RELIEF**

WHEREFORE, FF respectfully requests the following relief:

- Judgment in FF's favor and against EVelozcity on the cause of action alleged herein;
- For damages in an amount to be further proven at trial;
- For preliminary and permanent injunctive relief;
- For judgment that this is an exceptional case;

- 13 -
COMPLAINT
Exhibit E
Page 48
08273-00001/9906698.1

| | |
|---|---|
| 1 | - For punitive damages; |
| 2 | - For restitution; |
| 3 | - For costs of suit incurred herein; |
| 4 | - For prejudgment interest; |
| 5 | - For attorneys' fees and costs; and |
| 6 | - For such other and further relief as the Court may deem to be just and |
| 7 | proper. |

**DEMAND FOR JURY TRIAL**

FF hereby demands trial by jury for its claim and for all issues in this action that are triable as a matter of right to a jury.

DATED: March 9, 2018

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By     */s/ Charles K. Verhoeven*
       Charles K. Verhoeven
       Attorneys for *Faraday&Future, Inc.*

- 14 -
COMPLAINT

08273-00001/9906698.1